UNITED STATES DISTRICT COURT FOR
THE WESTERN DISTRICT OF VIRGINIA

UNDER SEAL

          Plaintiff,

   v.

UNDER SEAL

          Defendant.

COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT (31
U.S.C. §3729, *et seq.*)

JURY TRIAL DEMANDED

FILED UNDER SEAL PURSUANT TO 31 U.S.C. §3730(b)(2)

# DO NOT PLACE ON PACER

UNITED STATES DISTRICT COURT FOR
THE WESTERN DISTRICT OF VIRGINIA

| | |
|---|---|
| UNITED STATES ex rel. IAN DIXON, KARL QUIST, and SARA STOVALL, | |
| Plaintiff, | 3:20-cv-62 |
| v. | |
| OPTIMA HEALTH PLAN, SENTARA HEALTHCARE and MILLIMAN, INC. | |
| Defendants. | |

COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT (31 U.S.C. §3729, *et seq.*)

JURY TRIAL DEMANDED

FILED UNDER SEAL PURSUANT TO 31 U.S.C. §3730(b)(2)

1

Plaintiffs and *qui tam* relators Ian Dixon, Karl Quist and Sara Stovall ("Relators"), by

their undersigned attorneys, respectfully bring this action to recover damages and civil penalties

on behalf of the United States government ("United States") for violations of the federal False

Claims Act, 31 U.S.C. §§ 3729 et seq. (the "FCA"), by defendants Optima Health Plan

("Optima"), Milliman, Inc. ("Milliman") and Sentara Healthcare ("Sentara")(collectively,

"Defendants"), and allege as follows:

## I.  INTRODUCTION

1.      Relators are Charlottesville citizens who were galvanized into action when

Optima effectively tripled insurance rates in the Charlottesville individual marketplace in 2018,

while also imposing an 81.8% rate increase statewide.  Their advocacy and investigation

revealed how Defendants imposed knowingly fraudulent surcharges, falsified calculations, and

engaged in intentional cost shifting to generate massive illicit profits, almost entirely at the

expense of the United States.  Relators seek to recover on behalf of the United States more than

$200 million in fraudulently generated federal subsidies; to disgorge Optima of its illicit profits;

and to punish Defendants for their fraudulent and unconscionable actions.

## II. SUMMARY OF ALLEGATIONS

2.      In August 2017, Anthem Blue Cross Blue Shield in Virginia ("Anthem")

announced that it was withdrawing from Virginia's individual health-insurance marketplace.

Anthem's announcement left Optima as the only issuer in the individual marketplace across

regions of Virginia, with the opportunity to impose predatory, monopoly pricing on Virginia

residents.

3.      One barrier stood in its way: in order to sell insurance in the marketplace, and to

qualify for federal subsidies, it was required to submit an actuarially certified rate filing

2

demonstrating that its rates were reasonable, and that it would achieve a Medical Loss Ratio ("MLR") of at least 80% -- that is, that at least 80% of the premium dollars it collected would be spent on medical services.

4.    Working hand-in-glove with its actuaries at Milliman, Optima submitted a rate filing purporting to demonstrate that it required a jaw-dropping 81.8% year-over-year statewide rate increase. Just a few weeks earlier, before Anthem left the market, Defendants had certified that Optima needed only a 19% statewide increase. Defendants asserted that even with the 81.8% statewide increase, Optima would achieve an MLR of 85.6%, far exceeding the minimum requirements.

5.    Defendants did not allocate the 81.8% statewide increase equally across the Commonwealth. To protect Optima's home market in Hampton Roads, Defendants imposed a disproportionate share of the rate increase on residents of Charlottesville and other areas outside of Hampton Roads. In Charlottesville, Defendants set rates that were 57.89% more expensive than in Hampton Roads.

6.    With these rates, a typical family of four in Charlottesville was required to pay more than $35,000 for a low-quality plan with a nearly $15,000 annual deductible -- meaning that the family would need to spend more than $50,000 out-of-pocket before Optima's insurance coverage kicked in.

7.    Rates in Charlottesville were the highest in the nation -- 23% higher than the rates in the next most expensive market in the United States.

8.    Relators are ordinary Charlottesville residents who were shocked into action by the unconscionable rates. Determined to protect their families and community, they joined together to investigate and oppose the rate increase. They spent hundreds of hours writing

3

formal and informal letters and e-mails, reviewing documents, making phone calls and holding meetings.

9.      Gradually, they uncovered facts demonstrating that Defendants had knowingly falsified their rate filings in order to produce the 81.8% statewide rate increase and to shift costs away from Optima's home market and onto other areas of the State.

10.     They discovered that, among other things, Defendants had imposed a 25% statewide surcharge on rates and had zeroed out a key calculation of transfer payments, under false pretenses and without any actuarial basis. They discovered that Defendants had imposed a disproportionate rate increase on Charlottesville and other areas of the State in order to advance their competitive interests, in blatant disregard of the regulations prohibiting such price discrimination.  They also discovered that the United States had paid out more than $200 million in premium subsidies to cover Defendants' fraudulent overcharges, which the United States never has recouped.

11.     In one element of the fraud, Defendants imposed a fraudulent 25% across-the-board statewide surcharge that went straight to Optima's bottom line.  In their filing, Defendants claimed that a 25% increase was necessary because, due to a variety of factors, the then-existing uncertainty in the health-care marketplace would drive out healthy subscribers.  They asserted that Optima needed a 25% rate increase to cover the increased "morbidity" costs of the resultant, more sickly population. Defendants claimed that multiple studies supported their conclusion.

12.     Asked to produce such studies, Defendants could not.  No such studies existed.

13.     The single study Defendants could produce merely projected that, if the Affordable Care Act's individual mandate were repealed, then rates might rise by 25% "*in the first full year after repeal*."

4

14.     But the individual mandate had not been repealed at the time of the filing and was not repealed prior to the 2018 rate year. Defendants' rate filing itself did not claim to be based on repeal of the individual mandate. To the contrary, Defendants' rate filing certified it was based on the law that was then in effect, including specifically "the *enforcement* of the individual mandate."

15.     Defendants later admitted that imposing the 25% multiplier for generalized "market uncertainty" was a business judgment made by Optima, not an actuarial judgment of likely costs. There was no increased morbidity from market uncertainty, and the money generated by the 25% surcharge was converted into Optima profits. The United States paid out more than $100 million in increased subsidies for this fraudulent element alone.

16.     Defendants also falsified their calculations of Risk Adjustment Transfer payments. Risk Adjustment Transfer payments are payments insurers make to each other to account for differences in the risk profile of their insured populations. When an issuer projects it will receive Risk Adjustment Payments, the projection reduces the premiums it needs to charge on a dollar-for-dollar basis.

17.     Before Anthem left the market, Defendants filed proposed rates with the Commonwealth which estimated that Optima would receive slightly less than $50 million in Risk Adjustment Transfer payments for the members it projected to enroll.

18.     After Anthem left the market, these members remained with Optima and could still be expected to generate the same Risk Adjustment Transfer payments.

19.     In addition, Optima executives said that its new members, such as those in Charlottesville, would have greater projected risk than its existing members, which should further have increased the projected Risk Adjustment Transfer payments. Even assuming its risk

5

profile had remained constant, Optima was in line to receive slightly less than $100 million in Risk Adjustment Transfer payments in 2018.

20.     With monopoly power in hand, instead of adjusting its calculation to reflect the doubling of its population, Defendants simply zeroed out this projection.

21.     Defendants' rate filing falsely claimed that their zero dollar entry reflected an actuarial projection that Optima's membership would have average risk, and therefore would produce $0 in Risk Adjustment Transfer payments. But Defendants had performed no such projection. Instead, they simply had zeroed out this entry without any actuarial analysis, as if risk adjustment also had been repealed. Zeroing out the Risk Adjustment Transfer payment had the ultimate effect of increasing premiums statewide by nearly $100 million.

22.     When asked later to justify this conclusion, Milliman asserted that since Optima would insure a "sizeable percent" of the market, and therefore would influence marketplace averages, it was reasonable to assume that no risk adjustment transfer would be made.

23.     But under basic mathematic principles, just because an insurer covers a "sizeable portion" of the market does not mean it sets the market average. Such an approach runs counter to the basic principles of averaging.

24.     Optima is in any event a relatively small insurer and provides insurance in only a limited number of Virginia markets. In 2018, it covered less than 17% of the Virginia marketplace. Its market share could not rationally have supported the conclusion that its patient population was of average morbidity.

25.     In addition, if Defendants really had projected that Optima's small market share would set the statewide average, it was required to state this remarkable assumption clearly.

6

26.    Optima ultimately received nearly $100 million in Risk Adjustment Transfer payments.  Defendants' fraudulent Risk Adjustment Transfer projection cost the United States more than $81 million in subsidy overcharges.

27.    Relators also learned that Defendants engaged in knowing fraud when they set rates in Charlottesville that were 57.89% greater than the rates imposed on Hampton Roads.

28.    Insurers such as Optima are permitted to vary prices from one region of a State to another only to reflect differences in the cost of providing care.  They may not vary prices based on residents' pre-existing health conditions (sometimes referred to as "morbidity").  Making geographic adjustments using data that includes morbidity is strictly prohibited under federal rules.

29.    Defendants knew that the difference in the cost of providing care between Charlottesville and Hampton Roads was minimal, and not 57.89%.  Optima's own experience and all the reliable data said so.  Other than Optima, no insurer had ever found Charlottesville's costs even to be above average.

30.    But, as Defendants admitted to Virginia regulators, they made their geographic rate adjustments with the specific purpose of advancing Optima's competitive interests, and *not* based on actuarial calculations.  They saw competitive advantage in keeping premiums low in Hampton Roads, and set about shifting costs to Charlottesville and other areas in order to maximize Optima's competitive position.

31.    Defendants therefore rejected actual historical costs in setting rates.  Instead, they used a cascading series of false computations to produce their desired outcome.

32.    Defendants began by selecting Milliman's Health Cost Guideline ("HCGs") as a basis for calculating geographical differences in rates.  Relators have learned that while Milliman

7

markets that dataset for use in making geographic rate adjustments, the dataset includes morbidity. This fact was well known to each of the Defendants.

33.     Relators provided their information to Virginia regulators, and the regulators concluded that Defendants' certification that the data did not include morbidity was "incorrect." Virginia regulators also said that they never would have approved Defendants' geographic rate adjustments if they knew the adjustments included morbidity.

34.     Relators also learned that the Milliman HCG dataset on which Defendants relied had another significant error. It treats costs generated at regional hospitals as if those costs had been generated by local residents. This mis-allocation of costs has the effect of significantly inflating costs for people who live near academic medical centers (such as Charlottesville residents) who may be assigned the costs of the severely ill or badly injured patients transferred to academic medical centers for treatment.

35.     Defendants' fraudulent shifting of costs did not stop with their use of the improper HCG dataset. Defendants compounded this fraud by further multiplying the HCG factor by Optima's own internal contract rates. These contract rates were substantially influenced by the highly inflated contracts that Optima had entered with affiliated entities under the mutual control of its corporate parent, Sentara Healthcare.

36.     Defendants then utilized one additional calculation to further inflate costs in Charlottesville. Optima's own experience in the Charlottesville individual market in 2016 was limited to a tiny cohort of people, predominantly AIDS patients who took advantage of a particular feature of Optima's insurance plan. The cohort numbered fewer than 100 members in total.

37.     Defendants extrapolated from this tiny cohort with extremely high costs to the general Charlottesville population, which had the effect of even further inflating costs.

38.     By multiplying the already inflated HCG Guidelines factor by the additionally inflated internal contract rates, and then further multiplying the rates by averages generated by Optima's tiny and very ill AIDS cohort, Defendants produced the 57.59% multiplier that generated Charlottesville's astronomical rates.

39.     Defendants were fully aware that their statewide and local rates were fraudulent. Among other things, they doctored the language of the mandatory certification that the federal rules required them to submit with their rate filing.

40.     The mandatory certification required an actuary to state unequivocally that "the [statewide] rates are neither excessive nor deficient."; Milliman did not sign the mandatory, unequivocal certification.

41.     Instead, the Milliman actuary certified only that the rates were neither excessive nor deficient "based on my best estimates of the 2016 market." The failure to certify unconditionally that the rates were not excessive reflected Defendants' understanding that the statewide rates really were excessive, including the 25% surcharge, the zeroing out of Risk Adjustment Transfer payments, and other statewide rate manipulations.

42.     Defendants also doctored the certification of the geographic adjustments, so that it effectively said the opposite of what was required. The certification is set out below, with strikethroughs indicating where Defendants altered the mandatory certification language.

> The geographic rating factors reflect ~~only~~ differences in ~~the~~ costs ~~of delivery (which can include unit cost and provider practice pattern differences)~~ . . ..

43.     The mandatory certification required that the calculation must reflect "only" one thing: differences in the costs of delivery.  Milliman instead certified that the rates "reflect differences in [unspecified] costs," indicating that the rates may have reflected many things, but did not necessarily reflect the costs of delivery.

44.     The doctored certification is consistent with Defendants' efforts fraudulently to drive increased costs to Charlottesville and other areas by including impermissible factors in their calculations in order to advance their competitive interests.

45.     Throughout 2018 and 2019, Relators fought to uncover the truth while Defendants defended the 2018 rates as reasonable.  In August 2018, for example, Optima advised State regulators that its first quarter MLR was 74.9% and likely was rising; but by then it knew that its second quarter MLR was approximately 54% and falling, and that it was unlikely to meet the mandatory 80% MLR threshold.

46.     Then, in October 2019, the federal government released Optima's 2018 MLR percentage.  Rather than the 85.6% MLR which Defendants had certified, Optima's statewide MLR was 49.8%. In Charlottesville, the MLR was less than 40%.

47.     While Optima had projected a profit margin of approximately 8% of total premiums, it instead generated profits of nearly 50% of premiums. Almost half of the policy premiums it received, paid for by individual consumers and the United States, went straight to Optima's bottom line.

48.     In absolute terms, Optima's MLR shortfall was the largest any insurer ever generated under the Affordable Care Act.  While Optima insured less than 17% of the Virginia individual marketplace, its shortfall exceeded the total statewide shortfalls, of all insurers

combined, in every single State. Optima's fraudulent rates generated 13% of the entire nation's

MLR shortfall in 2018, though it insured about 0.6% of the total insured in the individual market.

49.     The cost of Defendants' false and fraudulent rate filing was borne substantially by

the United States Government (the "United States").

50.     The United States subsidizes the purchase of insurance in the Virginia individual

healthcare marketplace. United States subsidies covered more than 83% of the premiums paid to

Optima for the 2018 rate year. Optima bragged frequently about how the cost of its exorbitant

rates were being paid by the United States.

51.     The false and fraudulent filing generated more than $200 million in federal

overpayments in 2018. The United States paid a total of more than $538 million in subsidy

payments for the benefit of Optima in 2018, all made pursuant to its false and fraudulent filing.

52.     The United States never has recouped any of the excess amounts it paid to Optima

as a result of its false and fraudulent filing. Absent relief in this action, it never will.

53.     Relators therefore bring this action to recover damages and civil penalties on

behalf of the United States for Defendants' violations of the FCA.

**III.   PARTIES**

54.     Relator Sara Stovall is a resident of Charlottesville, Virginia. Ms. Stovall works

for a small software company in Charlottesville and is an avid gardener and home chef. Ms.

Stovall and her family purchased health insurance through the individual market from 2013

through 2017.

55.     Relator Ian Dixon is a resident of Charlottesville, Virginia. Mr. Dixon owns and

operates Dixon Mobility LLC — a mobile application development business that publishes

11

public transit apps. He purchased health insurance for his family in the individual insurance market from 2016 to 2017.

56.     Relator Karl Quist is a resident of Charlottesville, Virginia. Mr. Quist is a co-founder and owner of PriceBlink — an online price comparison tool that helps consumers save money when shopping online. He purchased health insurance for his family in the individual insurance market from 2009 to 2019.

57.     Optima Health Plan is a Virginia corporation with a principal place of business at 4417 Corporation Lane, Virginia Beach, VA 23462.

58.     Sentara Healthcare is a Virginia corporation with its principal place of business at 6015 Poplar Hall Drive, Norfolk, VA, 23502.

59.     Sentara is the parent corporation of a large conglomerate of health care providers, including hospitals, medical groups, behavioral centers; insurers, including HMOs and insurance companies; and for-profit, health-care related entities.

60.     Optima is a wholly owned subsidiary of Sentara. Optima offers its health plans only in markets where Sentara affiliates operate health-care entities.

61.     Sentara operates affiliates such as Optima through the use of mirror boards, in which substantially the same directors and officers serve on the affiliated entities.

62.     Sentara causes its subsidiaries to transfer money among different corporate affiliates to meet various goals and requirements.

63.     Milliman, Inc. is a Washington State corporation, with its principal place of business at 1301 5th Ave. Suite 3800 Seattle WA, 98101. It maintains offices throughout the world, including in the Commonwealth of Virginia. Milliman markets itself as an independent

12

risk management, benefits, and technology company, and provides actuarial services to health insurance companies.

## IV.    JURISDICTION AND VENUE

64.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, 42 U.S.C. § 18033 and 31 U.S.C. § 3732, the latter of which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730.

65.    Venue is appropriate in this court pursuant to 31 U.S.C. §3732(a) because Sentara and Optima transact business in this district, and the acts undertaken in violation of the False Claims Act occurred in this district.

## V.    APPLICABLE LAW

### A.    The False Claims Act

66.    Congress originally enacted the FCA during the Civil War and substantially amended the FCA in 1986, in 2009, and 2010, each time to clarify the remedial purposes of the FCA and/or to enhance the ability of the United States to recover losses sustained as a result of fraud against it.

67.    Congress amended the FCA after finding that fraud in federal programs was pervasive and that the statute, which Congress characterized as the primary tool for combating fraud against the government, needed modernization. Additionally, Congress amended the FCA to create incentives for individuals with knowledge of fraud against the government to disclose the information without fear of reprisals or government inaction, and to encourage the private bar to commit legal resources to prosecuting fraud on the government's behalf.

68.    The FCA prohibits, among other things, knowingly making, using, or causing to be made or used any false record or statement material to an obligation to pay or transmit money

13

or property to the Government, or knowingly concealing or knowingly and improperly avoiding

or decreasing an obligation to pay or transmit money or property to the Government. 31 U.S.C. §

3729(a)(1)(G). Any person who violates the FCA is liable for a civil penalty for each violation,

plus three times the amount of the damages sustained by the United States. 31 U.S.C. §

3729(a)(1).

69.     If the government declines to intervene in the action, the relator may proceed with

the case on behalf of the government. 31 U.S.C. § 3730(c)(3).

70.     For purposes of the FCA, a person acts "knowingly" if that person: "with respect

to information (i) has actual knowledge of [the falsity of] the information; (ii) acts in deliberate

ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth

or falsity of the information." 31 U.S.C. § 3729(b)(1). The FCA does not require proof that a

defendant specifically intended to commit fraud. *Id.*

71.     Any person with information about an FCA violation may act as a relator, may

bring a *qui tam* action on behalf of the United States, and may share in any recovery. The FCA

requires that the *qui tam* complaint be filed under seal for a minimum of 60 days (without service

on the defendant during that time) to allow the government time to conduct its own investigation

and to determine whether to join the suit.

**B.      The Affordable Care Act's FCA Provisions**

72.     Under the Affordable Care Act, payments made by, through, or in connection

with a federal Health Exchange are subject to the False Claims Act if those payments include any

Federal funds. 42 U.S.C. § 18033(a)(6)(A).

73.     The civil penalty assessed on any person found liable for violating the False

Claims Act in connection with payments made by, through, or in connection with an Exchange is

14

increased not less than three times and not more than six times the amount of damages sustained by the federal Government. 42 U.S.C. § 18033(a)(6)(B).

    **C.**    **The Affordable Care Act's Statutory Rate Provisions**

    74.    The Affordable Care Act ("ACA") is a comprehensive health care reform law enacted in March 2010.

    75.    The ACA established state-based health exchanges in which individuals and small groups can purchase health insurance coverage.

    76.    The ACA includes provisions intended to make insurance more affordable.

    77.    In one such provision, the federal government provides premium tax credits for households with incomes between 100% and 400% of the federal poverty level.

    78.    In another such provision, the ACA mandates certain Cost Sharing Reductions ("CSR"). Cost-Sharing Reductions require insurers to absorb the cost of certain out-of-pocket expenditures made by lower-income enrollees.

    79.    When the ACA was enacted, it was anticipated that the federal government would reimburse insurers for CSR costs through Congressional appropriations. The appropriations were not passed, and President Trump announced on October 12, 2017 that the federal government no longer would pay CSR subsidies. Insurers remained liable to absorb Cost Sharing Reductions without federal reimbursement.

    80.    As enacted, the ACA also included an individual mandate. The individual mandate required most people to obtain health insurance or pay a tax penalty. The individual mandate was repealed effective 2019.

    81.    To keep rates affordable, the Affordable Care Act also includes Medical Loss Ratio provisions. The MLR provisions require insurance companies to spend at least eighty

percent of premium dollars on medical care. Expenditures on executive salaries, profit, and other administrative expenses are to be capped at an aggregate of twenty percent of total premiums. Any "risk premiums" that an insurer charges are included in administrative expense and subject to the twenty percent aggregate MLR cap on administrative expenses.

82.     The ACA also includes provisions intended to protect subscribers from paying premiums based on pre-existing health conditions, or "morbidity."

83.     To accomplish this goal, the ACA requires that insurers treat each State as a single risk pool, with all State residents paying the same rates. An insurer in the individual market may not discriminate between State residents by charging one group of residents more than another group. Such an insurer may only vary its rates based on age, tobacco use, family size, and geographic differences in the cost of delivering care.

84.     Premium differentials based on geographic differences in the cost of delivering care may include differences in treatment patterns, such as where physicians in one region regularly order a less expensive test than physicians in a different region. Premium differentials based on geographic differences in the cost of delivering care also may include differences in cost, such as those arising from differences in rent and labor costs between Washington, D.C., and rural West Virginia. If an insurer wishes to differentiate between geographic regions based on the cost of delivering care, it must specifically ensure that any cost differentials it identifies are not the product of geographical differences in health conditions, or morbidity. Allowing differentials in morbidity to generate differences in premiums is strictly prohibited.

85.     The ACA also requires that insurers participate in a Risk Adjustment Transfer program. In this program, insurers transfer funds to each other based on the degree of risk in their insured population. This has the effect of neutralizing differences in morbidity between

regions and plans, and allows plans enrolling people with higher morbidity to charge the same average premiums as plans enrolling people with lower morbidity.

86.     The ACA also provides for a process for annual reviews of insurer rate increases, which is described in the next section.

### D.     The Affordable Care Act's Regulatory Rate Setting Provisions

#### 1.  The Federal Rate Review Process

87.     The Affordable Care Act required the Secretary of Health and Human Services, in conjunction with the States, to establish a process for the annual review of unreasonable increases in premiums. 42 U.S.C. § 300gg-94 (West).

88.     The ACA also provided States with substantial funding to develop "Effective Rate Review Programs." 45 C.F.R. § 154.225(b).

89.     The HHS regulations establish minimum standards for an Effective Rate Review Program. 45 C.F.R. § 154.301. To qualify, the State's rate review process must include an examination of the reasonableness of the assumptions used by the insurer to develop the proposed rate increase, and the validity of the historical data underlying the assumptions. *Id.*

90.     In an Effective Rate Review Program, the State's determination of whether a rate increase is reasonable must be made under a standard that is set forth in State statute or regulation. *Id.* An Effective Rate Review Program must address an insurer's Medical Loss Ratio, among other factors. *Id.*

91.     For a State with an Effective Rate Review Program, CMS adopts the State's determination of whether a rate increase is unreasonable.

17

92.     Under the federal regulations, insurers who wish to have their rate increases
approved by a state must submit a "Rate Filing Justification" to the Effective Rate Review
Program.

93.     Part I of the Rate Filing Justification must contain specified data.  In Part II, the
insurers must submit a written description of the rate increase that includes a simple and brief
narrative describing the data and assumptions that were used to develop the rate increase and an
explanation of the most significant factors causing the rate increase. Part III consists of an
actuarial memorandum (the "Actuarial Memorandum") that contains the reasoning and
assumptions supporting the rate filing.  45 C.F.R. § 154.215.

94.     Under the regulations, CMS is required to issue instructions on how to fill out the
Rate Filing Justification. 45 C.F.R. § 154.215.

95.     Pursuant to this regulatory mandate, CMS has published Unified Rate Review
("URR") Instructions that describe how Rate Filing Justifications must be compiled and
submitted.

96.     The URR Instructions also contain specific instructions relating to geographic
adjustments among different regions of a State. In keeping with the strict rules prohibiting
discrimination among different members of a single risk pool, the URR Instructions provide that
geographic factors should only reflect differences in the cost of delivery and may not reflect
differences in morbidity.

97.     The URR Instructions require insurers to explain all the assumptions they make to
calculate Risk Adjustment Transfer payments.

98.     The URR Instructions require that an insurer's Rate Filing Justification must
include a detailed description of how the actuary developed the geographic rating factors,

including specifically a showing of how the actuary ensured that differences in morbidity were not included in the rates. (Geographic adjustments are referred to in the URR as geographic rating factors, and by some regulators as Area Rating Factors or "ARFs." Those terms are used interchangeably herein.)

99.    The URR Instructions also include specific requirements for how insurers are to treat their return on risk. An insurer's Risk Margin is to be treated the same as its Profit Margin. They both are to be entered in an appropriate field in Part I, and described in Part III of the rate filing. The URR Instructions further explain that while entered separately, both "profit" and "risk margin" are an element of administrative expense, and together with all other administrative expenses are subject to the twenty percent aggregate MLR cap.

100.    The URR Instructions also set out the minimum requirements for an actuarial certification. These include a certification that the statewide rate is, without qualification: "neither excessive nor deficient." The URR Instructions further require a certification that the

> geographic rating factors reflect only differences in the costs of delivery (which can include unit cost and provider practice pattern differences) and do not include differences for population morbidity (or rate of illness) by geographic area.

### 2. The Virginia Rate Review Process

101.    HHS has approved the Commonwealth of Virginia to provide an Effective Rate Review Program.

102.    Virginia law vests authority to set rates with the State Corporation Commission ("SCC"). Va. Code § 38.2-316.1 (2016). To be approved by the SCC, the rates must be reviewed and approved by the SCC's Bureau of Insurance ("BOI").

103.    SCC regulations set a minimum MLR of 75%, with up to 25% allowed for administrative expenses.   14 Va. Admin. Code § 5-130-65.

104.     The SCC also has adopted state law requirements for submitting rate justifications
to BOI.   State submissions have some differences in form and content from the submissions
required under the Affordable Care Act.

## VI.    DEFENDANT'S FRAUDULENT PRACTICES

### A.    Defendants Leveraged Optima's Monopoly Position in Virginia to Hike Optima's Rates.

105.     On or about May 1, 2017, Defendants submitted a memorandum to the
Commonwealth of Virginia requesting approval of Optima's 2018 rates, as was required under
Virginia law.   Defendants proposed a statewide increase in rates of 8.1%.   The May
memorandum assigned an ARF multiplier for Charlottesville of 1.26.

106.     On May 2, 2017, the federal House of Representatives passed the American
Health Care Act.   That bill would have repealed substantial portions of the Affordable Care Act,
including the individual mandate.

107.     On July 15, 2017, Defendants filed a revised Commonwealth of Virginia
memorandum requesting approval of 2018 rates.   This memorandum proposed a 19% Statewide
increase in rates.   The July memorandum again assigned an ARF multiplier to Charlottesville of
1.26.

108.     On July 25-27, 2017, four separate bills to repeal and replace the Affordable Care
Act were defeated in the Senate.

109.     In August 2017, Anthem announced that it was withdrawing from Virginia's
individual health-insurance marketplace.

110.     Anthem's withdrawal left Optima as the sole insurer in regions across Virginia.
Defendants now had the opportunity to engage in monopoly pricing of Optima's individual-
market health plans.

20

111.    Optima announced that it would provide insurance coverage only in certain regions in which its affiliate entities provided inpatient services, but not in other areas.

112.    By a filing dated September 15, 2017, Defendants submitted Optima's Rate Filing Justification for 2018. The filing imposed a statewide increase of 81.8%. It also assigned Charlottesville a 1.59 multiplier.

113.    On September 15, 2017, Anthem announced that it had agreed to re-enter the individual insurance marketplace and provide coverage in those areas in which no other insurer offered policies.

**B.    Optima's 2018 Rates Were Shockingly High**

114.    Optima's rates for Virginia as a whole, and for Charlottesville in particular, were shockingly high.

115.    While Optima statewide rates increased by 81.8%, the average national increase was 25%. In Virginia itself, the average increase was 33%, a number made even higher because it included the Optima 81.8% increase.

116.    Defendants imposed a statewide increase of 81.8% even though they forecast that the average morbidity of Optima's insured population would decrease by more than 17%.

117.    The rate increase was unevenly distributed across the State.

118.    Under the rate filing, the same plan that could be purchased for about $22,000 in Hampton Roads could only be purchased in Charlottesville for 1.579 times that amount, or about $35,000.

119.    In a typical scenario, the cost to a family of four purchasing the cheapest available plan went from $940 a month in 2017 under Anthem to $2,920 in 2018 under Optima, more than tripling the rates.

21

## Monthly Premiums for Optima's Cheapest Bronze Plan
$7,200 individual deductible, $14,400 family deductible

| Household | Monthly Premiums 2017 (Anthem) | Monthly Premiums 2018 (Optima) |
|-----------|-------------------------------|-------------------------------|
| 2 Parents (46,48) + 2 Children | $940 | $2,920 |
| 2 Adults (62, 62) | $1,150 | $3,596 |
| 1 Adult (40) | $256 | $800 |

Charlottesville's rates rose 8x faster in 2018 compared to the average 25% increase across the country

120.    The rates Optima charged in Charlottesville's individual market were much greater than the rates Optima charged in Charlottesville's small group market, even though the networks and providers were identical.

121.    While Defendants assigned a 1.579 multiplier to Charlottesville residents seeking coverage in the individual market, it assigned a .97 multiplier to Charlottesville residents in the small group market.

Optima Area Rating Factors Used in its Small Group & Indiv Filings

| Area | Small Group | Individual |
|---|---|---|
| Blacksburg-Christiansburg-Radford VA | 1.037 | |
| Charlottesville | 0.937 | 1.579 |
| Danville | 1.107 | |
| Harrisonburg | 0.984 | 1.265 |
| Kingsport-Bristol-Bristol TN-VA | 0.965 | |
| Lynchburg VA | 0.960 | |
| Richmond VA | 1.040 | 1.404 |
| Roanoke VA-NC | 0.998 | |
| Virginia Beach-Norfolk-Newport News | 0.965 | 1.000 |
| Washington-Arlington-Alexandria | 1.459 | |
| Winchester, VA-WV | 0.986 | |
| Out-of-Area | 1.012 | 1.250 |

| | | |
|---|---|---|
| Ratio - Charlottesville/Hampton Roads | 97% | 158% |

122.     The large difference between Optima's individual market Charlottesville ARF of

1.579 and Optima's small-market Charlottesville ARF of 0.97 were not the result of any real-

world differences in costs.  Optima used identical networks to service both the individual and

small-group market.  According to Optima senior executives and BOI, Optima's agreements with

providers were identical for both networks.

123.     Nevertheless, according to Defendants, identical patients presenting to the same

hospitals, doctors and pharmacies, with identical price lists and networks, were projected to

generate $.97 in treatment if they were enrolled in a small group plan in Charlottesville, and

$1.59 if they were enrolled in an individual plan.

124.     Optima's 1.579 Charlottesville multiplier had the effect of imposing a significant

portion of the 81.8% statewide increase on Charlottesville residents, and reducing the impact of

its increase on Hampton Roads.

## C.     Relators Investigated and Challenged Optima's Rates

125.    Almost immediately after the rates were published, Relators undertook intensive

efforts to investigate and reverse the rate increases.

126.    On or about October 26, 2017, Petitioner Karl Quist wrote to the BOI.  As Mr.

Quist explained:

> I just checked the rates on healthcare.gov and am, frankly, in shock.
>
> Currently my family of 4 pays $940/month for a Healthkeepers Bronze Plan with a $12K deductible. That itself is crazy — much higher than comparable plans in the small business and large group market.
>
> As you know, Anthem withdrew from our market and Optima has entered as the only Insurer.
>
> The cheapest plan available for this market for 2018 will be $2,920/month for my family. Think about that — that's $35,000 per year — and a $24,000 per year INCREASE.
>
> I trust that you've reviewed their rate application closely, and had to be careful since they were the only insurer in certain markets, but I cannot understand any justification for premiums this high. For example, i noticed in their filing Charlottesville is subject to a 58% rate adjustment. On what basis? Our pool is smaller, but are claims really 58% higher than for comparable plans in Hampton Roads?
>
> What are families like ours supposed to do? $35,000/year for insurance that doesn't kick in until we've incurred $14,400 of expenses? Optima has dramatically overpriced its plans.

127.    From then on, Relators repeatedly asked BOI to revise the Optima rates.  They

also repeatedly reached out to federal officials at CMS, who advised them to pursue their

complaints with State officials at BOI.  They engaged in numerous phone calls, written

communications, and meetings with federal and state regulators and Optima officials.  They met

privately and repeatedly with Optima executives, state officials and Milliman-related contacts to

identify the basis of Optima's rate increases.

128.    They also submitted two formal requests to BOI for a review of the rates.

129.    Throughout their investigation, Relators kept federal and state officials informed of the fraud they were uncovering. They asked state regulators to request specific information and helped federal and state officials identify the false and fraudulent nature of Defendants' filings.

130.    After updating federal and state officials, Relators also notified the press of the information that they discovered.

131.    Relators ultimately uncovered the facts demonstrating that the rate filing Defendants had used to generate more than $538 million in federal premium support payments was false and fraudulent, and had generated more than $200 million in United States subsidy overpayments directly resulting from the fraudulent provisions of Defendants' filings.

**D.    Defendants' 2018 Rate Filing Was False and Fraudulent.**

132.    Defendants' 2018 rate filing was false and fraudulent, including the Statewide 81.8% increase and the fraudulently calculated Area Rating Factors.

**1.  *Defendants' Statewide 81.8% Rate Increase Was False and Fraudulent***

133.    As alleged in more detail below, Defendants' statewide 81.8% rate increase was false and fraudulent.  Among other things, Defendants imposed a twenty-five percent surcharge without any legitimate basis; fraudulently zeroed out the Risk Adjustment Transfer payment calculation; and added an 8% trend factor that exceeded reasonable estimates of medical inflation. Defendant's statewide rates were increased further by Sentara and Optima's fraudulent rate inflation.

134.    Defendants further committed fraud and confirmed their fraudulent intent by altering the mandatory certification language in their Rate Filing Justification.

25

### a. Defendant's Imposed a Twenty-Five Percent Surcharge Without Any Legitimate Basis.

135.  Defendants' fraudulent 81.8% statewide rate increase was generated in

substantial part by a fraudulently imposed twenty-five percent statewide surcharge on rates.

136.  Defendants' Actuarial Memorandum falsely asserted that Milliman had

conducted an analysis which determined that, as a result of generalized market uncertainty,

healthy patients would drop out of the ACA marketplace to such an extent that Optima's

average costs per member would increase by 25%.

137.  That section of the Actuarial Memorandum reads as follows:

> In addition to the impact of the service area mix on morbidity, we also
> further considered adjustments that may be needed to reflect a growing
> uncertainty in the marketplace, particularly with respect to various aspects
> of the Affordable Care Act (ACA) that continue to remain uncertain and
> unstable after several months of discussions. Such issues include, but are
> not limited to, the effectiveness / enforceability of the individual mandate,
> stability of available plan options in the marketplace (e.g., carriers exiting
> the market), unknown funding of the CSR subsidies, and preliminary rate
> filings indicating substantial rate actions for 2018 across various
> marketplaces, including Virginia. In addition, given a sizeable portion of
> the Virginia marketplace will lose its current coverage in 2018 and need to
> select a new carrier, there is substantial concern around the cost impact for
> 2018.
>
> In light of these issues, we believe the potential for adverse lapsation and
> selection is increasingly more likely. Based on a review of published studies
> and preliminary 2018 rate filings across various markets it is anticipated
> claim costs could increase 20 to 25% compared to 2016 levels. In setting
> final rates, we used 25.0% additional morbidity, the conservative end of this
> range.
>
> The combined impact of the service area changes, increased membership,
> and the additional morbidity due to market shifts, uncertainty, and adverse
> selection is an overall morbidity factor of 1.033 relative to 2016 experience.
> This adjustment is anticipated to result in projected 2018 costs reflective of
> the market average for Optima's service area.

138.  According to this section, Defendants identified at least four "issues" that created

"market uncertainty" and therefore increased the "potential of adverse lapsation and selection." Based on multiple "studies," the filing "anticipated claims costs could increase up to 25% compared to 2016 levels."

139.    In the final paragraph of the selection above, Defendants further presented the 25% multiplier as an actuarial judgment of "projected 2018 costs reflective of the market average for Optima's service area."

140.    The Virginia regulators understood this provision to mean what it said.  In a March 2018, letter to Optima, they described their understanding:

> On page 6 of your September 1, 2017 Part III Actuarial Memorandum you indicate that you increased projected claims by an additional 25% due to adverse lapsation and selection that may result from growing market uncertainty as a result of issues such as . . ..

141.    Defendants' description of the 25% increase was knowingly false.

142.    According to the documents that Optima and Milliman provided the BOI in response to questions posed by Relators, the only study Milliman relied on to generate the 25% multiplier was a Congressional Budget Office ("CBO") report that analyzed the impact of a House bill that would have effectively repealed the Affordable Care Act.

143.    The CBO study said that the number of people who went uninsured "would be limited initially, because insurers would have already set their premiums for the current year, and many people would have already made their enrollment decisions for the year."

144.    The CBO report then projected that if the House bill repealing the Affordable Care Act was enacted into law, then in the first full policy year *after* repeal, health insurance rates on the exchange would increase by up to 25%.

145.    The CBO report said that the increase in rates would primarily result from repeal of the individual mandate (though rates would also increase from insurers taking advantage of a

27

less competitive environment).

146. The ACA's individual mandate had not been repealed at the time of the rate filing, and would not be repealed for the 2018 rate year

147. At the time of the filing, there was no data or analysis at all to support the conclusion that as a result of market uncertainty, adverse selection and lapsation would produce a 25% increase in costs. To the contrary, after the filing Defendants admitted that the 25% multiplier was based solely on the repeal of the individual mandate, and that it had the effect of artificially inflating 2018 statewide rates by twenty-five percent.

148. More specifically, on January 15, 2018, BOI requested that Milliman "provide quantitative support for this additional 25% morbidity load, including specific references to the published studies which were reviewed and how they are applicable to the current environment in Virginia." In its request, the BOI said it was requesting the information in response to relator's challenge to Optima's rates.

149. In response to this request, and despite repeated further requests, Milliman could identify only the single CBO study which projected up to a 25% increase if the House bill were enacted.

150. By letter dated August 8, 2018, Optima's president Dennis Matheis more clearly stated to BOI the basis for the 25% morbidity factor in the rate filing. According to Matheis, "The rates were set with . . . key assumptions: *The mandate to purchase insurance would end in 2018 which added 25% to premiums.*"

151. The letter continued to explain that "the new federal tax law signed in January 2018 ended the mandate to purchase insurance but that will not go into effect until 2019. *Optima . . . had already priced the mandate change into 2018 premiums. . ..*"

28

152.    Milliman also admitted that the decision to impose the 25% increase was not an actuarial judgment that it had made, but instead a business judgment made by Optima.  In its letters to BOI, it said that "Optima made the business decision" to choose the 25% factor, and referenced "the decision-making process that Optima took in determining a final assumption."

153.    In summary, Defendants pretended that Milliman had undertaken an analysis of likely cost effects that might result from market uncertainty and that Milliman had reached an actuarial conclusion that costs would increase by 25% due to an increase in morbidity.  In fact, Optima had made the decision itself. The only study Defendants had relied upon was a CBO report that projected that in the first full year after repeal of the individual mandate, costs might increase by up to 25%.  Repeal had not yet occurred, and when it later occurred it would not be effective until 2019.

154.    Defendants' knowing fraud ultimately is confirmed by the actuarial certification contained in its 2018 rate filing.  Optima's President told BOI that its 2018 rates were based on *repeal* of the individual mandate.  Yet Optima's 2018 rate filing certified that:

> "The premium rates developed are based upon regulatory and legislative provisions in effect at the time of this filing, including, but not limited to, *the enforcement* of the individual mandate." (emphasis added).

155.    The certification, and the 25% increase, were knowingly false.

### b. Defendants' Zeroing Out of the Risk Adjustment Transfer Payment Was False and Fraudulent.

156.    Defendants also knowingly falsified their treatment of Risk Adjustment Transfer payments calculations, in two separate respects: they fraudulently zeroed out their projection, and falsely described how they arrived at the $0 projection.

157.    When Defendants made their original rate filings with the State of Virginia for

2018, they projected that Optima would receive just under $50 million in Risk Adjustment Transfer payments.

158.     After Anthem left the market, this cohort of members remained with Optima. The associated $50 million in forecasted Risk Adjustment Transfer payments should have remained in place.

159.     In addition, Optima effectively doubled its membership. Senior executives at Optima frequently asserted that its new members, such as those in Charlottesville, would have much higher morbidity than its existing members. The increased projected morbidity should have further increased projected Risk Adjustment Transfer payments.

160.     Even assuming Optima's relative morbidity only had remained constant, doubling statewide membership should have doubled the amount of Risk Adjustment Transfer payments. Defendants should have projected that Optima would receive slightly less than $100 million in Risk Adjustment Transfer payments in 2018.

161.     In any event, Optima knew that its original cohort of members were projected to produce nearly $50 million in Risk Adjustment Transfer payments

162.     Yet now that Anthem had left the market and Optima had achieved a monopoly, its projected receipts from Risk Adjustment Transfer payments vanished entirely from the Rate Filing Justification. Defendants now projected that Optima would receive $0 in Risk Adjustment Transfer payments. This had the effect of increasing premiums by nearly $100 million.

163.     Defendants' Actuarial Memorandum asserted that the $0 calculation was based on an estimate that Optima's 2018 risk profile would be equal to the statewide average. The Actuarial Memorandum said so explicitly: "we estimate Optima's 2018 risk profile will be similar to the Virginia 2018 individual single-risk pool market average."

164.    The relevant section of the Rate Filing Justification reads as follows:

PROJECTED RISK ADJUSTMENTS per-member-per-month Optima's
2018 risk adjustment estimate is based on anticipated changes in Optima's
risk relative to the statewide average, consideration of the changes to the
risk adjustment model, and actuarial judgement.

In consideration of a sizeable increase in membership, we estimate
Optima's 2018 risk profile will be similar to the Virginia 2018 individual
single-risk pool market average and will only pay the $0.14 per-member-
per-month user fee. . . .Along with the metallic projection, we assume that
members in Optima's new catastrophic plan will also have a risk profile
similar to the state average, resulting in an expected transfer payment of $0.

165.    BOI told Optima in March 2018 that it understood this to mean what it said: that

Optima had "the expectation that [it] will attract a population with market average morbidity."

166.    The Actuarial Memorandum's description of the Risk Adjustment Transfer

calculation was knowingly false. In fact, as Milliman later explained to the BOI in response to

Relators' efforts, it had "no evidence" on which to calculate Optima's relative morbidity. It

simply assumed Optima's morbidity would equal statewide morbidity, due to Optima's share of

the market.

167.    As Milliman said in its letter to BOI:

Anthem's market exit caused us to anticipate the potential for significant
disruption to average premiums and geographic factors underlying the risk
transfer model since Anthem's members comprised a majority of the 2017
marketplace. Based on available information at the time of the rate filing,
Optima had no evidence to support the expectation of a payable or
receivable under these circumstances. Combined with the assumption that
Optima would also have a sizeable percent of the market, and would
therefore influence marketplace averages, it was reasonable to assume that
no risk adjustment transfer payment or receivable would be transferred in
2018.

168.    Thus, while the Actuarial Memorandum asserted that Milliman had calculated

that Optima would have a population with average morbidity, Milliman "had no evidence to

support" any such conclusion. It determined that Optima would have average morbidity because

31

Optima would have a "sizeable percent" of the marketplace.

169.    The Actuarial Memorandum not only falsely described the rate calculation, it also omitted the purported "assumption[s]" that were made in reaching the conclusion. Under the governing URR Instructions, Optima was required to explain all of its assumptions related to Risk Adjustment Transfers:

> Issuers are expected to explain all of their market and plan level assumptions related to the inputs of the HHS payment transfer formula (or alternative State payment transfer formula, if applicable).

170.    If it were true that, as Milliman later asserted, Defendants had zeroed out the Risk Adjustment Transfer calculation because they assumed that Optima's market share set the statewide average, they were required to "explain" this (remarkable) assumption in the Actuarial Memorandum.

171.    Milliman's *post hoc* justification for zeroing out the Risk Adjustment Transfer calculation further highlights that Defendants' rates were falsely calculated.

172.    Defendants knew that Optima's risk profile was worse than the statewide average. They had projected $50 million in payments before Anthem left the market, which was consistent with the per-member amounts Optima received in 2016 and 2017. Their senior executives said that new enrollees such as those in Charlottesville would have a worse risk profile than existing members.

173.    Yet they nevertheless set projected payments to zero based on Optima's "sizeable percent" of the market.

174.    As Optima explanation itself says, an insurer with a "sizeable percent" of the marketplace might "influence marketplace averages," but in no way does it set the average. That is not how averages work.

175.    Optima is in fact a relatively small insurer in the Virginia individual marketplace.

It offers its plans only in a few regions, and does not offer plans in some of the Commonwealth's most populous areas.

176. Optima's 2018 share of the Virginia individual marketplace was approximately 16.66%. Even if Anthem had not re-entered the individual marketplace, and all of Anthem's 2018 subscribers had instead remained un-insured, Optima still would have insured only about 25% of the marketplace.

177. Such a small population is not a basis for setting a statewide average.

178. The Actuarial Standards Board explains when a zeroing out of Risk Adjustment Transfer payments is appropriate based on an insurer's market share:

> If the issuer is large *and has a current membership that is close to that of the total market*, then it is unlikely that its future membership risk level will be significantly different than the market, and in this situation, without other information, the actuary may wish to assume no risk transfers. American Academy of Actuaries, Practice Note on Actuarial Practices Relating to Preparing, Reviewing, and Commenting on Rate Filings Prepared in Accordance with the Affordable Care Act at 15 (emphasis added).

179. Thus, the Standards Board sets two requirements: the issuer must have current membership close to that of the total market, and must have no other information regarding likely risk transfers.

180. That was not the case here. Optima did not have membership close to that of the total market. Its total market share was small. It did have other information by which to make the calculation. Its own experience and prior projection were that it would receive $50 million, before its population doubled and (in its own statements) suffered from greater morbidity. There was no legitimate basis for zeroing out the Risk Adjustment Transfer calculation.

181. In summary, Optima's risk profile was inconsistent with Defendants' zeroing out of the Risk Adjustment Transfer calculation. They nevertheless set the calculation at $0, and

33

then falsely described the $0 calculation as reflecting a projection of anticipated morbidity, when in reality the projection had been based on "no evidence." Their attempt at a *post hoc* justification, that they had set the calculation to zero based on Optima's market share, was nonsensical.

182.    In addition, even if the *post hoc* justification had been reasonable, it came too late. Significant consequences already had attached to Defendants' false explanation of its Risk Adjustment Transfer payment.

183.    On September 15, 2017, Anthem announced it was re-entering the Virginia marketplace. The purported market uncertainty that Milliman's *post hoc* justification posited as a basis for not calculating Risk Transfer Adjustment payments was resolved.

184.    Upon Anthem's announcement that it was re-entering the Virginia marketplace, regulators would not, and legally could not, have approved Defendants' zeroing out of the Risk Adjustment Transfer payment if Defendants had accurately described the assumptions on which it had been made. Defendants' fraud therefore prevented regulators from evaluating the reasonableness of the assumptions used by the Optima, and the validity of the data underlying the assumptions, as the regulations require.

185.    Defendants also had a duty to inform BOI that Defendants' Rate Filing Justification had been based on inaccurate assumptions and was not reliable, and an obligation to withdraw their Rate Filing Justification and re-file with an appropriately calculated Risk Adjustment Transfer payment calculation.

186.    The fraudulent nature and intent of Defendant's Rate Filing Justification is confirmed further by the Rate Filing Justification's treatment of Cost Sharing Reductions.

187.    Virginia regulators issued guidance in 2017 authorizing insurers to assume that

the federal government would not be making CSR payments. Defendants therefore had no incentive to deceive regulators or the public about this assumption.

188.    In that instance, the Actuarial Memorandum clearly explains the assumption regarding the CSR payment. It provides at the outset that:

> The premium rates developed and supported by this Actuarial Memorandum assume that Cost Share Reductions (CSR) will not be funded and therefore are not calculated as described in current regulations and guidance.

189.    The actuarial certification devotes four entire sentences to the CSR, describing in detail Defendants' treatment of the CSR subsidies. The certification concludes its discussion of the CSR subsidies by stating that:

> [Defendants'] approach to rate setting was made allowable, but not prescribed, by the Virginia Bureau of Insurance (BOI) in its August 9, 2017 guidance memo. If these provisions materially change, then these rates may no longer be appropriate and will need to be withdrawn and refiled.

190.    This disclosure demonstrates the approach that Milliman deemed necessary when making a significant assumption that had a substantial rate ramification. It disclosed the important assumption it had made and issued a caveat stating that if the facts underlying the assumption materially changed, then the rate filing would need to be withdrawn and refiled.

191.    Defendants treated the Risk Adjustment Transfer payment very differently. They failed to disclose the purported assumptions on which the calculation supposedly rested, and instead supplied a false and misleading explanation. When the purported but unstated assumption was no longer operative, Defendants made no effort to correct the by-now entirely unjustified calculation.

192.    Defendant's setting of the projected Risk Adjustment Transfers at zero without any actuarial justification at all; their description of this entry as based on actuarial calculations;

their failure to describe their assumptions; their failure to advise regulators specifically about their failure to calculate Risk Adjustment Transfers; and their failure to withdraw or amend their rate filing after Anthem re-entered the marketplace, were, individually and collectively, knowingly false and misleading.

193.    Optima ultimately received more than $93 million in risk adjustment transfers for the 2018 plan year, or $93 million more than it had projected. If Optima had accurately forecast its Risk Adjustment Transfer, its premium increase would have been reduced by that amount.

194.    At least 83% of the cost of Defendants' fraudulent treatment of Risk Adjustment Transfer payment was paid for the United States through the federal subsidy program. As a result of Defendants' fraudulent treatment of Risk Adjustment Transfers, the United States suffered direct damages of at least $81 million.

### c. Defendants Included an 8% Trend Factor That Exceeded Milliman's Estimates of Medical Inflation.

195.    Defendants rate manipulations were further increased by an overstated inflation rate.

196.    Optima projected an 8.1% "trend factor" for medical inflation in 2018. Milliman's own Milliman Medical Index ("MMI") showed that medical trend was 4.7% in 2016 and 4.3% in 2017.

### d. Optima's Statewide Rates Were Inflated Further by Sentara and Optima's Fraudulent Internal Rate Inflation.

197.    Optima offers insurance exclusively in areas in which Sentara owns inpatient healthcare facilities. It negotiates rates directly with Sentara. Optima and Sentara operate with identical or nearly identical boards of directors.

198.    Sentara and Optima have the ability to manipulate their payment arrangement to

generate increased payments under the ACA.

199.    In 2015, Optima incurred approximately $333 per-member-per-month in claims. Over the next two years, its incurred claims nearly doubled, to $644 per-member-per-month in 2017.

200.    Optima's increase in per-member-per-month payments is not explained by changes in the cost of providing care. The national average during that period was essentially flat, increasing only slightly from $333 to $365. During the same period, Anthem's rates in Virginia increased from $278 per-member-per-month to $373 per-member-per-month – not close to the rate at which Optima's rates had increased.



Incurred Claims Per Member Per Month - Individual Market Comparison

201.    As a result, by 2017 Optima was paying 71% more per-member-per-month than was Anthem.

202.    Optima's inflation in per-member-per-month payments continued into 2018.

203.    Approximately half of the differential between Anthem and Optima was attributable to Optima paying higher rates, including to its parent Sentara.

204.    In view of their corporate relationship, Optima's payments to Sentara were not the

37

product of arms-length negotiation.

205. Defendants knew or should have known that the effect of increasing their internal billing rates would be to drive increased costs to the federal government.

206. The other half of the cost differential between Anthem and Optima reflects an increase in reported utilization. The amount attributable to higher utilization primarily was attributable to an increase in the reported severity of cases in facility inpatient (hospital) utilization. Optima reported an increase in severity of 2.5x from the first quarter of 2016 to 2018. Based on Anthem's experience and the experience of other providers nationally, this change is not explained by any legitimate reasons.

207. Optima and Sentara's cost inflation resulted in a significant increase in federal subsidy payments in 2018.

208. If Optima's costs per-member-per-month had increased at the same rate as Anthem's or the national average, federal subsidy payments to Optima in 2018 would have been substantially lower.

### e. Defendants Altered the Mandatory Certification Language to Avoid Certifying that the Rates Were Not Excessive.

209. The federal URR Instructions required Milliman to state unconditionally that "the rates were neither excessive nor deficient."

210. Instead, Milliman certified only that the rates were "neither excessive nor deficient based on my best estimates of the 2016 market." The caveat reflects an intent to avoid certifying unconditionally to the 2018 rates, including an intent to avoid certifying to the reasonableness of the 25% surcharge, the zeroing out of the Risk Adjustment Transfer payments, Optima and Sentara's post-2016 rate manipulations and other fraudulent aspects of the Rate Filing Justification that were not based on estimates of the 2016 market.

38

211.    The altered certification was itself fraudulent, and also serves as evidence of Defendants' fraud in setting the rates.

### 2. *Defendants Knowingly Utilized Fraudulent Area Rate Factors.*

212.    In addition to imposing a fraudulent 81.8% rate increase, Defendants also fraudulently imposed a substantial premium increase in Charlottesville and other areas, in order to protect Optima's home market in Hampton Roads.

213.    Under Defendants' 2018 rates, a policy that could be purchased for about $22,000 in Hampton Roads could only be purchased in Charlottesville for 1.579 times that amount, or about $35,000.

214.    The Charlottesville rates were astronomically high. The rates were 23% higher than in any other market in the country, more than twice the national average, and five standard deviations above the national average.



215.    Defendants knew that healthcare costs in Charlottesville were about the same as they were in Hampton Roads, and not fifty-eight percent greater. All the reliable data said so.

39

216.    Rather than rely on actuarial judgment, Defendants used competitive considerations in setting the Area Rate Factors. They selected the Milliman HCG dataset as a basis for calculating the ARFs, even though the dataset includes morbidity, and exaggerates costs for people living near academic medical centers. They compounded their fraud by then further multiplying the HCG multiplier by Optima's own internally manipulated rates with Sentara. They then further inflated rates by multiplying these rates by a dataset reflecting a tiny but very sick cohort of patients Optima previously had insured in the Charlottesville area.

217.    To cover up what they had done, Defendants fraudulently deceived regulators by hiding their methodology and lying about the dataset. They even doctored the mandatory certification of the ARFs, so that it effectively said the opposite of what was required. They later admitted that they had not complied with the certification requirements in setting the rates.

218.    Ultimately, the BOI determined that even the doctored certification was "incorrect," and that the HCGs did improperly include morbidity.

219.    By shifting costs to Charlottesville and other areas, Defendants significantly increased the proportion of the statewide rate increase that would be borne by the United States.

### a. Defendants Knew their ARFs Did Not Accurately Reflect Differences in the Cost of Delivering Care.

220.    Defendants knew or should have known that healthcare costs in Charlottesville were not 1.579 times greater than in Hampton Roads, but were lower or about the same.

221.    At the time of Optima's filing, no other insurer had ever used an ARF of higher than 1.0 for Charlottesville.

222.    At least four datasets accurately reflected Charlottesville's status as an average to below-average cost area with an ARF of approximately 1.0 or below. These datasets were known or should have been known to Defendants. The datasets include the Virginia All Payers

40

Claim Database; historical costs data of Charlottesville's previous primary insurer, Anthem; Optima's own, small-market data; and Milliman's Medicare payment database.

223.   The Virginia All Payers Claim Database is a program under authority of the Virginia Department of Health that collects paid medical and pharmacy claims for Virginia residents. The database therefore reflects actual, historical costs.

224.   Costs are reflected in the database as a product of utilization and price. According to the database, individual market utilization of services in Charlottesville was 43% lower than the Statewide average. Similarly, according to that database, average prices across all insurers were identical between the Charlottesville and Hampton Roads markets.

225.   Utilizing this database would have produced an ARF for Charlottesville that was approximately equal to or less than the 1.0 multiplier in Hampton Roads.

226.   A second dataset that Defendants knew about came from Anthem. Anthem historically was the primary insurer in the Charlottesville market. Based on historical data, Anthem estimated an ARF of 0.9638 for Charlottesville in the 2018 individual market. For 2017, Anthem calculated an ARF of 0.9285.

227.   Optima later explained to BOI that it had considered and rejected use of Anthem's data because that data conflicted with Optima's own experience. This assertion was false and misleading.

228.   When it filed its 2018 rate filing, Optima had experience in the individual and the small group market by which it could have compared Charlottesville rates relative to other areas.

229.   In the small group market in 2016, it had covered more than 1,000 members in Charlottesville, and their costs were on average nine percent lower than in Hampton Roads.

230.   In the individual market, it had covered fewer than 100 members, many of whom

41

were AIDS patients who, as Optima executives described to Relators, selected Optima because it provided a particular health benefit they desired.

231.    Optima's own small group market experience fully supported Anthem's ARF projections. Relators have obtained data Optima submitted to BOI in redacted form showing Optima's experience in the small group market. The data shows that in 2016, Charlottesville's cost per patient on a risk adjusted basis were nine percent lower than costs in Hampton Roads.

232.    Optima's own individual market experience was not reliable, as it was based on a tiny cohort of very sick patients. Its Rate Filing Justification asserted that this experience should be afforded only minimal weight in setting individual-market rates. BOI later concluded that Optima should not have relied on this cohort at all.

233.    Optima's own experience in the small group market is the third dataset that showed Charlottesville costs to be approximately equal to the statewide average. Optima's own risk adjusted experience in that market showed that costs in Charlottesville were about nine percent lower than in Hampton Roads. This data is supported by Optima's rate filings in the small group market. Optima's 2016 ARF in the Charlottesville small group market was 1.093. In 2017, it was 0.901.

234.    Finally, Defendants rejected a separate Milliman dataset that is based on amounts Medicare pays, which in turn is based on local costs. That dataset too was inconsistent with Defendants' projection of a 1.579 multiplier for Charlottesville.

### b. Defendants Set the ARFs to Advance Their Competitive Position.

235.    Defendants' Rate Filing Justification said very little about how they compiled ARFs. But in its non-ACA filing with the BOI, Defendants admitted using "competitive considerations" in setting the ARFs.

236.     Defendants later made similar admissions to the BOI.

237.     In response to Relators' investigations, the BOI persisted in asking Defendants how they arrived at the rates.

238.     Defendants responded by admitting to BOI that they had taken account of various impermissible considerations in setting geographic area ratings, including competitive considerations.

239.     They also admitted that differences in ARFs were not necessarily the product of actuarial differences.

### c.  Defendants Fraudulently Hid Their Methodology from Regulators.

240.     The URR Instructions required that if Optima engaged in geographic adjustments, it was required to "provide a detailed description of how geographic rating factors were developed."

241.     The detailed description was necessary for Virginia regulators to fulfill their duty to "examin[e] the reasonableness of the assumptions used by the insurer to develop the proposed rate increase, and the validity of the historical data underlying the assumptions." 45 C.F.R. § 154.301.

242.     Defendants' Actuarial Memorandum did not include any description of how geographic rating factors were developed.  The section of the Actuarial Memorandum in which this description should have appeared instead merely parroted the text of the relevant regulation.

243.     At Relators' urging, BOI repeatedly asked Defendants for the required description.  Nevertheless, more than two months after Defendants' rate filing, and after repeated inquiries, BOI stated that,

> To be honest, we are unclear at even the most basic level how the
> Milliman analysis was completed.

43

244.    In response, Defendants provided no new information, and instead directed BOI to look back at previous letters they had provided.  Defendants' failure to provide any additional support for their ARF calculations after being informed that regulators were unclear at even the most basic level of how the analysis was completed further evidences their intent to deceive regulators about the basis on which they calculated ARFs.

245.    Defendants' failure to describe how they developed the Area Rate Factors had the effect of denying regulators the opportunity to evaluate the reasonableness of the assumptions on which Defendants' ARFs were calculated, as the regulations require.

### d. Defendants' Rate Calculations Were Knowingly Fraudulent.

246.    With the prohibited goal of obtaining competitive advantage in mind, Defendants set about calculating rates that were impermissibly based on morbidity, faulty data and internal price manipulations.

247.    First, they relied on the Milliman "Health Cost Guidelines" ("HCGs"), a Milliman dataset that not only included morbidity, but also treated costs generated at regional hospitals as if they had been generated by local residents, with the effect of significantly inflating costs for people who live near academic medical centers.

248.    Defendants then further increased rates by multiplying the HCG data by Optima and Sentara's privately negotiated rates, which themselves had been fraudulently manipulated to increase costs.

249.    Finally, they further inflated this product by using a multiple generated by their tiny cohort of individual market patients, many of whom suffered from AIDS.

250.    The combination produced the astronomical Charlottesville rates.

44

### i. Defendants Utilized the HCG Dataset with Full Knowledge that It Improperly Included Morbidity.

251.    While Milliman publicly markets the HCGs as suitable for setting ARFs, when Milliman actuaries speak privately with other actuaries they freely admit that the HCGs include morbidity.

252.    On or about September 15, 2018, an actuary at Milliman described the HCGs to a fellow actuary as follows:

> The area factors are normalized for age / gender. To the extent there is morbidity not explained by age / gender, that left-over morbidity could be reflected in the area factors. The area factors are not explicitly risk-adjusted for morbidity drivers that are in addition to age / gender. The area factors will have some residual risk baked into them (risk that was caused by something other than age/gender).

253.    On or about October 29, 2018, a different Milliman actuary, with a significant role compiling the HCGs, explained to a different, non-Milliman actuary that:

> The area factors are meant to reflect the underlying practice patterns in the area for a standard population, but given the data we receive we do not explicitly adjust for morbidity, just age/gender. As such, there will be differences due to health status and it's difficult to fully separate those out.

254.    Optima and Sentara also were fully aware that the Charlottesville ARF was based on morbidity.

255.    On December 14, 2017, Relators met with Optima's incoming President, outgoing President, and Director of Marketing. In that meeting, these senior Optima officials repeatedly acknowledged that morbidity had played a role in the Charlottesville ARF.

256.    In one exchange at that meeting, for example, Relators asked Optima to explain the factors contributing to the 1.579 ARF multiplier. In response, Optima's President Matheis said: "So there's the relative health of the population that's buying and then there is the usage of that population that's occurring, based on that health status." The factors described by President

45

Matheis are the very morbidity considerations that may not be used in setting ARFs.

257.    Similarly, President Matheis explained the significant relative difference between the small group and individual market ARFs in Charlottesville by saying the difference was "all risk driven."

258.    At Relators' urging, BOI repeatedly asked Defendants to show how morbidity had been removed from the HCGs, as the Rules required.  They could not.  BOI therefore found that Defendants statement that morbidity had been removed should be considered "incorrect."

259.    As BOI concluded:

> The Milliman actuary did not provide documentation indicating that morbidity was removed in developing the area rate factors. Therefore, any actuarial certification included that indicated otherwise would be considered incorrect.

### ii.    The HCG Dataset Improperly Assigns Costs to Residents Based on Costs Incurred at Area Hospitals.

260.    The HCGs also are unsuitable for use in setting ARFs because they allocate costs based on provider location rather than patient location.

261.    Costs incurred by a healthcare provider do not accurately reflect the costs of the residents who live nearby.  Healthcare providers often treat out-of-area residents.  Attributing costs to local populations based on the experience of sick, out-of-area residents can have a significantly negative impact on the risk profiles of local residents. This is especially true of secondary and tertiary care hospitals, to whom other healthcare providers send their sickest and most badly injured patients.

262.    UVA, for example, is an academic medical center and Tier 1 Trauma Center, and handles the region's sickest and most badly injured patients.  Average costs incurred at UVA far exceed the average costs incurred by Charlottesville residents. Attributing UVA's patient

morbidity to local residents has the effect of dramatically increasing projected costs for those residents.

263.    The BOI asked Milliman specifically whether Milliman's HCG data was compiled on a member basis or provider basis. In response, Milliman acknowledged that in some cases provider data was used in calculating local costs. According to a letter from Milliman to BOI, "[p]rovider based data sources are modified to be on a member location basis *as able*" (emphasis added).

264.    Milliman's letter then continues by asserting that the HCGs "are *intended to be* applied to a population in a specific area."

265.    The letter therefore confirms both that Milliman "intend[s]" for the HCGs to be used to calculate ARFs, but that they are unsuitable for such use because local residents are assigned costs generated by regional hospitals.

### iii.    Defendants Further Manipulated Rates by Multiplying the HCGs with Inflated Hospital Rates Set by Optima and Sentara

266.    The Milliman HCG dataset afforded Defendants an additional opportunity to fraudulently increase rates to advance their competitive interests.

267.    Unlike the historically accurate datasets available to Defendants, the HCG dataset, according to Defendants, reflects amounts charged, not amounts paid. By using a purported charge-based dataset, Defendants could then subject the data to further manipulation to convert charges into payments.

268.    This allowed Defendants to further increase rates in Charlottesville and other areas by multiplying the already inflated HCG number with the further inflated numbers reflecting Optima and Sentara's inflated rates.

269.    As alleged previously, from 2016 to 2018 Optima's reported costs inexplicably

more-than-doubled. The increases were attributable both to increases in prices and unexplained increases in utilization.

270.    A large portion of Optima's increased payments were made for inpatient treatment at inpatient facilities, such as Sentara hospitals.

271.    The result of multiplying the inflated HCGs by the inflated, internally manipulated rates contributed to the astronomical rates in Charlottesville and other areas of the Commonwealth.

### iv.    Defendants Also Inflated Rates by Relying in part on a Dataset with a Miniscule Sample of Very Sick Subscribers.

272.    Prior to 2018, Optima insured a miniscule population in the individual market in Charlottesville. In 2016, the last full year prior to the 2018 Rate Filing Justification, Optima insured fewer than 100 members in Charlottesville.

273.    Optima executives advised Relators that this population consisted primarily of high-cost individuals with AIDS, who took advantage of certain features unique to Optima's health plan. These patients were much more expensive on average than other Charlottesville residents.

274.    Defendants nevertheless used this cohort as a basis to calculate 2018 rates in Charlottesville. It assigned the cohort a 13% credibility factor.

275.    Optima's own data in the small group market extended to more than 1,000 covered lives in 2016. This data showed that after adjusting for morbidity, the Charlottesville market had lower costs than Hampton Roads.

276.    The BOI later determined that it disagreed with Optima's decisions to afford even a 13% weight to its tiny population in the individual market.

277.    By improperly including this miniscule cohort of very ill members as a basis for

48

computing geographic rate adjustments, Defendants further inflated Charlottesville rates through the improper consideration of morbidity.

**v.   An Increase in UVA Rates Had Only a Minimal Impact on Optima's Charlottesville ARFs.**

278.    In defending their rates, Defendants argued to the BOI that UVA was the primary driving force in the Charlottesville 1.579 ARF. That assertion was false.

279.    Relators have demonstrated that Defendants falsely blamed UVA for the Charlottesville increase.

280.    On June 26, 2018, Relators met with Dr. Rick Shannon, Executive Vice President, Health Affairs at the University of Virginia to better understand UVA's role in the high costs. At the meeting, Relators were advised that there was only a single-digit difference in pricing between the rates UVA charged to Optima and those it charged to its predecessor in the individual market. (Optima's predecessor in the individual market in Charlottesville was Anthem, which had an ARF for Charlottesville of lower than 1.0.)

281.    Relators also learned that UVA accounted for less than 20% of Optima's Charlottesville premiums.

282.    Taking together UVA's rate of increase and relative share, the impact from UVA charging Optima higher rates than Anthem produced only a two percent increase in the ARF (*i.e.* from 1.0 to 1.02).

283.    The Charlottesville 1.579 multiplier was not primarily a result of UVA rates, but was a result of fraudulent manipulations by Optima and Sentara.

49

### vi.    Defendants Doctored Their Actuarial Certification of the ARFs, but It still Was False.

284.    Defendant's knowing fraud in setting the ARFs was demonstrated further by Milliman's conscious alteration of the mandatory actuarial certification.

285.    The mandatory certification language required Defendants to certify that ARFs "reflect only differences in the costs of delivery." Defendants doctored the certification so that they certified that ARFs "reflect differences in cost."

286.    Defendants' edits to the mandatory certification are shown by the strikethroughs below:

> The geographic rating factors reflect ~~only~~ differences in ~~the~~ costs ~~of delivery (which can include unit cost and provider practice pattern differences)~~ and do not include differences for population morbidity by geographic area."

287.    The edits radically alter the meaning of the certification. Simply by striking the word "only" from the certification, Defendants would at least have certified that the ARF reflected costs of delivery, though the ARFs also might have included other, impermissible differences.

288.    By also striking the term "costs of delivery," Defendants declined to certify that the rates reflected costs of delivery at all. As submitted, the certification only certifies that the ARFs reflect "costs," a term so vague as to lack content.

289.    Milliman later confirmed that it had knowingly used prohibited factors in setting the ARFs, by falsely claiming that the certification language required by the URR Instructions had been rendered inoperative.

290.    By letter dated July 26, 2018, Milliman defended its use of the doctored ARF certification language by arguing that the URR Instructions did not actually reflect government

policy. Instead it argued that government policy had been established by a speaker at a webinar explaining the URR process, through an answer given at a Q&A session. Milliman asserted that the Q&A answer permitted it to use competitive considerations in setting ARFs, such as the 1.579 Charlottesville multiplier.

291.    The webinar that Milliman relied upon took place in 2016. The URR Instructions are dated as of April 6, 2017.

292.    Even in Milliman's telling, the webinar speaker merely answered a question by saying that "[t]he intention is that you cannot include health status differences. Other considerations are allowable in area factors." The quoted language is consistent with the official guidance in the URR Instructions, which permits consideration of differences in the cost of delivery in setting geographic adjustments.

293.    Defendants' knowing deviation from the official government rules, and the doctoring of a mandatory certification based on a purported Q&A answer, further demonstrate that Defendants knowingly committed fraud.

294.    Even Milliman's certification as doctored by it was false.

295.    BOI's Chief Market Insurance Examiner for Market Regulation in the Life and Health Division has said that he assumed that Defendant's rate increase would not have been approved if Optima could not show that morbidity had been removed from the rates. Other BOI representatives also said that if they had been aware that Optima's rate filing included morbidity, the rate filing would have been rejected.

296.    BOI ultimately concluded that any actuarial certification that indicated that morbidity had been removed from Optima's ARFs would be considered "incorrect."

51

### e. By Fraudulently Calculating the ARFs, Defendants Shifted a Greater Proportion of the Statewide Increase on the United States.

297.    Defendants' fraudulently calculated ARFs had the effect of increasing the share of the fraudulent 81.8% statewide increase that was paid by the United States.

298.    The amount of subsidies paid under the federal subsidy program is based on the amount of family income available to pay the cost of premiums.  Incremental increases in premiums therefore result in greater subsidy payments than do average increases in premiums.

299.    In 2018, the United States paid approximately 91% of premiums for the Charlottesville market, according to Optima's projections.  Statewide, the United States paid approximately 83% of premiums.

300.    By imposing astronomical premiums on a portion of the statewide marketplace, Defendants increased the total amount of subsidies substantially.

### E. Defendants Falsely Defended Their Rates Throughout 2018.

301.    At the time of the rate filing and thereafter, Defendants knew or should have known that the 2018 ACA market had remained stable, and that its statewide premiums were overstated by more than 60%.

302.    At the time of the rate filing and thereafter, Defendants knew or should have known that the 1.579 ARF in Charlottesville and other ARFs outside of Hampton Roads overstated regional cost differences significantly.

303.    Over the course of 2018, Defendants had access to data that demonstrated that the 2018 rates were significantly inflated.  Over the course of 2018, Defendants knew or should have known that Optima would fall far short of the MLR requirements.

304.    Over the course of 2018, Defendants continued to defend the 2018 premiums as reasonable and accurate.

305.    Defendants' continued defense of the 2018 rates even when they knew or should have known that the rates were not accurate is further evidence that the 2018 rate filing was knowingly false.

306.    After Optima's false rate filing was approved, Defendants continued to deceive Virginia regulators throughout 2018. They repeatedly asserted that the Charlottesville rates did not include morbidity.

307.    By letter dated August 8, 2018, Optima advised the SCC that its MLR for the first quarter of 2018 was 74.9% and likely would rise throughout the year. This statement was false and misleading.

308.    At that time, Defendants knew or should have known that Optima's second quarter MLR was approximately 54%, and that its MLR through the first half of the year was 64%.

309.    MLRs almost always rise through the year, as policyholders meet their deductible and insurers begin paying a greater share of costs. The significant reduction in Optima's MLR over the course of 2018 was highly unusual. The extraordinary and unusual shift in Optima's MLR likely was the result of internal and intentional price manipulation by Defendants.

310.    On information and belief, at no time during the 2018 rate year did Optima advise the SCC or BOI of the likely scope of its MLR shortfall.

**F. Defendants Submitted a False and Fraudulent 2019 Rate Application**.

311.    On August 9, 2018, Defendants submitted Optima's rate filing for the 2019 rate year.

53

312.     One day later, on August 10, 2018, Anthem submitted its own rate proposal. Anthem proposed to provide coverage in Charlottesville and other areas in which it had been absent in 2018.

313.     Anthem proposed significantly lower rates than those proposed by Optima.

314.     Five days later, Defendants submitted a revised rate filing.  Defendants' revised rate filing projected statewide costs per-member-per-month that were five percent lower than its previous filing.

315.     BOI rejected that filing as late.  In response, Optima moved the SCC to have the filing accepted because its rate amendment was necessary to protect its market share.

316.     Defendants' submission of a rate filing with a lower projected per-member-per-month cost only five days after its initial filing demonstrates that its original rate filing was false and fraudulent.

317.     Optima's rates for 2019 were inflated at least by the five-percent excess per-member-per-month cost that it acknowledged in its revised rate filing, but which then was rejected by the BOI.

### G. Defendants' False and Fraudulent Rate Filing Produced Astronomical Profits for Optima and Substantial Unreimbursed Costs to the Government.

318.     On October 4, 2019 CMS released MLR data for the 2018 reporting year. The average MLR for insurers across the country in 2018 was 78%.   Optima's statewide Medical Loss Ratio (MLR) that year was 49.8%.   In Charlottesville, the MLR was approximately 35%.

319.     Optima individual-market plans generated an astounding $235 million in revenues above the 80% loss ratio permitted under federal law.

320.     Optima's MLR shortfall was the largest of any insurer in the nation.

54

321.    Optima generated 13% of the MLR shortfall nationwide, even though it insured only about 0.6% of the national market. While Optima insured only 16.66% of the Virginia market, its MLR shortfall in the individual market was greater than the total accumulated shortfall, of all insurers combined, in every single State.

322.    The ACA includes a mandatory rebate program through which insurers such as Optima who fail to meet minimum Medical Loss Ratios are required to rebate excess profits to policyholders. In Optima's case, however, Optima will retain tens of millions in illicit profits as a result of its fraudulent rate filings, and the federal government will suffer more than $200 million in losses.

323.    The federal MLR rebate program is designed to smooth out relatively small year-to-year deviations in the MLR. Under the MLR calculations, insurers such as Optima calculate their MLR rebates each year by comparing a three-year running average of expenses to revenues. Premiums in the following year are then reduced by that percentage.

324.    Rebate amounts therefore do not depend simply upon the amount of an overcharge in a given year, but on the percentage of overcharge trended forward.

325.    As a result, an insurer's overcharge in one year may be offset by credits earned in other years. In addition, an MLR earned in a year of unusually high enrollment also will not be fully refunded.

326.    Optima had MLRs well in excess of 80% in each of 2016 and 2017. Optima also had substantially more enrollment in 2018 than it did in 2019 and 2020.

327.    As a result, Optima's MLR rebates will not have the effect of disgorging the excess profits it earned in the 2018 rate year. Optima is likely to retain approximately $70

million in profits from its fraudulent 2018 Rate Filing Justification, even after MLR rebates are paid.

328.    MLR rebates do not reimburse the federal government for amounts it paid in subsidies.  Absent a remedy in this case, Defendants' fraud will cost the United States Treasury losses in excess of $200 million.

## H. The Allegations and Transactions Described Herein Are Not Subject to the Public Disclosure Bar.

329.    On information and belief, substantially the same allegations or transactions made herein never were publicly disclosed (i) in a Federal criminal, civil, or administrative hearing in which the Government or its agent is a party; (ii) in a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation; or (iii) from the news media (a "public disclosure").

330.    Prior to the public disclosures of the allegations and transactions made herein, Relators voluntarily disclosed to the Government the information on which the allegations or transactions herein are based.

331.    Relators have knowledge that is independent of and materially adds to any publicly disclosed allegations or transactions, and have voluntarily provided the information to the Government before filing an action under this section.

332.    On information and belief, the fraudulent nature of Defendants' statewide rate increase never has been publicly disclosed.

333.    On information and belief, Defendants' fraudulent inclusion of a 25% multiplier that was based on the unenacted repeal of the individual mandate never has been publicly disclosed.

334. On information and belief, Defendant's fraudulent omission of Risk Adjustment Transfer payments never has been publicly disclosed.

335. On information and belief, the HCG's use of hospital data that assigned costs to local residents based on the geographic location of the hospital never has been publicly disclosed.

336. On information and belief, the Commonwealth of Virginia's determination that Defendants failed to demonstrate that morbidity had been removed from the HCGs never has been publicly disclosed.

337. On information and belief, the Commonwealth of Virginia's determination that the Optima rate filing should not have been accepted never has been publicly disclosed.

338. On information and belief, Defendant's fraudulent reliance on its individual market experience in Charlottesville when its experience involved a very small cohort which included many AIDS patients never has been publicly disclosed.

339. On information and belief, Optima's misleading statements to the Commonwealth of Virginia that were made after the rate filing, including its assertion that its MLR was 74.9% and rising, never has been publicly disclosed.

340. At all relevant times, the Center for Medicare and Medicaid Services ("CMS") directed Relators to make complaints about Defendants false and misleading statements directly to officials in the SCC and BOI.

341. At all relevant times, Relators advised government officials with CMS and SCC or BOI before providing information to the press.

342.     On or before December 15, 2017, Relators advised a representative of CMS that Optima's incoming and outgoing president had admitted that Optima's Area Rate Factors, which produced the 1.579 multiplier for Charlottesville, had improperly included morbidity.

343.     On or before December 17, 2017, representatives of CMS advised Relators that they should address any issues they had with Optima's rate filing to BOI.

344.     By phone call on or before December 19, 2017, Relators advised the BOI of the admissions made by Optima's incoming and outgoing Presidents, and that morbidity had been included in Optima's ARFs. Relators further advised BOI of the same facts by e-mail and letter on December 20, 2017.

345.     By letter dated January 4, 2018, attorneys on behalf of Relators advised BOI that the rate filing was improper, including that the statewide 81.8% increase was excessive and improperly included a 25% multiplier. The letter also advised BOI that the 1.579 multiplier included morbidity and was the product of competitive factors rather than a reasonable actuarial judgment.

346.     Relators January 4, 2018 letter was provided to CMS no later than February 5, 2018.

347.     On or before June 17, 2018, Relators disclosed to CMS that Defendants improperly used competitive considerations in setting ARFs.

348.     On or before July 1, 2018, Relators disclosed to CMS that rates and utilization at UVA could have had only a relatively minor impact on Optima costs and were not a significant cause of the 1.579 multiplier.

### I.  Relators Seek the Full Amount of Damages Due under the FCA and ACA.

349.  Defendants' liability for their violations of the FCA is substantial.  Relators seek on behalf of the United States the fullest measure of recovery permitted by law.  Nothing in the preceding or succeeding paragraphs is intended to limit in any way the United States' authority and right to recover the full amount of damages and penalties due to it.

350.  The United States suffered more than $200 million in damages in 2018 above the amounts it would have paid if Defendants rate filing had not included false and fraudulent projections and calculations.

351.  Defendants rate filing was substantially false and fraudulent.  The United States government suffered damage in the amount of at least $538,136,201 in premium support payments as a result of Defendants false and fraudulent rate filing.

352.  Under the ACA, liability for damages to the United States under the FCA are multiplied by three to six times. Defendants' liability for direct damages under the FCA for their 2018 rate filing therefore ranges from $450 million to $3.2 billion.

353.  As of June 2020, the FCA imposes penalties of $11,665 to $23,331 per false claim.  Optima had 53,603 subscribers in 2018, which produced at least 53,603 false claims.

354.  Defendants' liability for penalties under the FCA for their 2018 rate filing therefore ranges from $625 million to $1.25 billion.

355.  Defendants' total liability for their 2018 rate filing ranges from $1.075 billion to $4.45 billion.

356.  Defendants are further liable for the payments generated by their false and fraudulent 2019 rate filings, multiplied by three to six times, in addition to associated penalties.

## V.    CAUSES OF ACTION

### COUNT I
*(False Claims Act 31 U.S.C. §3729 (a)(1)(A))*
*All Defendants*

357.    Relators re-allege and incorporate by reference the allegations made in paragraphs 1 through 356 of this Complaint.

358.    This is a claim for treble to sextuple damages and forfeitures under the False Claims Act, 31 U.S.C. §§ 3729-32.

359.    By virtue of the acts described above, the Defendants knowingly submitted, and caused to be submitted, false or fraudulent claims for payment and reimbursement by the United States Government.

360.    The United States, unaware of the falsity of the records, statements and/or claims made by the Defendants and in reliance on the accuracy thereof, paid for aforementioned false claims because the Defendants intentionally or with gross disregard for the truth submitted a false and fraudulent rate justification for Optima's rates under the Affordable Care Act, and inflated cost and utilization information in Optima's expenditure calculations.

361.    As set forth in the preceding paragraphs, Defendants violated 31 U.S.C. § 3729 and have thereby damaged and continue to damage the United States Government by their actions in an amount to be determined at trial.

### COUNT II
*(False Claims Act 31 U.S.C. §3729 (a)(1)(B))*
*All Defendants*

362.    Relators re-allege and incorporate by reference the allegations made in paragraphs 1 through 361 of this Complaint.

363.    This is a claim for treble to sextuple damages and forfeitures under the False Claims Act, 31 U.S.C. §§ 3729-32.

364.    By virtue of the acts described above, the Defendants knowingly made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim for payment and reimbursement by the United States Government.

365.    The United States, unaware of the falsity of the records, statements and/or claims made by the Defendants and in reliance on the accuracy thereof, paid for aforementioned false claims because the Defendants intentionally or with gross disregard for the truth submitted a false and fraudulent rate justification for Optima's rates under the Affordable Care Act, and inflated cost and utilization information in Optima's expenditure calculations.

366.    As set forth in the preceding paragraphs, Defendants violated 31 U.S.C. § 3729 and have thereby damaged and continue to damage the United States Government by their actions in an amount to be determined at trial.

## COUNT III
### *(False Claims Act 31 U.S.C. §3729 (a)(1)(D))*
### *Sentara and Optima Defendants*

367.    Relators re-allege and incorporate by reference the allegations made in paragraphs 1 through 366 of this Complaint.

368.    This is a claim for treble to sextuple damages and forfeitures under the False Claims Act, 31 U.S.C. §§ 3729-32.

369.    By virtue of the acts described above, Optima and Sentara knowingly had possession, custody, or control of property or money used, or to be used, by the Government and knowingly delivered, or caused to be delivered, less than all of that money or property

370.    As set forth in the preceding paragraphs, Defendants violated 31 U.S.C. § 3729 and have thereby damaged and continue to damage the United States Government by their actions in an amount to be determined at trial.

## COUNT IV
### *(False Claims Act 31 U.S.C. §3729 (a)(1)(G))*
### *All Defendants*

371.    Relators re-allege and incorporate by reference the allegations made in paragraphs 1 through 370 of this Complaint.

372.    This is a claim for treble to sextuple damages and forfeitures under the False Claims Act, 31 U.S.C. §§ 3729-32.

373.    By virtue of the acts described above, the Defendants knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government.

374.    As set forth in the preceding paragraphs, Defendants violated 31 U.S.C. § 3729 and have thereby damaged and continue to damage the United States Government by their actions in an amount to be determined at trial.

## COUNT V
### (False Claims Act 31 U.S.C. §3729 (a)(1)(C))
### All Defendants

375.    Relators re-allege and incorporate by reference the allegations made in paragraphs 1 through 374 of this Complaint.

376.    This is a claim for treble to sextuple damages and forfeitures under the False Claims Act, 31 U.S.C. §§ 3729-32.

377.    By virtue of the acts described above, the Defendants knowingly conspired to commit a violation of the False Claims Act as alleged in Counts I-IV above.

378.    As set forth in the preceding paragraphs, Defendants violated 31 U.S.C. § 3729 and have thereby damaged and continue to damage the United States Government by their

actions in an amount to be determined at trial.

## COUNT VI
### *(False Claims Act 31 U.S.C. §3729 (a)(1)(A))*
### *Milliman Defendant*

379.    Relators re-allege and incorporate by reference the allegations made in paragraphs 1 through 378 of this Complaint.

380.    This is a claim for treble to sextuple damages and forfeitures under the False Claims Act, 31 U.S.C. §§ 3729-32.

381.    Milliman markets its Health Cost Guidelines for use in ACA filings, including for use in setting geographic rating factors.

382.    Milliman uses its Health Cost Guidelines in filings it makes under the ACA, including in setting geographic rating factors.

383.    The Health Cost Guidelines are not adjusted to eliminate morbidity as is required for their use in setting geographic rating factors.

384.    The Health Cost Guidelines assign health-care costs to local populations based on provider location, with the effect of improperly imputing to local residents the morbidity of the providers' patient populations.

385.    By virtue of the acts described above, Milliman knowingly submitted, and caused to be submitted, false or fraudulent claims for payment and reimbursement by the United States Government.

386.    The United States, unaware of the falsity of the records, statements and/or claims made by Milliman, and in reliance on the accuracy thereof, paid for aforementioned false claims because insurers relied on the HCGs in submitting rate filings when the HCGs were not properly adjusted to remove morbidity, and improperly assigned provider costs by location to local

residents.

387.    As set forth in the preceding paragraphs, Defendants violated 31 U.S.C. § 3729

and have thereby damaged and continues to damage the United States Government by its actions

in an amount to be determined at trial.

## COUNT VII
### *(False Claims Act 31 U.S.C. §3729 (a)(1)(B))*
### *Milliman Defendant*

388.    Relators re-allege and incorporate by reference the allegations made in paragraphs

1 through 387 of this Complaint.

389.    This is a claim for treble to sextuple damages and forfeitures under the False

Claims Act, 31 U.S.C. §§ 3729-32.

390.    By virtue of the acts described above, Milliman knowingly made, used, or caused

to be made or used, a false record or statement material to a false or fraudulent claim for

payment and reimbursement by the United States Government.

391.    The United States, unaware of the falsity of the records, statements and/or claims

made by Milliman and in reliance on the accuracy thereof, paid for aforementioned false claims

because Milliman intentionally or with gross disregard for the truth made, used, or caused to be

made or used, a false record or statement material to insurers submissions of false and fraudulent

rate justifications under the Affordable Care Act.

392.    As set forth in the preceding paragraphs, Defendants violated 31 U.S.C. § 3729

and have thereby damaged and continues to damage the United States Government by its actions

in an amount to be determined at trial.

## COUNT VIII
*(False Claims Act 31 U.S.C. §3729 (a)(1)(G))*
*Milliman Defendant*

393.    Relators re-allege and incorporate by reference the allegations made in paragraphs 1 through 392 of this Complaint.

394.    This is a claim for treble to sextuple damages and forfeitures under the False Claims Act, 31 U.S.C. §§ 3729-32.

395.    By virtue of the acts described above, Milliman knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government.

396.    As set forth in the preceding paragraphs, Defendants violated 31 U.S.C. § 3729 and have thereby damaged and continues to damage the United States Government by its actions in an amount to be determined at trial.

**PRAYER**

WHEREFORE, Plaintiff/Relator prays for judgment against Defendants as follows:

1. That Defendants cease and desist from violating 31 U.S.C. § 3729 et seq.;

2. That this Court enter judgment against the Defendants in an amount equal to three to six times the amount of damages the United States Government has sustained because of Defendants' actions, plus a civil penalty of not less than $11,665 and not more than $23,331 for each violation of 31 U.S.C. § 3729 et seq., as

3. That Plaintiffs/Relators be awarded the maximum amount allowed pursuant to §3729 (d) of the False Claims Act;

4. That Plaintiffs/Relators be awarded all costs and expenses of this action, including attorney's fees.

## VI.   JURY TRIAL DEMANDED

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relators hereby demand a trial by jury.

DATED: October 8, 2020                    Respectfully submitted,

Arden B. Levy, Esq. (VSB No. 82993)
**Arden Levy Law PLLC**
2121 Eisenhower Ave, Suite 200
Alexandria, VA 22314
(703) 519-6800
alevy@ardenlevylaw.com

Martin Bienstock
*Pro hac vice pending*
**Bienstock PLLC**
Suite 300
1629 K. St. NW
Washington, DC 20006
202-908-6601
mbienstock@bienstockpllc.com

*Attorneys for Plaintiff Relators Ian Dixon,*
*Karl Quist, and Sara Stovall*