## IN THE UNITED STATES DISTRICT COURT FOR
## THE WESTERN DISTRICT OF VIRGINIA

UNITED STATES *ex rel.* IAN
DIXON, KARL QUIST, and
SARA STOVALL,

                    *Plaintiffs,*

        v.                                    Civil Action No. 3:20-CV-62
                                              JURY TRIAL DEMANDED
SENTARA HEALTH PLAN f/k/a OPTIMA
HEALTH PLANS, SENTARA HEALTH
f/k/a SENTARA HEALTHCARE, and
MILLIMAN, INC.,

                    *Defendants.*


## <u>FIRST AMENDED COMPLAINT</u>

# TABLE OF CONTENTS

I.   INTRODUCTION ............................................................................................. 1

II.  PARTIES ........................................................................................................ 2

III. JURISDICTION AND VENUE ...................................................................... 3

IV.  APPLICABLE LAW ........................................................................................ 4

    A.   The False Claims Act ............................................................................ 4

    B.   The Affordable Care Act ...................................................................... 5

    C.   Premium Rate Setting for Qualified Health Plans ................................ 6

        1)   Calculating the Index Rate ......................................................... 7

        2)   Adjusting the Market-Wide Index Rate Based on Projected Risk Adjustment Transfer Payments .......................................................................... 8

        3)   Adjusting Premiums at the Plan Level Based on "Rating Factors" .............. 8

        4)   Rate Approval Process ............................................................... 9

    D.   Insurers Must Make Attestations and Certifcations to Participate in an Exchange .............................................................................................................. 10

    E.   Virginia's 2018 Approval Process for Insurers to Participate in an Exchange ..... 12

    F.   Premium Tax Credits Under the ACA ................................................. 13

    G.   The Government Pays Advance Premium Tax Credits to Insurers ....................... 14

V.   DEFENDANTS' FRAUDULENT CONDUCT ............................................ 15

    A.   Sentara and Optima Leveraged Optima's Monopoly Position in Certain Gepgraphic Areas by Grossly Inflating Insurance Premiums in Violation of the ACA. ..................................................................................................... 15

    B.   Relators Investigated and Challenged Optima's Rates ......................... 20

    C.   Optima's 2018 Rate Filing Was False and Fraudulent ........................ 21

        1)   Defendants imposed a baseless 25% surcharge…………………...21

        2)   Optima and Milliman falsely represented to regulators that Optima did not expect to receive any risk adjustment transfer payments…25

        3)   Optima applied a fabricated 8% trend factor to account for medical inflation………………………………………………...………30

        4)   Defendants assigned self-serving geographic area rate factors to drive higher premiums while hiding their methodology from regulators………………………………………………………31

            i.  Optima's ARFs illegally incorporated morbidity data………...33

            ii. Optima's ARFs were based on erroneous cost data for local residents………………………………………………..…………35

i

iii. Defendants further inflated the ARFs by overly relying on a
small dataset comprised of very sick subscribers………………..36

iv. Optima and Milliman Falsely Certified That Optima's ARFs Did
Not Account for Morbidity………………………………………37

D.    Defendants Concealed Their Fraud Through False Statements, Material
Omissions, and a Public Campaign of Misinformation ........................................ 38

E.    Optima's 2019 Premium Rates Were Also Fraudulent ......................................... 40

F.    Defendants Presented or Caused to be Presented False Claims to the Government
and Made or Caused to be Made False Statements Material to False Claims ...... 41

G.    Defendants' Fraud Caused Hundreds of Millions of Dollars in Damages to the
United States ......................................................................................................... 43

VI.    CAUSES OF ACTION .................................................................................................... 46

## FIRST AMENDED COMPLAINT

Plaintiffs and *qui tam* relators Ian Dixon, Karl Quist, and Sara Stovall ("Relators"), by and through their undersigned attorneys, respectfully file this First Amended Complaint, seeking to recover damages and civil penalties on behalf of the United States for violations of the federal False Claims Act, 31 U.S.C. §§ 3729 *et seq*. (the "FCA"), by defendants Sentara Health Plan; Milliman, Inc.; and Sentara Health (collectively, "Defendants"), and allege as follows:

## I.    INTRODUCTION

1.      In August 2017, Anthem, Optima's leading competitor, announced that it was withdrawing from the Affordable Care Act's individual health-insurance marketplace, leaving Optima as the sole remaining insurer across swathes of Virginia. Optima and its parent company, Sentara, immediately sought to leverage Anthem's withdrawal by greatly increasing the price of premiums that Optima would charge for its individual health insurance plans (plans offered to individuals and families).

2.      Working hand-in-glove with its actuaries at Milliman and its parent Sentara, Optima submitted a rate filing purporting to justify an unprecedented 81.8% year-over-year statewide rate increase. In Charlottesville, rates nearly tripled and were by far the highest in the nation. Optima's actual results for 2018 demonstrated that Optima's rate filing justification dramatically misrepresented key data—actual profits exceeded projections by about 146%, and total claims fell short of projections by about 49%. An insurer of Optima's experience would not have such extreme missed projections on key indicators if it were acting in good faith.

3.      Relators are Charlottesville residents who spent thousands of hours opposing and investigating the rate increases. They discovered that, among other things, Defendants' rate filing had imposed a 25% statewide surcharge on rates under false pretenses and without any actuarial basis; zeroed out a key calculation of transfer payments that Optima was due to receive, which in

1

turn caused a huge rate increase; forecasted medical inflation at about twice the rate that Milliman itself had predicted; and improperly adjusted area rate factors based on business judgment and morbidity, which was illegal. These fraudulent methods were contrary to express representations that Optima and Milliman made to the government.

4.      As a result of Defendants' false and fraudulent rate filings for 2018 and 2019 and materially false representations, the United States paid Optima hundreds of millions of dollars more than it should have, none of which the United States has recouped.

5.      Additionally, by law, Optima's fraudulent rate manipulation would have prohibited Optima from being qualified and allowed to sell individual health insurance plans under the Affordable Care Act. Accordingly, every dollar that Optima obtained during the relevant time period from the United States was the result of fraudulent inducement.

6.      Relators now bring this action to recover damages and civil penalties on behalf of the United States for Defendants' violations of the FCA.

## II.    PARTIES

7.      Relator Ian Dixon is a resident of Charlottesville, Virginia.

8.      Relator Karl Quist is a resident of Charlottesville, Virginia.

9.      Relator Sara Stovall is a resident of Charlottesville, Virginia.

10.     Defendant Sentara Health ("Sentara"), formerly known as Sentara Healthcare, is a nonstock, nonprofit, 501(c)(3) tax-exempt Virginia corporation with its principal place of business at 1300 Sentara Park, Virginia Beach, Virginia 23464. Sentara is one of the largest health systems in the Mid-Atlantic and Southeast regions and among the largest integrated health systems in the country. It operates a total of twelve hospitals, numerous diagnostic and rehabilitative programs,

physician offices and clinics, neighborhood medical centers, home health services, and the Sentara

Health Plans division that serves more than one million members.

11.     Defendant Sentara Health Plans ("Optima"), formerly known as Optima Health

Plan, is a Virginia corporation with a principal place of business at 1300 Sentara Park, Virginia

Beach, Virginia 23464. Optima is a full-service health plan with products for groups and

individuals, as well as Medicaid, and Medicare plans. In Virginia—where Optima is

headquartered—Optima offers health insurance through an extensive state-wide network,

including a vertically integrated delivery network with affiliated Sentara hospitals and providers.

12.     Optima is a wholly owned subsidiary of Sentara and is the health plan division of

Sentara.

13.     In 2018 and 2019, Optima offered its health plans only in markets where Sentara

affiliates operated health-care entities such as hospitals.

14.     Milliman, Inc. ("Milliman") is a Washington State corporation, with its principal

place of business at 1301 5th Ave. Suite 3800 Seattle Washington, 98101. Milliman is registered

to do business in Virginia. It maintains offices throughout the world, including in Virginia at 1921

Gallows Rd. Suite 710, Vienna, Virginia 22182. Milliman markets itself as an independent risk

management, benefits, and technology company, and provides actuarial services to health

insurance companies.

### III.     JURISDICTION AND VENUE

15.     This Court has jurisdiction over the subject matter of this action pursuant to 28

U.S.C. § 1331, 42 U.S.C. § 18033, and 31 U.S.C. § 3732, the latter of which specifically confers

jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730.

3

16.    Venue is appropriate in this court pursuant to 31 U.S.C. §3732(a) because Defendants transact business in this district, and acts undertaken in violation of the False Claims Act occurred in this district.

17.    Pursuant to Section 3730(e)(4)(B) of the FCA, Relators are the original source of the allegations and transactions described herein, and, as discussed below, Relators repeatedly reported these allegations and transactions to the government prior to filing this lawsuit. Further, Relators have knowledge that is independent of and materially adds to any public disclosure and voluntarily provided that information to the government before filing this lawsuit.

## IV.    APPLICABLE LAW

### A.    The False Claims Act

18.    Congress originally enacted the FCA during the Civil War and substantially amended the FCA in 1986, 2009, and 2010.

19.    The FCA prohibits, among other things, knowingly making, using, or causing to be made or used any false record or statement material to an obligation to pay or transmit money or property to the government. 31 U.S.C. § 3729(a)(1)(A)-(G). Any person who violates the FCA is liable for a civil penalty for each violation, plus three times the amount of the damages sustained by the United States. 31 U.S.C. § 3729(a)(1).

20.    Any person with information about an FCA violation may act as a relator and may bring an action on behalf of the United States and may share in any recovery.

21.    If the government declines to intervene in the action, a relator may proceed with the case on behalf of the government. 31 U.S.C. § 3730(c)(3).

**B.   The Affordable Care Act**

22.     The Affordable Care Act ("ACA") is a comprehensive federal healthcare reform law that was enacted in March 2010.

23.     As enacted, the ACA included an individual mandate that required most people to obtain health insurance or pay a tax penalty.

24.     Under the ACA, each state must establish a health insurance marketplace ("Exchange") where individuals and small groups can purchase health insurance coverage. 42 U.S.C. § 18031(b)(1). During all relevant times, Virginia opted for a federally facilitated Exchange accessible online at HealthCare.gov.[1]

25.     The ACA provides that "[a]n Exchange may certify a health plan as a qualified health plan if . . . such health plan meets the requirements for certification as promulgated by the Secretary [of Health and Human Services] under subsection (c)(1)." 42 U.S.C. § 18031(e)(1)(A). The referenced subsection, in turn, provides that "[t]he Secretary shall, by regulation, establish criteria for the certification of health plans as qualified health plans." *Id.* § 18031(c)(1).

26.     Federal subsidy payments made under the ACA (including Advanced Premium Tax Credits ["APTCs"], which are at issue in this case) are subject to the FCA. 42 U.S.C. § 18033(a)(6)(A). Moreover, compliance with the requirements of the ACA concerning a health insurance insurer's eligibility to participate in the Exchange is "a material condition of the insurer's entitlement to receive payments, including payments of premium tax credits." *Id.*

---

[1] *See* HEALTHINSURANCE.ORG, *Virginia ACA Health Insurance Marketplace*, https://www.healthinsurance.org/aca-marketplace/virginia/#:~:text=Prior%20to%202024%2C%20Virginia%20residents%20enrolled%20in%20individual/family%20health%20coverage%20through%20HealthCare.gov (last visited Sept. 23, 2025); *see also* KFF, *State Health Insurance Marketplace Types*, https://www.kff.org/affordable-care-act/state-indicator/state-health-insurance-marketplace-types/?currentTimeframe=0&sortModel=%7B%22colId%22:%22Location%22,%22sort%22:%22asc%22%7D (last visited Sept. 23, 2025).

## C.  Premium Rate Setting for Qualified Health Plans

27.     Under federal regulations promulgated to implement the ACA, an insurer that chooses to participate in an Exchange as a Qualified Health Plan must submit an annual application to the United States' Department of Health and Human Services' Center for Medicare & Medicaid Services ("CMS") through the Health Insurance Oversight System. *See* 45 C.F.R. §§ 155.1010, 155.1075(a) (requirement for yearly recertification).[2]

28.     As part of the Qualified Health Plan application, an insurer must propose rates for insurance premiums on offered plans. The insurer must document this rate-setting process in a rate filing justification, which is included in its Qualified Health Plan application. *See* 45 C.F.R. § 154.215(a).

29.     A rate filing justification includes three parts: (1) a unified rate review template, (2) a written explanation of the rate increase, and (3) rate filing documentation. *See* 45 C.F.R. § 154.215(b)(1)-(3).

30.     First, the Unified Rate Review Template includes (1) the premium amounts that insurers intend to charge for each of their plans and (2) the insurer's projected medical loss ratio ("MLR"), which measures the relationship between incurred losses and earned premiums.[3]

31.     To help keep premiums affordable, the ACA establishes a minimum MLR of 80% for small group and individual markets, meaning that the insurers must pay out 80% of its earned

---

[2] *See also* CMS, LETTER TO ISSUERS IN THE FEDERALLY-FACILITATED MARKETPLACES 8–9 (2016), https://www.cms.gov/CCIIO/Resources/Regulations-and-Guidance/Downloads/Final-2018-Letter-to-Insurers-in-the-Federally-facilitated-marketplaces-and-February-17-Addendum.pdf (last visited Sept. 23, 2025).

[3] *See* CMS, 2018 UNIFIED RATE REVIEW INSTRUCTIONS: RATE FILING JUSTIFICATIONS PARTS I, II & III, at 4, 14, 61 (2017), https://www.cms.gov/cciio/resources/forms-reports-and-other-resources/downloads/unified-rate-review-urr-reporting-requirements-for-single-risk-pool-plans-omb-0938-1141-final-2018-urr-instructions-parts-i-ii-and-iii-.pdf. (last visited Sept. 23, 2025).

premiums on the actual provision of health benefits for policyholders. Insurers are allowed to keep the other 20% for their own administrative expenses and profits.

32.     Second, the written explanation component of the rate filing justification provides the justification for rate increases to plans, describes the relevant data in the Unified Rate Review Template, explains the assumptions used to develop any rate increases, and provides an explanation of the most significant factors that affect changes in rates.[4]

33.     Third, the rate filing documentation requires an actuarial memorandum explaining the "actuarial reasoning and assumptions, justifications, and methodologies that support the entries in the [Unified Rate Review Template]."[5] The memorandum must certify, among other things, that (a) the overall index rate and plan-specific premium rates were derived in accordance with federal regulations, (b) the geographic rating factors do not reflect differences in population morbidity by geographic area, and (c) the projected overall index rate is "[n]either excessive nor deficient."[6]

### 1)     Calculating the Index Rate

34.     When projecting premium rates under the ACA, the insurer must first calculate an average rate (the "Index Rate")[7] that serves as a baseline for premiums for all plans in the individual or small group market in a state. The Index Rate "must be based on the total combined claims costs for providing essential health benefits within the single risk pool of that State market." 45 C.F.R. § 156.80(a), (d)(1)(i).

---

[4] *Id.* at 4, 52.

[5] *Id.* at 4, 53.

[6] *See id.* at 53, 68-69.

[7] *See* CMS, OVERVIEW: FINAL RULE FOR HEALTH INSURANCE MARKET REFORMS 5 (2013), https://www.cms.gov/cciio/resources/files/downloads/market-rules-technical-summary-2-27-2013.pdf (referring to the "index rate" as the "average rate" for a particular market) (last visited Sept. 23, 2025).

### 2) Adjusting the Market-Wide Index Rate Based on Projected Risk Adjustment Transfer Payments

35.     After an insurer assesses the Index Rate, "[t]he index rate must be adjusted on a market-wide basis for the State based on the total expected market-wide payments and charges under **the risk adjustment program** . . . ." *Id.* § 156.80(d)(1)(ii) (emphasis added). This adjusted figured is referred to as the "Market Adjusted Index Rate."

36.     The "risk adjustment program" refers to a program in which insurers in a state must transfer funds to one another to balance the degree of risk and morbidity in their respective insured populations.

37.     Insurers that apply to be listed on the Exchange must account for any anticipated receipt of funds through the risk adjustment transfer payments when they submit their Qualified Health Plan applications. For example, if a Qualified Health Plan applicant expects to receive a risk adjustment transfer payment at the end of the year based on the risk profile of its insured population, then it must downwardly adjust its premium rates by subtracting that amount to account for this expected payment.

### 3) Adjusting Premiums at the Plan Level Based on "Rating Factors"

38.     At the third step, the ACA allows insurers to change the premium rate as compared to the Market Adjusted Index Rate, but only with respect to the following criteria:

- Whether the plan or coverage covers an individual or family
- Rating areas (discussed below)
- Age
- Tobacco use

45 C.F.R. § 147.102(a)(1)(i)-(iv).

39.    Relevant here, a "rating area" refers to a geographical area within a state. *Id.* §
147.102(b)(3). A "state may establish one or more rating areas within that state." *Id.* §
147.102(b)(1).

40.    During all relevant times, there were twelve rating areas in Virginia.

41.    Based on the above criteria, insurers set one "rating factor" per rating area.[8]
Premium differentials between rating areas may account for costs of care in different areas.
However, if an insurer differentiates between geographic regions based on the costs of care, it must
ensure that "[g]eographic [rating] factors . . . only reflect differences in the cost of delivery" and
"[do] not reflect differences in morbidity by region."[9]

42.    In other words, insurers may not adjust premiums based on morbidity. The term
"morbidity" refers to the prevalence of disease or medical complications in a group.

43.    After the insurer sets the rating factor, the insurer multiplies that factor by the
insurer's Market Adjusted Index Rate to determine the base premium in each rating area.

### 4)  Rate Approval Process

44.    After the insurer submits a rate filing justification in its Qualified Health Plan
application, CMS reviews the application. See 45 C.F.R. § 154.205(a). CMS delegates this
responsibility to certain states that operate their own review programs, referred to as "Effective
Rate Review Programs." *See* 45 C.F.R. § 154.210(b).

---

[8] *See* CMS, 2018 URR Instructions, *supra* note 3, at 11.

[9] *Id.*

45.     During all relevant times, Virginia had an Effective Rate Review Program.[10] Thus, Virginia regulations incorporate the above federal regulatory requirements. *See* 14 Va. Admin. Code §§ 5-130-50, 5-130-60.

46.     Virginia state law also sets forth additional requirements for the form and content of rate submissions to the Virginia Bureau of Insurance ("BOI"). Insurers on the Virginia Exchange must satisfy *both* the Virginia and federal requirements.

**D.   Insurers Must Make Attestations and Certifications to Participate in an Exchange.**

47.     As part of their applications, insurers must "submit the State Partnership Marketplace Insurer Program Attestation Response form."[11] Those attestations included, among other things, that the insurer agreed to the certification standards and operational requirements applicable to the insurer in 45 C.F.R. Parts 146, 147, 153, 155, and 156:[12]



> **Attestations Required of Both Medical QHP and SADP Issuers**
>
> Instructions: The following attestations apply to all QHPs and SADPs that an issuer is submitting for certification for the next plan year. All issuers who wish to offer either certified QHPs or SADPs on the FFMs are required to respond "Yes" to the following attestations.
>
> 1.  Applicant agrees to adhere to all of the certification standards and operational requirements applicable to applicant in 45 CFR Parts 153, 155, and 156.
>
>     ○ Yes          ○ No

---

[10] *See* CMS, STRENGTHENING STATE RATE REVIEW PROCESS: EARLY ACHIEVEMENTS OF HEALTH INSURANCE RATE REVIEW GRANTS (last updated 2011), https://www.cms.gov/cciio/resources/files/downloads/rate_review_report_092011.pdf (last visited Sept. 23, 2025).

[11] *See* CMS, QUALIFIED HEALTH PLAN ISSUER APPLICATION INSTRUCTIONS 17 (2018), available at https://www.qhpcertification.cms.gov/s/2018QHPInstructions_04132017.pdf?v=1 (last visited Sept. 23, 2025).

[12] *See* CMS, STATE PARTNERSHIP MARKETPLACE ISSUER PROGRAM ATTESTATION RESPONSE FORM (2018), available at https://www.qhpcertification.cms.gov/s/PY18_SPMAttestationForm.pdf?v=1 (last visited Sept. 23, 2025).

**Attestations Required of Medical QHP Issuers Only**

Instructions: The following attestations apply to all medical QHPs (not SADPs) that an issuer is submitting for certification for the next plan year. Applicants applying to offer medical QHPs on the FFMs are required to respond "Yes" to the following attestations with regard to those medical QHPs. All applicants not applying to offer medical QHPs should select "NA" (not applicable).

1. Applicant agrees to adhere to all of the certification standards and operational requirements applicable to applicant in 45 CFR Parts 146, 147, 155, and 156.

   ◯ Yes          ◯ No          ◯ NA

48.     As described in further detail below, Optima's submissions for 2018 and 2019 were false because Optima did not adhere to the applicable certification standards and operational requirements set forth in those regulations.

49.     In addition to these attestations, as well as the certification discussed above that any geographic rating factors reflect only differences in the costs of delivery and do not include differences for population morbidity, insurers that apply to be listed on the Exchange must also certify via an actuarial certification that the rates set forth in their application are neither excessive nor deficient.[13]

50.     As discussed below, Milliman and Optima falsely certified the following in Optima's September 15, 2017 actuarial memorandum:

---

[13] *See* CMS, QHP ISSUER APPLICATION INSTRUCTIONS, *supra* note 11, at 69.

---

**EXHIBIT 25. ACTUARIAL CERTIFICATION**

This memorandum may be considered a statement of actuarial opinion. I am a Principal and Consulting Actuary with the firm of Milliman, Inc. I am a member of the American Academy of Actuaries, and I meet the Qualification Standards of the American Academy of Actuaries to render the actuarial opinion contained herein. This filing is prepared on behalf of Optima Health Plan.

I certify to the best of my knowledge and judgment:

1. The projected index rate is

   - In compliance with all applicable State and Federal Statutes and Regulations (45 CFR 156.80 and 147.102).

   - Developed in compliance with the applicable Actuarial Standards of Practice.

   - Reasonable in relation to the benefits provided and the population anticipated to be covered.

   - Neither excessive nor deficient based on my best estimates of the 2016 individual market.

2. The index rate and only the allowable modifiers as described in 45 CFR 156.80(d)(1) and 45 CFR 156.80(d)(2) were used to generate plan level rates.

3. The percent of total premium that represents essential health benefits included in Worksheet 2, Sections III and IV was calculated in accordance with actuarial standards of practice.

4. The geographic rating factors reflect differences in costs and do not include differences for population morbidity by geographic area.

5. The CMS Actuarial Value Calculator was used to determine the AV Metal Values shown in Worksheet 2, Section I of the Part I Unified Rate Review Template for all plans.

---

## E. Virginia's 2018 Approval Process for Insurers to Participate in an Exchange

51.    After insurers submit their applications, the State Corporation Commission (the "SCC") through its subagency, BOI, approves or denies the rates, transfers the application data to the Health Insurance Oversight System,[14] and "provide[s] a certification recommendation for each plan to CMS."[15]

52.    CMS adopts the SCC's certification recommendation as long as the SCC "provide[d] to CMS . . . its final determination of whether a rate increase is unreasonable [or

---

[14] In 2018, the deadline for states to send CMS a recommendation for each plan was September 27, 2017. *See* CMS, QHP Issuer Application Instructions, *supra* note 11, at 2.

[15] *See* CMS, 2018 Letter to Issuers, *supra* note 2.

reasonable], which must include a brief explanation of how its analysis of the relevant factors set forth in § 154.301(a)(3) caused it to arrive at that determination." 45 C.F.R. § 154.210(b)(2).

53.    If approved, the applicant's plans are then listed on the Exchange.

**F.  Premium Tax Credits Under the ACA**

54.    The ACA also created a premium tax credit for individuals and families who meet certain income and eligibility requirements. *See* 42 U.S.C. § 18081(b)(3).

55.    This credit helps reduce the cost of monthly premiums for plans purchased through the Exchange. While the full premium charged by the insurer does not change, the individual's out-of-pocket obligation is reduced because the federal government pays a portion—or, in many cases, the majority—of the cost.

56.    Individuals claim a premium tax credit when they apply for healthcare coverage through the Exchange.[16]

57.    If CMS determines, based on the application and information available for the most recent taxable year, that an applicant is eligible for a premium tax credit, then CMS must calculate the amount due. *See* 42 U.S.C. § 18082(a)(1)(B); *see also id.* § 18082(a)(1). This calculation considers (1) the insurer's premiums and (2) the individual's income. *See* 26 U.S.C. § 36B(b)(2)(A).

58.    If the premium charged exceeds certain thresholds in comparison to the individual's income, then the government pays a portion of the premium cost to alleviate some of the burden that would otherwise fall on the individual.

59.    Individuals may elect whether to accept the federal payment in the form of APTCs, which are paid in advance directly to the insurer, or instead to later claim a tax credit on their

---

[16] *See* VIRGINIA MEDICAL PLANS, *How to Apply for Insurance on HealthCare.gov* (Jan. 20, 2014), https://vamedicalplans.com/2014/01/20/how-to-apply-insurance-healthcare-gov/ (last visited Sept. 23, 2025).

federal tax return.[17] The vast majority of enrollees choose APTCs paid directly to the insurer to reduce the individual's insurance premiums.[18]

## G. The Government Pays Advance Premium Tax Credits to Insurers.

60.    With respect to APTCs, the Secretary of Treasury must "make the advance payment . . . of any premium tax credit allowed . . . to the insurer of a qualified health plan on a monthly basis (or such other periodic basis as the Secretary may provide)." 42 U.S.C. § 18082(c)(2)(A).

61.    To facilitate these payments, CMS sends a monthly Preliminary Payment Report to insurers. This report provides each insurer with a list of the policies for which CMS will send APTC payments later that month.[19]

62.    After the insurers receive the APTC payments, CMS sends the insurer a file that "includes the same policy details supplied in the [Preliminary Payment Report], excluding the individual policy's total premium amounts."[20] This file "[i]ncludes official amounts of APTC . . . payments . . . from the U.S. Treasury" at the "[p]olicy-level."[21]

---

[17] *See* IRS, IRS UPDATES FREQUENTLY ASKED QUESTIONS ABOUT THE PREMIUM TAX CREDIT (2024), https://www.irs.gov/pub/taxpros/fs-2024-30.pdf; *see also* HEALTHCARE.GOV, GLOSSARY: PREMIUM TAX CREDIT, https://www.healthcare.gov/glossary/premium-tax-credit/ (last visited Sept. 23, 2025).

[18] HHS, MARKETPLACE ENROLLEE DEMOGRAPHICS, PLAN GENEROSITY, AND PLAN PREMIUMS IN HEALTHCARE.GOV STATES, *2015–2022* (2024), https://aspe.hhs.gov/sites/default/files/documents/7f06ee1bc345caaaa14c3dbda3c8f7ab/marketplace-plan-generosity.pdf (noting 90% of enrollees in 2022 received advance payment of the premium tax credit) (last visited Sept. 23, 2025); *see also* CMS, EFFECTUATED ENROLLMENT: EARLY 2024 SNAPSHOT AND FULLY YEAR 2023 AVERAGE (2024), https://www.cms.gov/files/document/early-2024-and-full-year-2023-effectuated-enrollment-report.pdf (indicating 93% of enrollees in 2024 received advance payment of the premium tax credit) (last visited Sept. 23, 2025).

[19] *See* CMS, STATE-BASED EXCHANGE PAYMENT DISPUTE, TECHNICAL REFERENCE GUIDE 4 (2019), https://www.hhs.gov/guidance/sites/default/files/hhs-guidance-documents/CMS/combined-enrollment-and-payment-technical-reference-guide.pdf (last visited Sept. 23, 2025).

[20] *Id.*

[21] *Id.* at 6.

63.     In exchange for APTC payments, insurers must reduce premiums payable by eligible individuals and notify the Exchange and the U.S. Department of Health and Human Services ("HHS") of such reductions. *Id.* § 18082(a)(2)(B)(i)-(ii).

## V.      DEFENDANTS' FRAUDULENT CONDUCT

**A.  Sentara and Optima Leveraged Optima's Monopoly Position in Certain Geographic Areas by Grossly Inflating Insurance Premiums in Violation of the ACA.**

64.     As detailed further below, Sentara—Optima's parent company—caused Optima to inflate premiums, deceive regulators, and cause the submission of thousands of false claims for reimbursement, paid for by the United States.

65.     On or about July 14, 2017, Optima submitted a rate filing justification to Virginia regulators, stating that Optima would offer individual healthcare plans in all twelve geographic rating areas across Virginia.

66.     About eight weeks later, on August 11, 2017, Anthem publicly announced that it was withdrawing from Virginia's Exchange.

67.     At that time, Michael Dudley was serving as Optima's president and CEO. He was also Senior Corporate Vice President at Sentara.

68.     Similarly, Howard Kern was President and CEO of Sentara and was serving as the Chair of Optima's Board of Directors.

69.     With Anthem out of the way, Dudley and Kern had an opportunity for Optima to engage in monopoly pricing, which would bolster the financial bottom lines of both companies. On the first business day after Anthem's announcement, Dudley and Kern immediately scheduled and held a meeting.

70.     As a result of that initial meeting and subsequent meetings, Sentara directed that Optima withdraw from many of the geographic areas where it had planned to offer insurance;

Optima would instead only offer individual health plans in those geographic areas where Sentara owned and operated hospitals. The following map shows the geographic areas where Sentara owned or operated hospitals.



71.     The following map shows the geographic areas where Sentara directed that Optima would offer individual health plans (following Anthem's withdrawal).



72.     In most of these geographic areas where Optima and Sentara would both operate, Optima would be the only insurer offering individual healthcare plans.

73.     Optima would therefore have monopoly pricing power in many of these markets, particularly in the most populous cities and counties in those markets. The following table shows that, in the counties and cities where Optima offered individual healthcare plans in 2018, 91% of the overall population of those areas resided in a county or city where Optima was the only insurer offering individual healthcare plans.

| County/City Where Optima Offered individual healthcare plans in 2018 | Rating Area | Insurers Offering individual healthcare plans | 2018 Population |
|---|---|---|---|
| Virginia Beach City | 9 | Optima | 457,763 |
| Chesapeake City | 9 | Optima | 246,000 |
| Norfolk City | 9 | Optima | 245,422 |
| Newport News City | 9 | Optima | 186,714 |
| Hampton City | 9 | Optima | 137,600 |
| Albemarle | 2 | Optima | 108,202 |
| Portsmouth City | 9 | Optima | 97,407 |
| Suffolk City | 9 | Optima | 93,356 |
| Rockingham | 4 | Optima | 80,959 |
| James City | 9 | Optima | 75,444 |
| York | 9 | Optima | 68,973 |
| Harrisonburg City | 4 | Optima | 55,011 |
| Charlottesville City | 2 | Optima | 50,183 |
| Isle Of Wight | 9 | Optima | 38,243 |
| Gloucester | 9 | Optima | 38,030 |
| Louisa | 7 | Optima, Kaiser | 35,634 |
| Halifax | 12 | Optima, Piedmont | 34,694 |
| Mecklenburg | 12 | Optima, Piedmont | 31,268 |
| Fluvanna | 2 | Optima | 26,616 |
| Page | 12 | Optima, HealthKeepers | 23,750 |
| New Kent | 7 | Optima, HealthKeepers | 22,202 |
| Greene | 2 | Optima | 20,084 |
| Southampton | 12 | Optima, HealthKeepers | 18,215 |
| Williamsburg City | 9 | Optima | 15,719 |

17

| Nelson | 2 | Optima, Piedmont | 14,763 |
|---|---|---|---|
| Madison | 12 | Optima, HealthKeepers | 13,386 |
| Poquoson City | 9 | Optima | 12,415 |
| Mathews | 9 | Optima | 8,529 |
| Franklin City | 12 | Optima, HealthKeepers | 8,513 |
| Surry | 9 | Optima | 6,623 |

74.     As previously explained, shortly after Anthem withdrew from the market, Sentara decided that Optima would only provide insurance in areas where Sentara or Sentara's affiliates owned inpatient healthcare facilities. Optima confirmed this fact to BOI, explaining in an August 2018 letter that "[a]fter a thorough discussion between the Boards of Sentara Healthcare and Optima Health, it was decided that Optima would participate in the markets where [Optima] has provider partners."

75.     Optima had almost no competition on the Exchange in the most populated cities where Sentara owned hospitals. Sentara wholly owns Optima. As a result, the cost and utilization of medical services provided by Sentara to Optima's beneficiaries were determined by Optima and Sentara, not by an arm's-length negotiation. Notably, around the relevant time period, Optima's per-member-per-month costs were substantially higher than the national average and Anthem's per-member-per-month costs.

76.     Indeed, Sentara's publicly filed financial documents show that in 2018, Optima (1) spent more than $200,000,000 on services from Sentara-related entities and (2) transferred another $60,000,000 directly to Sentara.

77.     On or around September 15, 2017, shortly after Anthem left the Virginia Exchange, Optima—along with its actuary, Milliman—submitted a new rate filing justification to BOI for 2018. This time, Optima (at Sentara's direction) sought to increase its rates by 81.8%.

18

78.    Optima and Sentara knew that this increase would be unaffordable for almost any family paying out of their own pocket. For example, whereas a family of four in Charlottesville could have purchased Anthem's cheapest health plan in 2017 for $940 per month, that same family would have to pay $2,920 to Optima every month in 2018 (and a family deductible of $14,400) for the least expensive plan—an increase of over 200%.

79.    But Optima and Sentara also knew that the United States would pay most of the premiums that Optima charged in the form of APTCs.

80.    Sentara was actively involved in making the decision for Optima to stay in the Virginia ACA market and to increase rates to such a large degree. *See United States v. Sentara Healthcare et al.*, Misc. Action No. 3:23-MC-00007 (W.D. Va. 2023), ECF No. 1, at 10-11. Indeed, Dudley testified that Sentara CEO Kern "felt it [was] important to ensure that the Board of Sentara was involved in [this decision]." *Id.*

81.    Dudley further stated that Kern was closely involved in all rate filing decisions that Optima made for 2018 and 2019, and that on "major decisions," Kern would obtain "approval from the Board of Sentara for Optima to execute" on those rate setting decisions. *See id.* at 11, 19-20.

82.    In fact, Milliman identified Sentara's chief actuary, James Juillerat, as Optima's contact in the September 15, 2017 actuarial memorandum.

83.    On or about September 20, 2017, BOI approved Optima's proposed rate increase. Among insurers having at least 1,000 enrollees, this was the largest rate increase in the history of the ACA.

84.    Unbeknownst to BOI and United States regulators, the rate filing justification that Optima and Milliman submitted (at Sentara's direction) in support of Optima's 81.8% proposed

rate hike was the product of bad faith assumptions, material omissions, and false and misleading certifications.

85.    Sentara and Optima executives (including but not limited to Dennis Matheis, Howard Kern, and Michael Dudley, among others) and Milliman executives and employees (including, but not limited to, Margaret Chance) personally participated in the unlawful rate-setting practices described herein.

**B.    Relators Investigated and Challenged Optima's Rates.**

86.    Almost immediately after Optima published its rates, Relators undertook intensive efforts to investigate the true causes of the rate increase.

87.    On or about October 26, 2017, Relator Karl Quist wrote a letter to BOI questioning the legitimacy of Optima's rates.

88.    Relators also reported their findings to federal officials at CMS. Relators engaged in numerous phone calls, written communications, and joint meetings with federal and state regulators and Optima officials. They met privately and repeatedly with Optima executives, state officials, and Milliman to determine the true reasons for Optima's rate increases.

89.    Relators also challenged the factual basis and legality of the rates by submitting two formal complaints to BOI.

90.    Throughout their investigation, Relators kept federal and state officials informed of their allegations and findings. They asked state regulators to request specific information and helped federal and state officials investigate the false and fraudulent nature of Defendants' filings.

91.    Throughout the relevant time period and through present day, Defendants have repeatedly blamed others (including other healthcare systems in Virginia), raised baseless excuses,

and otherwise denied that they submitted (or caused to be submitted) false claims for reimbursement.

92.     Relators ultimately uncovered the allegations in the instant action: that the rate filing justifications that Defendants had used to obtain the right to sell on the Exchange and generate hundreds of millions of dollars in APTCs paid by the federal government were false and misleading.

**C.  Optima's 2018 Rate Filing Was False and Fraudulent.**

93.     Optima, Sentara, and Milliman knowingly violated the law, multiple regulations, and explicit guidance when setting Optima's premium prices for individual healthcare plans in Virginia, including (1) fabricating a 25% surcharge to all of Optima's Virginia health plans in the individual market; (2) misrepresenting that Optima expected to receive "zero" risk adjustment transfer payments in 2018 and 2019; (3) applying a fabricated 8% "trend factor"; and (4) applying unwarranted area rate factors that lacked any legitimate factual basis. Each of these had the effect of increasing premium costs and, by extension, the federal government's APTC payments to Optima.

### 1)  <u>Defendants imposed a baseless 25% surcharge.</u>

94.     The 81.8% statewide rate increase was generated in substantial part by Defendants' decision to impose a sweeping 25% surcharge on projected allowed claims for 2018, which in turn inflated Optima's Index Rate (and its Market Adjusted Index Rate), on which premiums are based.

95.     As discussed above, projected rates must be based on "the total combined claims costs for providing essential health benefits within the single risk pool of that State market." 45 C.F.R. § 156.80(d)(1)(i). And insurers that apply to be listed on the Exchange must submit a rate

filing justification that fully discloses all assumptions and factual bases used to support a rate increase.

96.     Optima's rate filing justification, which was prepared and certified by Milliman, included misleading statements, false certifications, and material omissions in relation to the 25% surcharge.

97.     For example, Optima's rate filing justification falsely asserted that the 25% surcharge was supposedly "[b]ased on a review of published studies."

98.     Tellingly, neither Milliman nor Optima disclosed the title or author of these so-called "published studies." According to Milliman, these published studies purportedly anticipated that the cost of health insurance claims would increase between 20% and 25% in 2018.

99.     On January 15, 2018, at Relators' urging, BOI formally requested that Optima (or its actuarial firm Milliman) "provide quantitative support for this additional 25% morbidity load, *including specific references to the published studies* which [Defendants] reviewed and how [those studies] are applicable to the current environment in Virginia." (emphasis added).

100.    In response to this request, and despite repeated further requests, Milliman could only identify one study that mentioned a possible 20% to 25% increase in healthcare costs. Milliman pointed to a Congressional Budget Office report relating to what may happen if Congress should repeal the ACA. But this Congressional report was published in January 2017—well before Optima submitted its prior rate filing justification on July 14, 2017, in which Optima had only proposed a 7.5% surcharge (not a 25% surcharge).

101.    Moreover, between July 25 and July 27, 2017, the Senate defeated four separate bills that would have repealed and replaced the Affordable Care Act, making it ostensibly less likely that Congress would repeal the ACA for the 2018 year. Thus, Optima had no reasonable

basis to increase its projected surcharge from 7.5% (the percentage surcharge Optima proposed in its prior submission on July 14, 2017) to a sweeping 25% based on this Congressional Budget Office report from January 2017.

102.    In any event, Optima did not identify this report in its rate filing justification and instead falsely referred to multiple "published studies." Thus, regulators did not (and could not) appreciate the false and misleading nature of Optima's submission.

103.    Relators continued to push Optima and Milliman for more answers. By letter dated August 8, 2018—nearly a year after the 2018 rates were approved—Optima's President, Dennis Matheis, admitted that the 25% surcharge had been entirely based on Optima's previously undisclosed (and unfounded) assumption that Congress would repeal the ACA's individual mandate in 2018.

104.    Mr. Matheis noted in his letter that although "the new federal tax law signed in January 2018 [that] ended the mandate to purchase insurance [would] not go into effect until 2019, Optima . . . had already priced the mandate change into 2018 premiums[.]"

105.    This was a startling admission by Optima's President because it proved that Optima's rate filing justification included a materially false certification.

106.    Specifically, Optima had expressly certified to regulators that its proposed rate increase was based on Optima's assumption that the law would not change in 2018 and that the individual mandate would remain in effect.

107.    Milliman's certification in the rate filing justification read as follows:

The premium rates developed are based upon regulatory and legislative provisions in effect at the time of this filing, **including, but not limited to, the enforcement of the individual mandate**.

(emphasis added)

108.    Given Optima's subsequent admission, this certification was knowingly false when made.

109.    Milliman later admitted that the 25% increase had been the product of Optima's "business judgment," not the product of professional actuarial judgment.

110.    In Milliman's letters to BOI, Milliman wrote that "Optima made the business decision" to apply the 25% surcharge and referenced "the decision-making process that Optima took in determining a final assumption."

111.    If Optima and Milliman had told Virginia regulators the truth—*i.e.*, that its proposed 25% surcharge was not based on published studies or actuarial judgment and was instead based on Optima's "business decision" to increase profits—Optima never would have obtained approval for the 25% surcharge and would not have been eligible to participate in the Virginia Exchange in 2018.

112.    Optima's projection of a 25% surcharge on total combined claims costs for providing essential health benefits in Virginia violated the ACA's implementing regulations, including, but not limited to, 45 C.F.R. § 156.80(d)(1)(i), which requires an insurer to set its Index Rate "based on the total combined claims costs for providing essential health benefits within the single risk pool of that State market."

113.    Specifically, when Optima attested that its projected premiums complied with 45 C.F.R. § 156.80(d)(1)(i), it impliedly certified that the costs for providing essential health benefits in Virginia had not been unlawfully inflated. Optima's attestation was therefore false because Optima had imposed an unwarranted and unjustified 25% surcharge on projected claims costs, allowing Optima to collect premiums that were much higher under than MLR requirement.

114.    Additionally, Milliman and Optima falsely certified in their September 15, 2017 actuarial memorandum that Optima's projected premiums were (1) based upon regulatory and legislative provisions then in effect (including the individual mandate), (2) "[i]n compliance with all applicable State and Federal Statutes and Regulations (45 CFR 156.80 and 147.102)"; (3) "[r]easonable in relation to the benefits provided and the population anticipated to be covered"; and (4) "[n]either excessive nor deficient based on [Milliman's] best estimates of the 2016 individual market."

### 2) Optima and Milliman falsely represented to regulators that Optima did not expect to receive any risk adjustment transfer payments.

115.    Optima (at Sentara's direction) and Milliman made knowingly false statements about their projected risk adjustment transfer payments, in violation of the law, including 45 C.F.R. § 156.80, which requires insurers to adjust their projected costs per member based on expected risk adjustment transfer payments when setting premiums. Defendants' false statements regarding risk adjustment transfer payments led to fraudulent inflation of Optima's premiums, which, in turn, led to the government paying unwarranted APTCs to Optima.

116.    Under federal regulations, an insurer that anticipates receiving a risk adjustment transfer payment must adjust the index rate to account for expected payments and charges under the risk adjustment program. *See* 45 C.F.R. § 156.80(ii). In other words, the insurer must reduce premiums to account for payments it expects to receive at the end of the year.

117.    When Optima and Milliman submitted Optima's 2018 rate filings with Virginia's BOI for 2018 in July 2017 (*i.e.*, before Anthem left the market), Optima and Milliman represented that Optima expected to receive approximately $36 million (or $122.60 per-member-per-month) in risk adjustment transfer payments at the end of 2018. This expected risk adjustment payment

meant that Optima anticipated that its enrollees would have a higher average risk score than the average risk score for individuals across the Commonwealth of Virginia.

118.    However, in September 2017, after Anthem left the market, Optima and Milliman amended Optima's projection by resetting its anticipated risk adjustment transfer payment **to zero**. As a result, Optima and Milliman unlawfully increased premiums because there was no longer any deduction for the expected end-of-year payment.

119.    By resetting its risk adjustment transfer payment to zero, Optima represented to regulators that the average risk score for Optima's enrollees was equal to the average risk score for individuals in the State of Virginia.

120.    Milliman's actuarial memorandum, which was included in Optima's rate filing justification, asserted that the zero-dollar risk adjustment projection was based on Milliman's estimate that Optima's 2018 risk profile would be equal to the statewide average. The actuarial memorandum said so explicitly: "we estimate Optima's 2018 risk profile will be similar to the Virginia 2018 individual single-risk pool market average":

> PROJECTED RISK ADJUSTMENTS per-member-per-month Optima's 2018 risk adjustment estimate is based on anticipated changes in Optima's risk relative to the statewide average, consideration of the changes to the risk adjustment model, and actuarial judgement.
>
> In consideration of a sizeable increase in membership, we estimate Optima's 2018 risk profile will be similar to the Virginia 2018 individual single-risk pool market average and will only pay the $0.14 per-member per-month user fee . . . .

121.    These express representations were contradicted by Optima's own statements. For example, at a meeting with Relators, Optima's executives said that Optima needed to significantly increase its premiums to cover the higher cost of servicing new enrollees, such as those in Charlottesville, who would likely switch from Anthem to Optima.

122.    Optima's Matheis represented that the morbidity of individuals in Charlottesville who were buying health insurance through the Exchange was higher than the state average. In its September 2017 actuarial memorandum, Optima represented that the Charlottesville market comprised over 13% of its total enrollee group for 2018—a substantial increase from Optima's estimate of the number of policyholders it would have from the Charlottesville area made with Anthem exited the market (which was 0.2%).

123.    Likewise, in connection with Optima's area rating factor analysis, Optima represented that its beneficiaries in Charlottesville would incur costs 57.9% greater than the statewide average. Mr. Matheis admitted that this calculation was "all risk driven," meaning Charlottesville beneficiaries had greater morbidity compared with statewide average.

124.    By Mr. Matheis's logic, the addition of Anthem's Charlottesville enrollee pool to Optima's preexisting beneficiary group should have *increased* the end-of-year risk adjustment transfer payment, not reduced it.

125.    Had Optima properly accounted for the addition of Anthem's beneficiaries to its pool of beneficiaries, it would have calculated an expected risk adjustment transfer payment of about $93 million. Optima's misrepresentation regarding this payment resulted in an increase in premiums of about $93 million, much of which was paid by the United States.

126.    Optima's and Milliman's explanation of their expected risk adjustment transfer calculation was knowingly false. Milliman later claimed that it had "no evidence" on which to calculate Optima's 2018 risk profile for the risk adjustment transfer payments. It simply assumed Optima's risk profile would equal statewide averages due to what Optima and Milliman referred to as Optima's "sizeable" share of the market.

127.    Optima and Milliman also failed to disclose the "assumption[s]" that they relied on when calculating their expected risk adjustment transfer payment. Under CMS's Unified Rate Review Instructions, Optima was required to explain all its assumptions related to its risk adjustment transfers calculations:

> Insurers are expected to explain all of their market and plan level assumptions related to the inputs of the HHS payment transfer formula (or alternative State payment transfer formula, if applicable).

128.    In fact, Optima and Milliman possessed information showing that the true risk profile of Optima's enrollees was substantially higher than the statewide average.

129.    The Actuarial Standards Board—which sets guidelines for what actuaries like Milliman should consider, document, and disclose when performing their work—provides guidance to actuaries when estimating risk adjustment transfer payments. The Board warns that zeroing out the risk adjustment transfer payments based on an insurer's market share may be appropriate if the insurer's enrollees equaled the entire market or were at least close to that of the total market. But even then, the Board warns that this assumption would only be appropriate if the actuary was without other information to consider.

130.    Neither was the case here. Optima's 2018 market share was only 16%—a far cry from close to the total market. To boot, Optima's market share was concentrated in a few geographic areas, making it even less likely that its beneficiaries were representative of the statewide average risk pool.

131.    Optima later claimed that it simply did not have enough information to project a number, so it set the risk adjustment transfer payment to zero. But Optima knew when it reset its risk adjustment transfer payment to zero that it did not have (and would not obtain) a membership population that was so close to the total market that it would justify a zero risk adjustment transfer

payment, especially considering the geographic concentration of the areas in which Optima would offer individual healthcare plans in 2018.

132.    For example, Optima's decision to reset the number to zero *ignored its own historical data and experiences in the Virginia market*. In the two prior years (2016 and 2017), Optima received significant risk adjustment transfer payments[22] due to the greater-than-average morbidity of its enrollees, evidence that strongly supported Optima's original estimate of approximately $36 million (or $122.60 per-member-per-month) in expected risk adjustment transfer payments due.

133.    In fact, consistent with the prior risk adjustment transfer payments and the addition of the high-risk Anthem beneficiaries, at the end of 2018, Optima actually received $93 million more in risk adjustment transfer payments than it had projected (which was $0). This breaks down to $124.18 in risk adjustment transfer payments per-member-per-month, which is only about 1% higher than the $122.60 per-member-per-month payment that Optima projected in its July rate filing.

134.    If Optima had legitimately forecasted its expected risk adjustment transfer payments, its premium increase would have been reduced by approximately that same amount.

135.    As a result of Optima's fraudulent risk adjustment transfer payment projection, the United States paid tens of millions more in APTCs than it should have paid.

136.    This conduct rendered Optima's certification that it had complied with the requirements set forth in 45 C.F.R. Parts 147 and 156 (related to setting premiums) false and misleading. For example, 45 C.F.R. § 156.80(d)(1)(ii) requires an insurer adjust its Index Rate

---

[22] For 2016, Optima received over $48 million in total risk adjustment transfer payments and $117 in payments per-member-per-month. For 2017, the numbers were higher: it received over $52 million in total risk adjustment transfer payments and $235 in payments per-member-per-month.

basis market-wide "based on the total expected market-wide payments and charges under the risk adjustment program . . . ." Optima knew it would receive significant risk adjustment transfer payments; yet it falsely represented that it would not receive any risk adjustment transfer payments. Thus, Optima did not properly adjust its Index Rate as required by the regulations, which led to a significantly higher premium projection (and the receipt of hundreds of millions of APTCs).

137. Additionally, Milliman and Optima falsely certified in their September 15, 2017 actuarial memorandum that Optima's projected premiums were (1) "[i]n compliance with all applicable State and Federal Statutes and Regulations (45 CFR 156.80 and 147.102)"; (2) "[d]eveloped in compliance with the applicable Actuarial Standards of Practice"; (3) "[r]easonable in relation to the benefits provided and the population anticipated to be covered"; and (3) "[n]either excessive nor deficient based on [Milliman's] best estimates of the 2016 individual market."

### 3) Optima applied a fabricated 8% trend factor to account for medical inflation.

138. At Sentara's direction, Optima and Milliman falsely justified Optima's rate increase by applying an assumed 8.1% "trend factor" that purported to account for healthcare inflation.

139. Defendants knew the projected 8.1% increase was false, because it was flatly contradicted by Milliman's Medical Index, which showed that the medical related inflation trend was only 4.7% in 2016 and 4.3% in 2017, yet Milliman still certified the projected increase.

140. Optima did not have a good faith factual basis for its assumption of an 8.1% inflation rate in 2018, which would have represented a nearly two-fold increase over the prior years.

141. This fraudulent projection violated the requirements in 45 C.F.R. § 156.80(d)(1)(i) regarding setting premiums based on the total combined claims costs for providing essential health

benefits. Thus, Optima's certification that it complied with, among other things, 45 C.F.R. Part 156, was false.

142.    Additionally, Milliman and Optima falsely certified in the September 15, 2017 actuarial memorandum that Optima's projected premiums were (1) "[i]n compliance with all applicable State and Federal Statutes and Regulations (45 CFR 156.80 and 147.102)"; (2) "[r]easonable in relation to the benefits provided and the population anticipated to be covered"; and (3) "[n]either excessive nor deficient based on [Milliman's] best estimates of the 2016 individual market."

### 4) Defendants assigned self-serving geographic area rate factors to drive higher premiums while hiding their methodology from regulators.

143.    Optima's rate increases were more severe in certain areas of Virginia, and the geographic rates that Optima charged for its plans made no logical sense other than to drive profits by increasing premiums. For example, Optima and Milliman assigned a 1.579 area rate factor ("ARF") multiplier to its individual market plans in Charlottesville, meaning that Optima and Milliman had supposedly determined that the cost of healthcare in Charlottesville (while ignoring morbidity) was 59% higher than the average cost of healthcare throughout Virigina.

Optima Area Rating Factors Used in its Small Group & Indiv Filings

| Area | Small Group | Individual |
|---|---|---|
| Blacksburg-Christiansburg-Radford VA | 1.037 | |
| Charlottesville | 0.937 | 1.579 |
| Danville | 1.107 | |
| Harrisonburg | 0.984 | 1.265 |
| Kingsport-Bristol-Bristol TN-VA | 0.965 | |
| Lynchburg VA | 0.960 | |
| Richmond VA | 1.040 | 1.404 |
| Roanoke VA-NC | 0.998 | |
| Virginia Beach-Norfolk-Newport News | 0.965 | 1.000 |
| Washington-Arlington-Alexandria | 1.459 | |
| Winchester, VA-WV | 0.986 | |
| Out-of-Area | 1.012 | 1.250 |

31

144.    This rating score made no sense because, for example, although Optima and Milliman assigned an ARF of 1.579 for its individual healthcare plans in Charlottesville, they simultaneously assigned an ARF of only 0.97 to Optima's small-group plans in the same geographic area. Because Relators continued to pressure Optima for answers, Optima's executives admitted that the provider networks were the same for the individual healthcare plans and the small-group plans. This fact was confirmed by BOI.

145.    Unsurprisingly, Optima concealed the true reasons for its inconsistent ARFs from regulators. The Unified Rate Review Instructions required that if Optima engaged in geographic adjustments, which it did, then it was required to "provide a detailed description of how geographic rating factors were developed." The detailed description was necessary for Virginia regulators to fulfill their duty to "examin[e] the reasonableness of the assumptions used by the insurer to develop the proposed rate increase, and the validity of the historical data underlying the assumptions." 45 C.F.R. § 154.301.

146.    Milliman's actuarial memorandum in Optima's rate filing justification did not include any description of how the geographic rating factors were developed. Instead, the section of the memorandum in which this description should have appeared merely parroted the text of the relevant regulation.

147.    The differences in ARFs were not the product of actuarial differences in the cost of delivering healthcare; instead, Milliman admitted the differences were driven by "competitive considerations." Again, neither Optima nor Milliman had disclosed in the rate filing justification that Optima's ARFs were the product of "competitive considerations." The Deputy Director in the Rate Review Division of CMS told Relators that it was improper under applicable law for Optima to drive these differences based on "competitive considerations."

148.    Relators continued to investigate and push for answers. Relators eventually discovered that Optima's foremost goal was always to obtain a competitive advantage by setting ARFs based on morbidity, faulty data, and internal price manipulations. Each of these legal flaws is discussed in turn below.

### i. *Optima's ARFs illegally incorporated morbidity data.*

149.    First, Optima set their ARFs based, in large part, on Milliman's "Health Cost Guidelines" ("HCGs"), which incorporated morbidity data. The ACA strictly prohibits the use of morbidity data when calculating ARFs, and if morbidity is somehow reflected in the underlying data, the insurer and/or actuary must take affirmative steps to remove morbidity, so that it is no longer reflected in the calculation.

150.    Relators immediately suspected that Milliman was improperly injecting morbidity data into the ARFs (or was not taking the necessary steps to remove morbidity from the underlying data). At Relators' urging, BOI questioned Optima and Milliman, but Milliman denied that its HCGs included morbidity.

151.    Based on Milliman's repeated denials, Relators recognized that Defendants would never admit this fact to regulators. Therefore, Relators arranged for other non-Milliman actuaries to informally speak to actuaries at Milliman to learn the truth.

152.    On or about September 15, 2018, an actuary at Milliman described the HCGs to a fellow non-Milliman actuary as follows:

> The area factors are normalized for age/gender. To the extent there is morbidity not explained by age/gender, that left-over morbidity could be reflected in the area factors. The area factors are not explicitly risk-adjusted for morbidity drivers that are in addition to age/gender. The area factors will have some residual risk baked into them (risk that was caused by something other than age/gender).

153.     On or about October 29, 2018, a different Milliman actuary, with a significant role compiling the HCGs, explained to a different, non-Milliman actuary that:

> The area factors are meant to reflect the underlying practice patterns in the area for a standard population, but given the data we receive we do not explicitly adjust for morbidity, just age/gender. As such, there will be differences due to health status and it's difficult to fully separate those out.

154.     As a result, Relators discovered Milliman's HCGs included morbidity data (and that Milliman was not taking the necessary steps to remove morbidity from the ARF calculation). Optima and Sentara nevertheless relied on Milliman's HCGs to calculate ARFs.

155.     Additionally, on December 14, 2017, Relators personally met with Optima's incoming President Matheis, outgoing President Dudley, and Director of Marketing. In that meeting, these senior Optima executives repeatedly acknowledged that morbidity had played a central role in Optima's ARFs.

156.     In one exchange at that meeting, for example, Relators asked Optima to explain the factors contributing to the 1.579 ARF multiplier for the Charlottesville area. In response, Optima's President Matheis explained that the contributing factors were (1) the relative health of the population that is buying insurance in the Exchange and (2) the utilization rate of that population due to their health status. President Matheis described morbidity factors that cannot be considered when setting ARFs.

157.     Because of Relators' investigation and despite Defendants' repeated denials, it became clear by mid-2019 that Optima's and Milliman's certifications to regulators in their 2018 filings were false, including, but not limited to their certification that they had not relied on morbidity when setting ARFs.

158.    On or around May 24, 2019, Bob Grissom at BOI informed Relators that Optima's and Milliman's inclusion of morbidity data in their ARF calculations could have affected BOI's rate approval decision. This makes sense, given that the ACA, its implementing regulations, and applicable guidance required Milliman to truthfully certify that "[t]he geographic rating factors reflect differences in costs and do not include differences for population morbidity by geographic area."

### ii.    Optima's ARFs were based on erroneous cost data for local residents.

159.    Milliman's HCGs had other deficiencies. Milliman's HCGs were also unsuitable for setting ARFs because they wrongly assessed costs based on facility location rather than patient location.

160.    For example, costs incurred by a healthcare provider or facility do not accurately reflect the true costs of treating residents living near the facility. Healthcare providers often treat out-of-area residents. Attributing costs to local populations based on the experience of sick, out-of-area residents treated at academic or medical research hospitals overstates the risk profiles of local residents. This is especially true of secondary and tertiary care hospitals, to whom other healthcare providers send their sickest and most badly injured patients.

161.    For example, the Health University Medical Center at the University of Virginia ("UVAH") is an academic medical center that is categorized as a tier 1 trauma center. It handles the region's sickest and most badly injured patients. Average costs incurred at UVAH far exceed the average costs for treating residents who live near UVAH. UVAH's patient morbidity and cost data is not a reliable proxy for assuming the cost of treating local residents.

162.    By wrongly relying on UVAH's health costs to estimate the cost of treating local residents, Optima was able to greatly increase its ARFs scores for that locality, allowing Optima

35

to dramatically increase the premiums it charged to enrollees who live near hospitals such as UVAH.

163.    Because Relators continued to press for the truth, BOI regulators required Milliman to disclose whether its HCG data was compiled from actual member data or from provider (facility) data. In response, Milliman acknowledged that in some cases, its HCGs were calculated based on provider cost data rather than patient cost data.

164.    According to a letter from Milliman to BOI, "[p]rovider based data sources are modified to be on a member location basis as able." The letter then continues by asserting that the HCGs "are intended to be applied to a population in a specific area."

165.    Optima's rate filing justification should have disclosed that its ARFs were improperly based on the false assumption that costs generated at an academic or medical research hospital are costs incurred by local residents, when, in fact, Optima and Sentara knew that academic and research hospitals treat a disproportionate number of patients residing outside the region.

> iii.    *Defendants further inflated the ARFs by overly relying on a small dataset comprised of very sick subscribers.*

166.    Optima also inflated its ARFs for certain regions by relying on an unrepresentative sample of data associated with a small population of very sick patients.

167.    For example, prior to 2018, Optima insured a miniscule population in the individual market in Charlottesville. In 2016, the last full year prior to the 2018 rate filing justification, Optima insured fewer than 100 members in Charlottesville.

168.    In response to Relators' ongoing investigation, Optima executives told Relators that its Charlottesville enrollees consisted primarily of high-cost individuals being treated for chronic

immune deficiencies, including human immunodeficiency virus (HIV) and acquired immune deficiency syndrome (AIDS).

169.    The cost of treating this small population of patients was not representative of the Charlottesville area as a whole. Yet, Optima, Milliman, and Sentara relied heavily on the cost of treating these enrollees when calculating the ARF for the Charlottesville area (which included Albermarle, Fluvanna, and Greene Counties in addition to the City of Charlottesville).

170.    Optima had access to quality data but chose not to use it. In fact, Optima's own data in the small group market extended to more than 1,000 covered enrollees in 2016. This data confirmed that after controlling for morbidity, the cost of healthcare in Charlottesville was less than the average cost of healthcare in Virginia. Yet, Optima assigned an ARF to its Charlottesville individual market plans that was 57.9% higher than the average cost elsewhere in Virginia—in direct contradiction with Optima's other representation that it would not receive any risk adjustment transfer payments because its risk pool was equivalent to the market average.

171.    In response to Relators' ongoing investigation, BOI later rejected Optima's decision to rely so heavily on the cost of such a small population of immune deficiency patients when calculating the ARF for the Charlottesville area

172.    Optima violated the Unified Rate Review Instructions dictating that ARFs cannot consider morbidity and falsely certified that it complied with 45 C.F.R. §§ 147 and 156.

### iv.    Optima and Milliman Falsely Certified That Optima's ARFs Did Not Account for Morbidity.

173.    Mandatory certification language required Optima and Milliman to certify that their ARFs for the different geographic regions where they offered healthcare plans "do not include differences for population morbidity by geographic area." For the reasons discussed above, this certification was false.

174.    To cover its tracks, Milliman misleadingly amended the certification so that they certified that ARFs "reflect differences in cost." Milliman's edits to the mandatory certification are shown by the strikethroughs below:

> The geographic rating factors reflect ~~only~~ differences in ~~the~~ costs ~~of delivery (which can include unit cost and provider practice pattern differences)~~ and do not include differences for population morbidity by geographic area."

175.    Milliman's knowing deviation from the official government rules, and the doctoring of a mandatory certification based on a purported Q&A answer, further demonstrate that Defendants knowingly committed fraud.

176.    BOI later concluded that any actuarial certification that indicates that morbidity had been removed from Optima's ARFs would be considered incorrect.

**D.    Defendants Concealed Their Fraud Through False Statements, Material Omissions, and a Public Campaign of Misinformation.**

177.    As Relators continued to push forward in their investigation, Defendants continued to deny that they had violated the ACA's rate setting provisions and engaged in a campaign to sway public opinion based on false information.

178.    Over the course of 2018, Defendants had access to data that demonstrated that the 2018 rates were significantly inflated, but they chose to ignore it. Over the course of 2018, Defendants also knew that Optima would fall far short of the 80% minimum medical loss ratio required by the ACA.

179.    Yet, throughout 2018, Defendants continued to defend their 2018 premiums as reasonable and supposedly based on accurate data, even though they knew the premiums were neither reasonable nor based on accurate data.

180.    For example, by letter dated August 8, 2018, Optima told Virginia regulators that its MLR for the first quarter of 2018 had been 74.9%, and that this percentage would likely increase

38

throughout the remainder of the year when, in fact, Optima knew that this percentage would soon plummet.

181.    At that time, Defendants already knew that Optima's second quarter MLR was approximately 54%, and that its MLR through the first half of the year was only 64% and quickly dropping. On information and belief, at no time during the 2018 rate year did Optima disclose the full scope of the MLR shortfall.

182.    Defendants even tried to falsely blame others for Optima's exorbitant rate increases. For example, Optima tried to blame UVAH for supposedly causing the Charlottesville area to have a 1.579 ARF.

183.    Upon hearing Defendants' attempt to blame UVAH, Relators were suspicious. Among other reasons, Anthem (who was Optima's predecessor in the individual market in Charlottesville) had assigned an ARF to Charlottesville of less than 1.0 in 2017, meaning that Anthem considered the cost of treating Charlottesville residents to be less than the average cost of treating a patient elsewhere throughout Virigina.

184.    Nevertheless, Relators directed their investigation toward UVAH to uncover the truth. On June 26, 2018, Relators met with Dr. Rick Shannon, Executive Vice President of Health Affairs at the University of Virginia, to better understand UVAH's role in the cost of treating Charlottesville residents. At the meeting, Relators discovered there was only a minor difference in pricing between the rates UVAH charged Optima and what it charged other insurers.

185.    UVAH's modest price differential between Optima and other insurers in 2018 simply could not justify Optima's substantial increase in premiums in the Charlottesville market.

E.    **Optima's 2019 Premium Rates Were Also Fraudulent.**

186.    On August 16, 2018, Optima and Milliman submitted a new rate filing justification to BOI to justify Optima's proposed premium prices for 2019.

187.    While Optima's 2019 rates were somewhat lower than the 2018 rates, the 2019 rates were still significantly overpriced. Optima and Milliman had again falsely represented that they expected zero dollars in risk adjustment transfer payments for 2019, just as they had done one year earlier.

188.    In four of the five geographic areas where Optima offered individual healthcare plans, Optima and Millian again assigned an ARF that exceeded the average cost elsewhere in Virginia. Specifically, Optima and Milliman assigned an ARF of 1.347 to rating area 2 (Charlottesville); an ARF of 1.095 to rating area 4 (Harrisonburg); an ARF of 1.331 to rating area 7 (Richmond); and an ARF of 1.310 to rating area 12 (non-MSA) an ARF of 1.310, while setting an ARF of 1.0 for its corporate home base in rating area 9 (Virginia Beach/Hampton Roads).

189.    Like in 2018, Optima again set its prices in 2019 based on bad faith claim cost projections, causing its MLR to again fall woefully short of legal limits. Indeed, Optima's MLR for 2019 was an abysmal 56.4% for the individual plan market—well short of the 80% minimum statutory target.

190.    By fraudulently inflating Optima's rates through these mechanisms (and failing to disclose the true reasons for the inflated prices), Optima and Milliman deceived BOI into approving Optima's inflated rates for 2019, causing the United States to pay tens of millions in APTCs to Optima that it would not have paid had it known the truth.

**F.      Defendants Presented or Caused to be Presented False Claims to the Government and Made or Caused to be Made False Statements Material to False Claims.**

191.    As alleged herein, through Defendants' false and fraudulent rate filings for 2018 and 2019, as well as false attestations and certifications, Defendants submitted, or caused to be submitted, false claims to the government, as well as false statements material to false claims in violation of Sections 3729(a)(1)(A) and (B) of the FCA.

192.    A claim is defined under the FCA as "any request or demand . . . for money or property . . ." to the United States. 31 U.S.C. § 3729(b)(2)(A).

193.    Defendants' fraudulent conduct as alleged herein caused the following false claims to be submitted to the United States: (1) beneficiaries' claims for assistance with the payment of premiums that were fraudulently set by Defendants, (2) Optima's confirmations of enrollment to CMS, and (3) Optima's failure to correct CMS's monthly Preliminary Payment Reports, which provided Optima with that month's APTCs, as explained above.

194.    As a result, per the ACA, the Secretary of Treasury must "make the advance payment . . . of any premium tax credit allowed . . . to the insurer of a qualified health plan on a monthly basis (or such other periodic basis as the Secretary may provide)." 42 U.S.C. § 18082(c)(2)(A).

195.    In its 2018 MLR report, Optima admitted that for the 2018 rate year, it had received $534,635,654 in APTCs directly from the government. In its 2019 MLR report, Optima admitted it received $131,38,663 in APTCs from the government.

196.    One of the main purposes for the passage of the ACA was to control healthcare costs. The ACA includes many provisions intended to make insurance more affordable, including by those covering part or all of the premiums for certain individuals through the payment of APTCs by the government directly to insurers. 26 C.F.R. § 1.36B-1.

41

197.    Further, as detailed above, the ACA and implementing regulations are designed to prevent unreasonable rate increases like those at issue in this action. Here, CMS delegated the responsibility to Virginia to create an Effective Rate Review Program and determine whether the rates are reasonable. The rate review designed by Congress attempted to serve the very function of preventing health insurers from inflating premiums and receiving inflated APTCs from the government.

198.    Additionally, the law and regulations require insurers to make several key attestations of compliance to the government as a prerequisite to participate in the Exchange and to get premium rates approved as reasonable and as neither excessive nor deficient.

199.    Defendants knew that "[c]ompliance with the requirements of [the ACA] concerning eligibility for a health insurance insurer to participate in the Exchange shall be a material condition of an insurer's entitlement to receive payments, including payments of premium tax credits . . . through the Exchange." 42 U.S.C. § 18033(a)(6)(A). In other words, compliance with the ACA's eligibility requirements was a "condition of payment" to receive APTCs from the government.

200.    Defendants knew that the ACA specifically states that the False Claims Act applies to "[p]ayments made by, through, or in connection with an Exchange . . . if those payments include any Federal funds." 42 U.S.C. § 18033(a)(6)(A). Thus, Congress made it clear that payments such as the APTCs at issue in this action are subject to FCA liability.

201.    Defendants' fraudulent conduct goes to the "very essence of the bargain" between the government and Defendants. *Universal Health Servs. Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 193, 196 n.5 (2016) (cleaned up). Defendants' false and inflated premiums based on fraudulent rate filings had a direct effect on the amount paid by the government in APTCs to

Defendant Optima. In other words, Defendants' fraud directly increased the amount the government paid out.

202.    Because Defendants' fraud caused the government to overpay APTCs by hundreds of millions of dollars, the fraud was not "minor and insubstantial," further proving materiality. *Id.* at 194.

203.    The government, through the Department of Health and Human Services, has made it clear that violations of the ACA will be taken seriously and if found non-compliant, the consequences may include: decertification of Qualified Health Plans, the imposition of civil money penalties, FCA liability, and "depending on the specific conduct in question, there may be additional federal and state criminal or civil authorities that apply." Letter from Kathleen Sebelius, HHS, to the Hon. Jim McDermott, U.S. House of Representatives (Oct. 30, 2013).

**G.    Defendants' Fraud Caused Hundreds of Millions of Dollars in Damages to the United States.**

204.    In situations where a contract or extension of government benefit was obtained originally via fraudulent inducement, liability "attache[s] to all claims submitted to the government under the contract." *Skinner v. Armet Armored Vehicles, Inc.*, No. 4:12-cv-00045, 2015 WL 2238941, at *6 (W.D. Va. May 12, 2015).

205.    Defendants' rate filings, which were included as part of Optima's application to participate on the Exchange, were materially false and fraudulent. As a result, the government was fraudulently induced to allow Optima to participate on the Exchange in 2018 and 2019. The government suffered damages for every subsequent claim for payment of APTCs resulting from Defendants' fraudulent conduct and statements regarding Optima's eligibility.

206.    Alternatively, Defendants' materially false certifications and false and fraudulent rate filings caused the government to pay more APTCs to Optima than it would have absent Defendants' fraud.

207.    As a result, the United States suffered hundreds of millions of dollars in single damages. Under the FCA, damages are trebled.

208.    Additionally, the FCA imposes statutory penalties for each false claim.

209.    Defendants knowingly violated the ACA's rate setting regulations, causing an 81.8% increase in the price of healthcare premiums in certain markets throughout Virgina, most of which was paid for by the United States through APTCs.

210.    The fraud is evident when considering, among other allegations asserted herein, Optima's MLR for 2018. Again, the MLR is the percentage in premiums the insurer pays out on the actual provision of health care for policyholders. On October 4, 2019, CMS released MLR data for the 2018 reporting year. The average MLR for insurers across the country in 2018 was 78%. In comparison, Optima's statewide MLR for 2018 was only 49.8%. In Charlottesville, Optima's MLR was 35%.

211.    Optima's MLR shortfall was the largest of any insurer in the nation.

212.    In fact, Optima generated 13% of the total MLR shortfall nationwide among all insurers, even though it insured only about 0.6% of the national market. While Optima insured only 16.66% of the Virginia market, its MLR shortfall in the individual market for Virginia was greater than the total accumulated shortfall of all other insurers combined in any single state.

213.    As shown by the below table, Optima's extreme missed projections for 2018 extended well beyond MLR, also affecting other key data points such as its total projected claims,

claims per-member-per-month, net underwriting profits, profits per-member-per-month, and increased claims per-member-per-month.

| Measure | Projected In Filings | Actual Results | Delta |
|---|---|---|---|
| Total Projected Claims | $609,032,985 | $310,051,565 | -49% |
| Claims PMPM | $723.64 | $414.84 | -43% |
| Net Underwriting Profits (Before MLR Rebates) | $141,469,769 | $312,231,798 | +120% |
| Profits PMPM | $168.09 | $414.18 | +146% |
| Increase in Claims PMPM (YOY) | +21% | -21% | -200% |

214.    An insurer of Optima's size and experience, if acting in good faith, would not have such extreme misses on these key indicators. Rather, the wide discrepancy between Optima's projections and actual results indicates deliberate manipulation of the data.

215.    The ACA includes a mandatory rebate program. Under this program, insurers such as Optima who fail to meet minimum MLR requirement, must issue rebates to enrollees. (Critically, these rebates do not go to the government.)

216.    On information and belief, Defendants have not refunded the government any portion of the inflated APTCs that the government paid to Optima.

217.    Any rebate paid by Optima to policy holders obviously does not reimburse the government for the fraud. The rebate calculation cannot and does not make whole the policyholders when the insurer's MLR falls below 80% because the insurer gets to keep 20% of an amount that turns out to have been pegged too high. Put differently, the rebate does not refund the full amount the insurer overcharged. Even worse, the lower the insurer's MLR below 80%, the

greater the difference between the rebate amount and the overcharged amount. In other words, the bigger the deception, the bigger the profits.

218.    In Optima's case, even when accounting for rebates, Optima retained tens of millions in illicit profits that it never would have received but for the fraud.

219.    By knowingly inflating premiums in violation of the ACA, Optima's individual healthcare plans in Virginia generated an astounding $235 million in additional revenues—far above the 80% loss rate permitted by federal law. And by utilizing the three-year running average for rebate calculations, Optima was able to retain at least $70 million dollars in illicit profits that it would not have received but for the fraud.

220.    Damages are calculated by the harm Defendants caused to the United States. Absent a remedy in this case, Defendants' fraud will have caused hundreds of millions in damages to the United States.

## VI.    CAUSES OF ACTION

### COUNT I

**Federal False Claims Act – False Claims
31 U.S.C. § 3729(a)(1)(A)
Against All Defendants**

221.    Relators reallege and incorporate by reference Sections I-V as if fully set forth in this claim for relief.

222.    This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729, *et seq.* as amended.

223.    The FCA, 31 U.S.C. § 3729(a)(1)(A), creates liability for a person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval." Defendants repeatedly violated this provision of the FCA.

224.    The government, unaware of the falsity of all such claims made or caused to be made by Defendants, has paid such false or fraudulent claims that would not have been paid but for Defendants' illegal conduct.

225.    By reason of Defendants' acts, the United States has been damaged in a substantial amount to be determined at trial.

226.    Additionally, the United States is entitled to the maximum statutory penalty for each and every violation alleged herein.

<u>COUNT II</u>

**Federal False Claims Act – False Records or Statements**
**31 U.S.C. § 3729(a)(1)(B)**
**Against All Defendants**

227.    Relators reallege and incorporate by reference Section I-V as if fully set forth in this claim for relief.

228.    This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729, *et seq.* as amended.

229.    The FCA, 31 U.S.C. § 3729(a)(1)(B), creates liability for a person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." Defendants repeatedly violated this provision of the FCA.

230.    The government, unaware of the falsity of the records, statements, and claims made or caused to be made by Defendants, or records, statements, has paid claims that would not have been paid but for Defendants' illegal conduct.

231.    By reason of Defendants' acts, the United States has been damaged in a substantial amount to be determined at trial.

232.    Additionally, the United States is entitled to the maximum statutory penalty for each and every violation alleged herein.

47

## Count III

### Federal False Claims Act – Conspiracy
### 31 U.S.C. § 3729(a)(1)(C)
### Against All Defendants

233.     Relators realleges and incorporates by reference Sections I-V as though fully set forth herein.

234.     This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729, *et seq.* as amended.

235.     By and through the acts described above, Defendants Optima and Sentara conspired with Milliman to commit violations of 31 U.S.C. § 3729(a)(1)(A) and (B).

236.     The government, unaware of the conspiracy and fraudulent schemes, has paid claims that would not have been paid but for Defendants' illegal conduct.

237.     By reason of Defendants' acts, the United States has been damaged in a substantial amount to be determined at trial.

238.     Additionally, the United States is entitled to the maximum statutory penalty for each and every violation alleged herein.

## PRAYER FOR RELIEF

**WHEREFORE,** Relators respectfully pray for judgment against Defendants as follows:

a.     On all counts, treble damages and all applicable civil penalties in the maximum amount allowed by law;

b.     All attorneys' fees, expenses, and costs associated with prosecuting this civil action;

c.     Interest on all amounts owed to the United States and/or Relators at the highest amounts allowed by law; and

d.     All other relief the Court deems just and proper.

48

## JURY TRIAL DEMANDED

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relators hereby demand a

jury trial.

Respectfully submitted,

**GUTTMAN BUSCHNER PLLC**

*/s/ Rick Mountcastle*
Rick Mountcastle
Virginia Bar No. 19768
rmountcastle@gbblegal.com

1509 22nd Street, NW
Washington, D.C. 20037
Telephone: (202) 800-3001

**REESE MARKETOS LLP**

By: */s/ Adam Sanderson*
Pete Marketos *(pro hac vice)*
  pete.marketos@rm-firm.com
Joshua M. Russ *(pro hac vice)*
  josh.russ@rm-firm.com
Adam Sanderson *(pro hac vice)*
  adam.sanderson@rm-firm.com
Brett S. Rosenthal *(pro hac vice pending)*
  brett.rosenthal@rm-firm.com
Andrew O. Wirmani *(pro hac vice)*
  andrew.wirmani@rm-firm.com
Allison N. Cook *(pro hac vice)*
  allison.cook@rm-firm.com

750 Saint Paul St., Suite 600
Dallas, Texas 75201
Telephone: (214) 382-9810

**BERGER MONTAGUE PC**

By: */s/ Sherrie R. Savett*
Sherrie R. Savett *(pro hac vice)*
  ssavett@bergermontague.com
Joy P. Clairmont *(pro hac vice)*
  jclairmont@bergermontague.com

49

William H. Ellerbe *(pro hac vice)*
wellerbe@bergermontague.com

1818 Market Street, Suite 3600
Philadelphia, Pennsylvania 19103
Telephone: (214) 382-9810

**BIENSTOCK PLLC**

*/s/ Martin Bienstock*
Martin Bienstock *(pro hac vice)*
mbienstock@bienstockpllc.com

1629 K. St. NW, Suite 300
Washington, D.C. 20006
Telephone: (202) 908-6601

**ATTORNEYS FOR RELATORS**

## CERTIFICATE OF SERVICE

The undersigned certifies that, on September 23, 2025, the foregoing document was served on all known counsel of record electronically through the CM/ECF system.

By: */s/ Allison N. Cook*
Allison N. Cook