CLERKS OFFICE US DISTRICT COURT
AT CHARLOTTESVILLE, VA
FILED

July 31, 2026

LAURA A. AUSTIN, CLERK
BY: **/s/ Nik Sams**
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, *ex rel.* IAN DIXON, KARL QUIST, and SARA STOVALL, | ) ) ) ) | |
| Plaintiffs, | ) | Civil Action No. 3:20-cv-00062 |
| | ) | |
| v. | ) ) | By: Elizabeth K. Dillon |
| SENTARA HEALTH PLANS f/k/a OPTIMA HEALTH PLAN, SENTARA HEALTH f/k/a SENTARA HEALTHCARE, and MILLIMAN, INC., | ) ) ) ) ) | Chief United States District Judge |
| Defendants. | ) | |

## MEMORANDUM OPINION

Relators Ian Dixon, Karl Quist, and Sara Stovall brought this qui tam action against

defendants Sentara Health Plans (f/k/a Optima Health Plan), Sentara Health (f/k/a Sentara

Healthcare) (collectively, Sentara), and Milliman, Inc.  The case was initially maintained under

seal while the United States considered whether to intervene.  After the United States declined to

intervene, the court unsealed the case.  Relators then filed a First Amended Complaint (FAC),

which is the operative complaint.  (Dkt. No. 108.)[1]

Most of the actions that Relators challenge as fraudulent were taken by Optima Health

Plan (Optima) in conjunction with its actuary, Milliman.  Sentara Health is Optima's parent

corporation and is also alleged to have participated in the fraud.

Pending before the court are two motions to dismiss, one filed by Sentara and the other

by Milliman.  (Dkt. Nos. 134, 136.)  The motions seek dismissal on various grounds, but the

---

[1]  Throughout this opinion, references to page numbers in the record are to the page numbers supplied by the court's Case Management/Electronic Case Filing (CM/ECF) system, rather than the numbers the parties supplied.

court relies only on one.[2]  The court determines that the federal filed-rate doctrine bars the claims here, which directly challenge rates approved by the Virginia Bureau of Insurance (BOI), a Virginia regulatory agency.  BOI acted under federal authority to approve premium rates for insurers offering health insurance through the Virginia Marketplace under the Affordable Care Act, the same rates Relators challenge as fraudulent and unreasonable.  For this reason, both motions to dismiss will be granted.

Also pending before the court are two motions to strike filed by Relators, each titled as a "Motion to Disregard Exhibits."  (Dkt. Nos. 149, 150.)  They ask the court to strike various documents attached to the motions to dismiss, which Relators contend the court may not consider when ruling under Rule 12(b)(6).  Because the court does not rely on any factual materials outside the FAC, the motions to strike will be denied as moot.

## I.  BACKGROUND

### A.  Overview of Affordable Care Act's Rate-Approval Process

In this section, the court provides a broad overview of the FAC's factual allegations, and additional relevant details are discussed in context in Section III.  Many of the FAC's detailed factual allegations, however, are irrelevant to the court's ruling.

The Affordable Care Act (ACA) is a federal healthcare reform law enacted in March 2010.  The ACA required each state to establish a health insurance marketplace (Exchange) where individuals could purchase health insurance coverage.  42 U.S.C. § 18031(b)(1).  Virginia opted for a federally facilitated Exchange accessible online at HealthCare.gov.  (FAC ¶¶ 22–24.)

An insurer that wants to participate in Virginia's Exchange as a Qualified Health Plan must submit an annual application to the Centers for Medicare & Medicaid Services (CMS), an

---

[2] Defendants also urge dismissal on the grounds that the public-disclosure bar of the False Claims Act bars Relators' claims and that Relators have failed to state facts sufficient to plausibly state their claims.

agency within the U.S. Department of Health and Human Services.  The application must include proposed rates for insurance premiums on its offered plans, which must be supported by specific explanations and documentation, as well as an actuarial memorandum supporting the proposed rates.  (FAC ¶¶ 27–33.)  The actuarial memorandum certifies that the rates set forth in the insurer's application are neither excessive nor deficient.  (*Id.* ¶ 49.)  The insurer also must provide an attestation agreeing to the relevant certification standards in various federal regulations.  (*Id.* ¶ 47.)

The rate application is submitted to CMS, who delegates its review authority in Virginia to BOI, a subagency of the State Corporation Commission (SCC).  If BOI/SCC approves the rates, then CMS adopts SCC's recommendation where SCC has provided a "final determination of whether a rate increase is unreasonable [or reasonable], which must include a brief explanation of how its analysis of the relevant factors set forth in [45 C.F.R.] § 154.301(a)(3) caused it to arrive at that determination."  (FAC ¶ 52 (quoting 45 C.F.R. § 154.210(b)(2)).)

The ACA also created a premium tax credit for certain eligible individuals.  (*See* FAC ¶¶ 54–63.)  In very broad terms, and as relevant to Relators' allegations, most eligible enrollees choose to have their tax credit paid directly to the insurer by the government to reduce the individual's insurance premium, rather than claiming it afterward on their tax returns.  These advanced premium tax credits, or APTCs, are calculated based on an insurer's premiums and the individual's income, and higher premiums generally result in higher tax credits.  In exchange for the APTCs, insurers must reduce premiums payable by eligible individuals and notify the Exchange and HHS of the reductions.

**B.  Optima's 2018 and 2019 Rate Applications**

In August 2017, Anthem, Optima's leading competitor, announced that it was withdrawing from the ACA's individual health-insurance marketplace, leaving Optima as the sole remaining insurer across portions of Virginia.  (FAC ¶ 1.)  At that time, Optima had already submitted a rate-filing justification to Virginia regulators for 2018.  (*Id.* ¶ 65.)  In September 2017, Optima, assisted by Sentara and Milliman, submitted a revised rate filing that contained a significant rate increase of 81.8% statewide.  (*Id.* ¶¶ 2, 77.)

Relators accuse Milliman and Optima of "leverag[ing] Optima's monopoly position in certain geographic markets[, where it would be the only insurer offering plans,] by grossly inflating insurance premiums in violation of the ACA."  (FAC at 15 (heading).)  BOI approved the rate increase, even though it was "the largest rate increase in the history of the ACA" for insurers having at least 1,000 enrollees.  (*Id.* ¶ 83.)

For some families, switching from Anthem's cheapest plan in 2017 to Optima's in 2018 would increase their premiums more than 200%.  (FAC ¶ 78.)  Relators suggest that Optima and Sentara Health were unconcerned about affordability for families because they "knew that the United States would pay most of the premiums . . . in the form of APTCs."  (*Id.* ¶¶ 78–79.)

Relators are Charlottesville residents who have devoted significant time and resources to investigating and opposing Optima's rate increases.  (FAC ¶ 3.)  They allege that Optima's rate-filing justifications in 2018 and 2019, which were submitted to BOI and approved by both BOI and CMS, "dramatically misrepresented key data" and were fraudulent.  (*Id.* ¶¶ 2–3.)  The rate filings resulted in payments by the United States of hundreds of millions of dollars that it should not have paid and that it has not recouped.  (*Id.* ¶ 4.)

4

Relators have alleged specific fraudulent statements and misrepresentations by Defendants in connection with their rate applications and emphasize that these led to the unreasonable rate requests in both 2018 and 2019.[3] "Defendants' false and inflated premiums based on fraudulent rate filings had a direct effect on the amount paid by the government in APTCs to Defendant Optima." (FAC ¶ 201.)  The "fraud caused the government to overpay APTCs by hundreds of millions of dollars," which it has not recouped.  (*Id.* ¶¶ 4, 202.)

Relators raised their concerns to BOI and CMS for both years, challenging the rates initially approved by BOI, including via two formal complaints.  (FAC ¶¶ 87–89.)  Those reports prompted BOI to request additional information from Optima or Milliman and to review at least the 2018 rate application again.  (*Id.* ¶¶ 99–100, 110, 150, 163–64.)  Relators allege that Optima and Milliman continued to misrepresent and conceal important information from BOI during this process.  (*See id.* ¶¶ 177–85.)  But BOI again deemed Optima's rate filing reasonable and justified, it never withdrew its approval of the 2018 rates, and it approved the 2019 rates.  (*Id.* ¶¶ 83, 190, 205.)  Apparently unsatisfied with that decision, Relators brought this lawsuit as a qui tam action under the federal False Claims Act (FCA).

The FAC contains three causes of action, all brought under different subparts of the FCA against all defendants.

> Count I – "False Claims," in violation of 31 U.S.C. § 3729(a)(1)(A);
> Count II – "False Records or Statements," in violation of 31 U.S.C. § 3729(a)(1)(B); and
> Count III – "Conspiracy," in violation of 31 U.S.C. § 3729(a)(1)(C).

Defendants move to dismiss the FAC in its entirety.  Although their motions differ slightly in their organization and the specific authorities on which they rely, both ask for dismissal based on the filed-rate doctrine, the public-disclosure bar, and for failure to state a

---

[3] For purposes of this opinion, it is not necessary to detail the specific misrepresentations.

claim.[4]  The court concludes that the filed-rate doctrine bars Relators' claims.  Thus, it will

dismiss on that ground alone.

## II.  DISCUSSION

### A.  Motion to Dismiss Standard

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the

allegations in the complaint must "state a claim to relief that is plausible on its face."  *Ashcroft v.

Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

This standard "requires the plaintiff to articulate facts, when accepted as true, that 'show' that the

plaintiff has stated a claim entitling him to relief, i.e., the 'plausibility of entitlement to relief.'"

*Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (quoting *Twombly*, 550 U.S. at 557).

In determining whether the plaintiff has met this plausibility standard, the court must

accept as true all well-pleaded facts in the complaint and any documents incorporated into or

attached to it.  *Sec'y of State for Defence v. Trimble Navigation Ltd.*, 484 F.3d 700, 705 (4th Cir.

2007).  Further, it must "draw[] all reasonable factual inferences from those facts in the plaintiff's

favor," *Edwards v. City of Goldsboro*, 178 F.3d 231, 244 (4th Cir. 1999), but "need not accept

legal conclusions couched as facts or 'unwarranted inferences, unreasonable conclusions, or

arguments.'"  *Wag More Dogs, LLC v. Cozart*, 680 F.3d 359, 365 (4th Cir. 2012) (quoting

*Giarratano v. Johnson*, 521 F.3d 298, 302 (4th Cir. 2008)).

---

[4]  Both Defendants also submit that the FCA's qui tam provisions violate Article II of the U.S. Constitution "by vesting unelected, unappointed, and financially motivated private parties with substantial executive authority, particularly in declined cases [like] here."  (Milliman Mem. Supp. Mot. Dismiss 14, Dkt. No. 137; Sentara Mem. Supp. Mot. Dismiss 21 n.20, Dkt. No. 135.)  *Cf. Wis. Bell, Inc. v. U.S. ex rel. Heath*, 604 U.S. 140, 167 (2025) (Kavanaugh, J., concurring) (suggesting that the FCA's "qui tam provisions raise substantial questions under Article II [and] in an appropriate case, the Court should consider the competing arguments on the Article II issue").  While both Defendants advised that they may raise the issue in a Rule 12(c) motion, neither one has.  Thus, this issue is not before the court.

The filed-rate doctrine is an affirmative defense. *South Branch LLC v. Commonwealth Edison Co.*, 46 F.4th 646, 649 (7th Cir. 2022); *In re Rawson Food Serv., Inc.*, 846 F.2d 1343, 1349 (11th Cir. 1988). And "a Rule 12(b)(6) motion to dismiss, which addresses the sufficiency of the complaint, generally does not enable the court to determine whether [an affirmative defense] has been satisfied . . . ." *L.N.P. v. Kijakazi*, 64 F.4th 577, 585 (4th Cir. 2023). Yet, "when all facts necessary to the affirmative defense clearly appear on the face of the complaint," a court may decide the defense on a Rule 12(b)(6) motion. *Id.* at 586; *see also Patel v. Specialized Loan Servicing, LLC*, 904 F.3d 1314, 1326–27 (11th Cir. 2018) (affirming granting of a motion to dismiss based on the filed-rate doctrine); *Lewis v. M&T Bank*, No. 21-933, 2022 WL 775758, at *3 (2d Cir. Mar. 15, 2022) (same); *Hooks v. Am. Med. Sec. Life Ins. Co.*, No. 3:06-cv-00071, 2008 WL 3911130, at *6 (W.D.N.C. Aug. 19, 2008) (dismissing under Rule 12(b)(6) based on North Carolina's filed-rate doctrine); *cf. Gunn v. Cont'l Cas. Co.*, 968 F.3d 802, 806–07 (7th Cir. 2020) (construing Rule 12(b)(6) motion based on filed-rate doctrine as a Rule 12(c) motion because the complaint did not fall within the exception "for a plaintiff who has pleaded herself out of court"). Like *Patel* and *Lewis*—and unlike *Gunn*—the court concludes that all the facts necessary to support application of the doctrine here are pled in the FAC.

## B.  The Filed-Rate Doctrine

### 1.  Background

The federal filed-rate doctrine is a judicially created doctrine that initially arose in the context of carrier rates. *Keogh v. Chicago & N.W. Ry. Co.*, 260 U.S. 156, 161 (1922). Many courts have subsequently applied the doctrine—or a state counterpart—in the field of insurance. *Shannon v. The Allstate Corp.*, No. 24-50836, 2026 WL 675629, at *2 (5th Cir. 2026) (per

7

curiam) ("Courts have applied the [filed-rate] doctrine to various regulatory fields, including the insurance industry."); *In re N.J. Title Ins. Litig.*, No. 08-1425, 2009 WL 3233529, at *3 (D.N.J. Oct. 5, 2009) (collecting authority applying filed-rate doctrine "in the context of private suits challenging insurance rates approved by state regulatory agencies").

The parties here disagree about the scope of the doctrine's applicability. But, in general terms, the doctrine precludes attacks through judicial cases on regulator-approved rates—or, in some circuits, rates filed with regulators and not disapproved[5]—and essentially prevents a court from determining whether a filed rate is reasonable. *See Square D Co. v. Niagara Frontier Tarriff Bureau, Inc.*, 476 U.S. 409, 417 n.19 (1986). "The doctrine is designed to insulate from challenge the filed rate deemed reasonable by the regulatory agency." *Wegoland Ltd. v. Nynex Corp.*, 27 F.3d 17, 20 (2d Cir. 1994).

The filed-rate doctrine "is a form of deference and preemption" and "precludes interference with the rate setting authority of an administrative agency." *Wah Chang v. Duke Energy Trading & Mktg., LLC*, 507 F.3d 1222, 1225 (9th Cir. 2007). The "doctrine's purpose is twofold: to prevent discrimination among consumers and to preserve the rate-making authority of federal agencies." *Bryan v. BellSouth Commc'ns, Inc.*, 377 F.3d 424, 429 (4th Cir. 2004). These have been called the nondiscrimination and nonjusticiability principles.

The nondiscrimination principle prevents a court's judgment from allowing certain rate-payers to pay less than others by preventing a court from "entering a judgment that would serve to alter the rate paid by a plaintiff." *Id.* at 429. So, if a claim's success "would require an award of damages that would have the effect of imposing different rates upon different consumers," the doctrine bars the claim. *Id.* at 429–30.

---

[5] *E.g.*, *Town of Norwood v. New Eng. Power Co.,* 202 F.3d 408, 419 (1st Cir. 2000) ("It is the *filing* of the tariffs, and not any affirmative approval or scrutiny by the agency, that triggers the filed rate doctrine.").

The nonjusticiability principle recognizes the particular expertise of authorities tasked with rate-making or rate-approving.  The doctrine supports this principle and "preserve[s] the rate-making authority of federal agencies" by keeping courts out of the rate-making process.  *Id.* at 429.  As the Second Circuit has recognized, "[r]egulators employ their peculiar expertise to consider the whole picture regarding the reasonableness of the proposed rate.  They make hundreds if not thousands of discretionary decisions about the submitted costs and ultimately arrive at the approved filed rate.  Courts are simply ill-suited to systematically second guess the regulators' decisions and overlay their own resolution." *Wegoland*, 27 F.3d at 21.

### 2. The federal filed-rate doctrine is the relevant doctrine, not any state counterpart.

A threshold question exists here about whether the court should apply the federal filed-rate doctrine or a state counterpart, if one exists.  Federal courts have sometimes applied a state's own version of the filed-rate doctrine, such as where there are state-law claims based on state regulatory action.  *E.g.*, *Gunn*, 968 F.3d at 807–08 (remanding for district court sitting in diversity over state-law claims to determine the choice-of-law issue of which state's version of the filed-rate doctrine applied); *Coll v. First Am. Title Ins. Co.*, 642 F.3d 876, 886–87 (10th Cir. 2011) (applying state filed-rate doctrine to state-law claims, where case had been removed to federal court under the Class Action Fairness Act).  While a state agency is the entity that approved the rate here, neither party has argued that the court should look to Virginia law on the filed-rate doctrine.[6]

Some courts of appeals have held that the federal filed-rate doctrine applies to rates approved by both federal and state rate-making authorities, and many have held that it applies equally to federal and state causes of action.  *Patel v. Specialized Loan Servicing, LLC*, 904 F.3d

---

[6] Relators point out that Virginia previously had a statutory filed-rate doctrine, but that statute was repealed in 1970.  (Relators' Opp'n to Sentara Mot. to Dismiss 14–15 n.3, Dkt. No. 151.)

1314, 1323–24 (11th Cir. 2018) (collecting authority); *Rothstein v. Balboa Ins. Co.*, 794 F.3d 256, 261 (2d Cir. 2015) ("The [filed-rate] doctrine reaches both federal and state causes of action and protects rates approved by federal or state regulators."). In this case, the state regulatory agency was acting pursuant to a federal law (the ACA), and Relators' claims are all asserted under federal law (the FCA). And the parties' briefing assumes that it is the federal filed-rate doctrine that would apply, if at all. Thus, the court will determine the applicability of the federal doctrine.

## C. Application

The parties have wildly divergent views of how and when the filed-rate doctrine applies. Defendants contend that the filed-rate doctrine "certainly" and "unequivocally" applies to the claims here. (Sentara Reply 18, Dkt. No. 155; Milliman Mem. Supp. Mot. Dismiss 22, Dkt. No. 137.)

Relators, on the other hand, insist that the filed-rate doctrine does not apply in this case at all, setting forth five distinct reasons: (1) the complaint does not challenge Defendants' rates; (2) the doctrine does not bar claims by the government; (3) the plain language of the ACA mandates that the FCA shall apply and precludes application of the filed-rate doctrine; (4) the doctrine only bars some specific types of damages, and Relators need not plead a particular damages calculation at this stage; and (5) the rationales for the doctrine "are inapposite in this case." (*See generally* Relators' Opp'n to Sentara, Dkt. No. 151; Relators' Opp'n to Milliman, Dkt. No. 152.) The court discusses each of these, combining its discussion of the fourth and fifth reasons.

In their motions, Defendants also preemptively discussed that there is no "fraud exception" to the filed-rate doctrine. (Milliman Mem. Supp. Mot. Dismiss 29–30; Sentara Mem. Supp. Mot. Dismiss 29–30, Dkt. No. 135.) Relators' response addresses this in arguing that the

10

FCA is the primary litigative tool for combating fraud and that FCA claims should not be barred by the filed-rate doctrine. Thus, the court also addresses, as a final argument, the general notion of a "fraud exception," although Relators do not couch it this way.

### 1. The First Amended Complaint challenges Defendants' rates.

Relators' first contention is that the FAC is not challenging the charged rates but is instead challenging Optima's *eligibility* to offer insurance under the ACA and in Virginia's Exchange. But that is not a fair characterization of the FAC, which is replete with challenges to the rates charged by Optima. Indeed, the significant increase to premium rates, which were supported by allegedly fraudulent statements and information provided by Defendants, is the very crux of Relators' claims. The FAC emphasizes that the 2018 rate increase was "the largest rate increase in the history of the ACA," and it alleges that the rate-filing justification and proposed 81.8% rate hike were "the product of bad faith assumptions, material omissions, and false and misleading certifications." (FAC ¶¶ 83, 84).

In describing the allegedly fraudulent actions taken by Defendants, Relators refer to them as "unlawful rate-setting practices." (FAC ¶ 85.) And the discussion of the specific alleged falsities falls under a heading titled, "Optima's 2018 Rate Filing Was False and Fraudulent." (*Id.* at 21; *see generally id.* ¶¶ 93–176.) Relators reference premium prices and insist that the falsities "had the effect of increasing premium costs and, by extension, the federal government's tax credit payments to Optima." (*Id.* ¶ 93; *see also id.* ¶ 115 ("Defendants' false statements led to fraudulent inflation of Optima's premiums, which, in turn, led to the government paying unwarranted [APTC] to Optima."); *id.* ¶¶ 134–35 ("If Optima had legitimately forecasted its expected risk adjustment transfer payments, its premium increase would have been reduced by approximately that same amount. [But a]s a result of Optima's fraudulent risk adjustment

11

transfer payment projection, the United States paid tens of millions more in [APTC payments] than it should have paid.").)  They make similar allegations as to the 2019 premium rates under the heading, "Optima's 2019 Premium Rates Were Also Fraudulent."  (*Id.* at 43.)

In discussing their own actions, Relators state that they "questioned the legitimacy of Optima's rates" and "challenged the factual basis and legality of the rates."  (FAC ¶¶ 87, 89)  In accusing Defendants of concealing their fraud, the FAC again refers to them violating the "ACA's rate setting provisions" and to their alleged knowledge that the 2018 "premiums were neither reasonable nor based on accurate data."  (*Id.* ¶¶ 177, 179.)  And Relators submit that Defendants tried to falsely blame others for "Optima's exorbitant rate increases."  (*Id.* ¶ 182.)

The FAC does refer occasionally to the false and fraudulent rate filings inducing the government to allow Optima to *participate* in the Exchange.  (*E.g.*, FAC ¶ 205.)  Overall, though, what Relators are describing in their briefing as an "eligibility challenge" is described throughout the FAC as a challenge to the rates submitted for approval and approved by BOI.  To the extent the FAC can be viewed as asserting an eligibility challenge, moreover, any such challenge is inextricably intertwined with BOI's approval of Optima's rates.  The FAC is, in fact, directly challenging Optima's approved rates.  The court rejects Relators' arguments to the contrary.

    **2.  The filed-rate doctrine can apply in cases, like the qui tam action here, even though the government is the real party-in-interest.**

Relators also contend that the doctrine "does not bar *the Government* from bringing an action against the defendant," citing to four (non-FCA) cases so holding.  (Relators' Opp'n to Sentara 11–12; *see* Relators' Opp'n to Milliman 13–15.)

In its reply, Milliman acknowledges that the government may bring civil and criminal claims of all sorts alleging violations of federal law (such as anti-trust claims or claims under the

Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961–68).  But it insists that, under the filed-rate doctrine, even the government cannot bring claims that depend on the unreasonableness of a filed rate.  (Milliman Reply 11, Dkt. No. 156.)  Sentara goes so far as to accuse Relators of pulling the government exception from "thin air."  (Sentara Reply 17.)

Although Relators and Defendants both seem assured of the correctness of their respective positions, the court does not view either side's argument as utterly meritless.  The issue is not simple, and few cases address it.  Despite the paucity of controlling case law, and for the reasons discussed next, the court concludes that Relators cannot overcome the filed-rate bar under any "government exception" to it.

As an initial matter—and contrary to Defendants' suggestion—Relators' insistence on a "government exception" to the filed-rate doctrine is not without basis.  In *Keogh v. Chicago & Northwestern Railway Co.*, 260 U.S. 156 (1922), the Court noted that the fixed rates at issue were reasonable and nondiscriminatory.  But it then explained that, even if the rates were reasonable, it could still be illegal for a combination of carriers to fix those rates.  Thus, an antitrust action might still stand, in the form of criminal proceedings, an injunction, or forfeiture. *Id.* at 161–62.  So, Relators did not invent the idea that the government might proceed where a private litigant could not.

That said, a careful reading of *Keogh* reflects that an antitrust action by the government could be permitted on similar facts but that, even then, the rate itself would still be treated as presumptively reasonable.  Put differently, *Keogh* implies that the rate itself could not be challenged, even in a government action.  *See id.*

Similarly, the Supreme Court noted the distinction between private parties and government action in *Square D Co. v. Niagara Frontier Tarriff Bureau, Inc.*, 476 U.S. 409

(1986).  That case involved two class-action complaints brought against motor carriers, in which

the plaintiffs argued that the carriers' filed rates were fixed pursuant to an agreement forbidden

by the Sherman Act.  The question before the court was "whether the carriers are subject to

treble-damages liability in a private antitrust action if the allegation is true."  *Id.* at 410.  The

Court first noted there was a similar case brought by the government, which had been settled by

the entry of a consent decree.[7]  Thus, the government action was not before it.

In *Square D*, the district court had dismissed the two private class actions, finding them

barred by the filed-rate doctrine.  It specifically found that the plaintiffs could not obtain treble

damages under the Sherman Act, because their claims were based on filed rates.  The Supreme

Court affirmed and held the claims barred.  *Id.* at 417.  It also declined to overrule *Keogh*.  *Id.* at

418–24.

In rejecting the plaintiffs' arguments that applying *Keogh* and the filed-rate doctrine

provided "immunity" to the carriers, the Court explained:

> The alleged collective activities of the defendants in both cases were
> subject to scrutiny under the antitrust laws by the Government and
> to possible criminal sanctions or equitable relief.  *Keogh* simply held
> that an award of treble damages is not an available remedy for a
> private shipper claiming that the rate submitted to, and approved by,
> the ICC was the product of an antitrust violation.  Such a holding is
> far different from the creation of an antitrust immunity . . . .

*Id.* at 422 (internal citations and footnotes omitted).  Thus, *Square D*  acknowledged that

potentially illegal activities were still "subject to scrutiny . . . by the Government."  *Id.*

So, both *Keogh* and *Square D* recognized that the filed-rate doctrine does not necessarily

preclude government claims.  Neither case stated, however, that *rates themselves* could be

---

[7]  The consent decree did not include an award of damages and did not reverse or otherwise alter rates.
Instead, it enjoined the carriers from harassing or coercing any other carrier to modify its rates, and it enjoined them
from discussing rates except "within an authorized ratemaking body of a rate bureau . . . ."  *Id.* at 411 n.1.

14

challenged in an action by the government, as Relators insist.  As a result, the language in those cases is not dispositive here, where the filed rates are clearly being challenged.

Relators also rely on two district court cases, but the court concludes that neither non-binding case persuasively answers the question about a government exception in this case. The first, *Sun City Taxpayers' Ass'n v. Citizens Utilities Co.*, 847 F. Supp. 281 (D. Conn. 1994), *aff'd,* 45 F.3d 58 (2d Cir. 1995), contains language supporting Relators' position, although statements on this issue were arguably dicta, as the government was not a party to the case.  Still, the opinion echoes statements from both *Square D* and *Keogh* reasoning that "the filed rate doctrine does not completely immunize utilities from the anti-trust laws; they remain subject to actions brought by the Government for criminal sanctions and other equitable relief."  *Id.* at 290 (citing *Square D,* 476 U.S. at 422).  The court then makes a similar statement about RICO, saying utilities "would remain subject to suits brought by the Government under RICO because the filed rate doctrine bars only a ratepayer's private civil RICO remedy."  *Id.* at 291.  Like *Keogh* and *Square D*, the case does not expressly state that the government could bring a RICO suit that was challenging rates, but its language about the doctrine barring "only a ratepayer's private civil . . . remedy" is certainly broad.  *See id.*

Notably, though, in affirming the district court, the Second Circuit specifically stated that the filed-rate doctrine "exists for reasons independent of the type of plaintiff."  45 F.3d at 62.  At a minimum, then, the Second Circuit's clarification calls into question the distinction the district court made in its broad pronouncement.

The second case relied upon by Relators, *In re Title Insurance Antitrust Cases*, 702 F. Supp. 2d 840 (N.D. Ohio 2010), addressing an argument like the one rejected in *Square D*, explained that the filed-rate doctrine "does not create an antitrust immunity."  *Id.* at 849.  In

doing so, that court characterized the filed-rate doctrine as barring only private plaintiffs from a damage recovery. Citing *Square D*, the court reasoned:

> The filed rate doctrine is merely a judicially created restriction on remedies and standing under which private plaintiffs are barred from suing for a damage recovery. It does not preclude injunctive relief or prohibit the Government from seeking civil or criminal redress. Therefore, this Court rejects Plaintiffs' contention that applying the filed rate doctrine to the Ohio title insurance industry would be an impermissible extension of antitrust immunity.

*In re Title Ins.*, 702 F. Supp. 2d at 849 (footnotes omitted); *cf. United States v. Reliant Energy Servs., Inc.*, 420 F. Supp. 2d 1043, 1067 (N.D. Cal. 2006) (concluding that the filed-rate doctrine did not bar criminal enforcement proceedings by the federal government).

To the extent that *In re Title Insurance* suggests the doctrine is only applicable against private parties, the court does not read either *Keogh* or *Square D* so broadly. Certainly, these cases involved private parties, but the Supreme Court's *holding* in each was that certain claims were precluded because they would require re-examination of a filed rate. In so reasoning, the Court recognized that the defendants could still be held responsible for an antitrust violation by the government. But they did not say that the government could bring an antitrust case challenging rates.

So, despite some of the broader language used, none of the cases cited by Relators held that the *rate itself* could be challenged by the government. They simply noted, consistent with *Keogh*, that the government may still bring certain antitrust or RICO claims.

Turning to Defendants' authority on this issue, it is not particularly strong, either. Sentara concedes that the government can use its criminal and civil enforcement tools in cases that involve filed rates, but it insists that the government "still cannot bring an action that would result in a reexamination of filed rates." (Sentara Reply 17–18; *see also* Milliman Reply 11

16

(making same argument).)  Like Relators' authority, however, the cases relied upon by Defendants do not speak directly to the circumstances here.

For example, Sentara relies on *Arkansas Louisiana Gas Co. v. Hall*, 453 U.S. 571, 577–79, 582 (1981).  That decision contains broad language suggesting that the filed-rate doctrine might prohibit a case brought by the government.  But that case did not involve a government entity, nor did it expressly address whether an exception should exist for a government entity.  The plaintiff in that case was a natural gas producer who sued a non-governmental purchaser/customer for a violation of a contract provision concerning rates.  *Id.* at 573–74.

Sentara also relies on the Fourth Circuit's decision in *Bryan v. BellSouth Communications, Inc.*, 377 F.3d 424 (4th Cir. 2004), for the proposition that even the government cannot bring "an action that would result in the reexamination of filed rates." (Sentara Reply 17–18 (citing 377 F.3d at 430–32).)  Like *Arkansas Louisiana Gas*, *Bryan* contains broad language about the filed-rate doctrine precluding types of claims, but *Bryan* did not involve a government plaintiff and says nothing about any distinction between the government and private plaintiffs.

Lastly, Sentara points to *Town of Norwood v. New England Power Co.*, 23 F. Supp. 2d 109, 119–20 (D. Mass. 1998), which held that the filed-rate doctrine precluded a town's antitrust and damages claims against power companies.  Its result supports Defendants because the fact that a ratepayer plaintiff was a local government did not preclude application of the filed-rate doctrine.  *Town of Norwood* did not explicitly address, however, whether an exception *should* exist for a government plaintiff.  Thus, it is unclear whether that issue was even raised there.

The primary case relied upon by Milliman is *California ex rel. Lockyer v. Dynegy, Inc.*, 375 F.3d 831, 852–53 (9th Cir.) (affirming dismissal of government claims for injunctive relief

and civil penalties), *denial of reh'g*, 387 F.3d 966 (9th Cir. 2004). In that case, the district court had invoked the filed-rate doctrine only as an alternative ground for its dismissal. On appeal, the Ninth Circuit addressed the doctrine in broad language that supports Defendants' position here. The appellate court said, "To the extent that California is seeking to enforce the penalty provision of the tariff, or to have them expanded, this conflicts with the filed rate doctrine and the exclusive authority conferred to FERC to enforce its tariff." *Id.* at 853. This court recognizes that the Ninth Circuit did not *rely* on the filed-rate doctrine to affirm dismissal of the government's claims. It discussed the doctrine only because it "reinforce[d]" the court's conclusions that FERC had exclusive jurisdiction over certain claims and that those claims were thus preempted. *Id.* at 852. Still, its language supports Defendants here.

Having reviewed the authority above presented by the parties, the court still lacks clear direction in this case. But three other points all weigh in Defendants' favor.

First, this qui tam action is not a criminal enforcement proceeding brought by the government. And the remedies sought are not merely equitable remedies. Additionally, as already discussed, Relators' claims clearly challenge approved rates and would require the court, in order to award Relators any relief, to conclude that the approved rates were unreasonable and, perhaps, to set a different rate.

Second, and importantly, Relators—while they bring claims on behalf of the United States—are not the United States. (*Cf.* Sentara Reply 18 n.6 (insisting that relators do not stand in the government's shoes for purposes of any such government exception and noting limitations on relators).) The unique and hybrid nature of qui tam suits and the fact that the government has declined to intervene here make it unclear whether Relators could take advantage of a government exception, assuming one exists.

18

To be sure, the Fourth Circuit has expressly held and continues to re-affirm that the United States is the real party in interest in any FCA qui tam suit, but it has also emphasized the lesser powers that relators possess in bringing and prosecuting such suits, as compared to the government.  *See United States ex rel. Milam v. Univ. of Tex. M.D. Anderson Cancer Ctr.*, 961 F.2d 46, 50 (4th Cir. 1992) (concluding, in determining whether the state defendants had Eleventh Amendment immunity, that "the United States is the real party in interest in any [FCA] suit" even where it has declined to intervene);[8] *United States ex rel. Michaels v. Agape Senior Cmty., Inc.*, 848 F.3d 330, 340 (4th Cir. 2017) (affirming that the United States is the real party in interest but cautioning, "As a class of plaintiffs, qui tam relators are different in kind than the Government.  They are motivated primarily by prospects of monetary reward rather than the public good." (quoting *Hughes Aircraft Co. v. United States ex rel. Schumer*, 520 U.S. 939, 949 (1997))).

Third, the United States's declining to intervene further removes this case from a typical "government action."  Indeed, courts have found the United States' decision not to intervene important in determining the nature of a qui tam case in other contexts.  *See, e.g.*, *U.S. ex rel. Kolbeck v. Point Blank Solutions, Inc.*, 444 B.R. 336, 340–41 (E.D. Va. 2011) (concluding that an FCA action in which the government has expressly declined to intervene is not an action or proceeding by a governmental unit so as to fall within the "governmental police powers exception to [bankruptcy's] automatic stay," and distinguishing other cases where the United States had not yet determined whether to intervene).

In an attempt to bolster their "government exception" argument, Relators rely heavily on two out-of-circuit district-court decisions: *Murray v. BellSouth Telecommunications, Inc.*, No.

---

[8] Regardless of the status of *Milam*'s holding about Eleventh Amendment immunity, its description of the United States as the party-in-interest remains good law.

19

94-6059 (S.D. Fla. July 30, 1996), and *Falsetti v. Southern Bell Telephone & Telegraph Co.*, No. 91-40267-WS (N.D. Fla. Apr. 7, 1995).[9]  Relators describe these as the "only FCA cases that address the filed rate doctrine." (Relators' Opp'n to Sentara 4.)  The court has considered these cases, but they do not alter its conclusion that there is not a wholesale government exception and that, regardless, it would not apply here.

The court also discusses these two cases in analyzing whether the filed-rate doctrine applies to the ACA.  Briefly stated, neither supports application of a government exception in this case.  In *Falsetti*, the court declined to apply the filed-rate doctrine at all and instead permitted the relators to pursue both damages and civil penalties.  But there, the relators alleged that the defendants submitted bills to the government seeking payment of filed rates for services they did not render.  It was the failure to provide services, not the reasonableness of the rates themselves, that the government challenged there.  *Falsetti* is easily distinguishable.

In *Murray*, also an FCA case, the court concluded that some of the damages sought by the relators were barred by the filed-rate doctrine, but it allowed the relators' request for civil penalties under the FCA to proceed "as long as [the penalty] is not based upon any consideration of the actual damages suffered by the Government."  No. 94-6059, at 6.  Thus, while *Murray* may support some of Relators' other arguments, it did not apply a blanket "government exception" or allow all the FCA claims to proceed.  In any event, *Murray* is an out-of-circuit district court decision that is not binding on this court.  And, to the extent that its holding conflicts with the court's conclusions in this opinion, the court finds *Murray* unpersuasive for the reasons discussed herein.

---

[9] *Murray* is docketed in this case at Dkt. No. 138-35, and *Falsetti* is at Dkt. No. 151-1.

In sum, there is no clear authority supporting the application of a blanket "government exception" to claims challenging rates, as Relators' claims do. And there is no clear authority showing that any such exception, even if it existed, would apply to a qui tam case in which the government has declined to intervene. So, the court rejects Relators' argument that the filed-rate doctrine is inapplicable because of any government exception.

### 3. The Affordable Care Act does not explicitly override application of the filed-rate doctrine.

Relators also argue that the ACA itself precludes application of the filed-rate doctrine. On this point, Relators first emphasize that the filed-rate doctrine is a judicially created doctrine. Congress thus has the authority to override it. They then claim that the ACA in fact overrules the doctrine and that applying it here would "eviscerate Congress's intent." This is especially true, they say, because the FCA is the government's primary tool for combatting fraud. (*Id.* at 17.)

Relators point, in particular, to 42 U.S.C. § 18033(a)(6)(A). That provision, titled, "Application of the False Claims Act," states:

> Payments made by, through, or in connection with an Exchange are subject to the False Claims Act (31 U.S.C. 3729 et seq.) if those payments include any Federal funds. Compliance with the requirements of this Act concerning eligibility for a health insurance issuer to participate in the Exchange shall be a material condition of an issuer's entitlement to receive payments, including payments of premium tax credits and cost-sharing reductions, through the Exchange.

Because the ACA itself provides that federal funds paid through an Exchange under the ACA shall be "subject to the False Claims Act," Relators' argument continues, "[t]he filed rate doctrine simply cannot be harmonized with Section 18033(a)(6)(A)." (Relators' Opp'n to Sentara 15.) At the motions hearing, Relators' counsel argued that "[t]he False Claims Act

21

cannot be harmonized with the filed rate doctrine when the government is seeking to obtain federal funds that have been paid out through an Exchange."  (Hr'g Tr. 51–52, Dkt. No. 176.)

The court has carefully considered Relators' contentions, but it finds them unpersuasive. As for their reliance on § 18033(a)(6)(A), it is unclear to the court the precise meaning of the second portion of that provision.  Indeed, at least one commentator, although describing this language as "entirely unclear," determined that this provision appears to simply reaffirm that federal payments made under the ACA are not exempt from the FCA merely because they get funneled through a *non-federal* intermediary, i.e., an Exchange.  Christopher R.J. Pace, *The ACA's Muddled Application of the FCA to Health-Insurance Exchanges*, 12 Health Law Lit. 2 (2015).  That is a far different interpretation than Relators'.

More problematic for Relators, though, is that neither that specific provision nor the ACA generally refers to the filed-rate doctrine at all.  And a court may only find intent to override the doctrine when Congress clearly expresses it.  *Hui v. Castaneda*, 559 U.S. 799, 800 (2010) ("Repeals by implication are not favored and will not be presumed absent a clear and manifest legislative intent to repeal.").

This principle was applied in *Square D* to conclude that the filed-rate doctrine was not repealed or overridden by a statute.  The *Square D* Court noted that Congress—as early as 1980—was "fully cognizant" of the filed-rate doctrine and did not see fit to change it when amending the antitrust law at issue in the *Square D* case.  476 U.S. at 420.  From this, the Court reasoned that the lack of a "specific statutory provision or legislative history indicating a specific congressional intention to overturn the longstanding *Keogh* construction" meant the doctrine remained applicable.  *Id.*  "[H]armony with the general legislative purpose is inadequate for that formidable task."  *Id.*

22

The same is true here.  The court sees no clear or manifest legislative intent to repeal the filed-rate doctrine in § 18033(a)(6)(A) or elsewhere in the ACA.  As all parties agree, some payments made under the ACA are subject to the FCA, as the statute states.  But that does not mean that the filed-rate doctrine might not bar *some* claims under the FCA.  Put differently, the court is not persuaded by Relators' argument that applying the filed-rate doctrine in this case "would eviscerate Congress's intent."  (Relators' Opp'n to Sentara 15.)

Indeed, Relators' suggestion that the FCA would not apply at all to the ACA if the filed-rate doctrine could bar claims goes too far.  The court can envision several factual scenarios in which the FCA might apply without implicating the filed-rate doctrine.  One is the precise situation in *Falsetti*, in which an insurer is paid by the federal government for services not actually provided.  That could give rise to an FCA claim without ever implicating the rates themselves.  Further, as Defendants note, the ACA is *consistent* with the filed-rate doctrine in that the ACA expressly delegates rate-approval authority to regulatory agencies.

Relators' attempts to rely on caselaw for the proposition that the filed-rate doctrine is inapplicable to cases involving an ACA Exchange are also unpersuasive.  At argument, Relators' counsel pointed to the Third Circuit's decision in *Alston v. Countrywide Financial Corp.*, 585 F.3d 753 (3d Cir. 2009), and its proclamation that application of the filed-rate doctrine in the case before it "would effectively be excluding [purchase mortgage insurance] from the reach of RESPA, a result plainly unintended by Congress."  *Id.* at 764.  But *Alston* cannot bear the weight Relators attempt to assign it.  Most notably, it suffers from the same infirmity as many other cases relied upon by Relators—the plaintiffs there were not challenging the amount of the approved rates.

The plaintiffs in *Alston* brought claims under the Real Estate Settlement Procedures Act of 1974, alleging that their private mortgage insurance premiums, which were rates approved by a state agency, were channeled and paid to other service providers; "essentially, a kickback scheme." 585 F.3d at 755. In concluding that the filed-rate doctrine did not bar these claims, the *Alston* court noted that if the plaintiffs were suing under RESPA and alleging "that the price they paid their settlement services was unfair," the filed-rate doctrine would bar the suit. *Id.* at 764 (citation omitted). And it distinguished a case in which the filed-rate doctrine was applied because the plaintiffs claimed that "hazard insurance premiums were excessive" in addition to being "unlawful compensation in the form of kickbacks." *Id.* at 764 n.13 (discussing *Stevens v. Union Planters Corp.*, No. 00-cv-1695, 2000 WL 33128256 (E.D. Pa. Aug. 22, 2000)). Indeed, the *Stevens* case squarely held that the robust regulatory system governing the hazard insurance rates meant that the insurance premium was "conclusively presumed reasonable under the filed rate doctrine" and "must be deemed reasonably related to the value of the insurance coverage." 2000 WL 33128256, at *3.

Unlike in *Stevens*, the claims in *Alston* did not challenge the amount of the rates; they simply complained that the service providers were violating RESPA by using kickbacks at all. Because plaintiffs were challenging only the commission of conduct proscribed by statute and not the rates themselves, the doctrine did not bar their claims. *Id.* at 764 n.13. The case at bar more closely resembles *Stevens* than *Alston* because Relators' claims are challenging Defendants' premiums themselves as excessive and unreasonable.

In attempting to bolster their position with other case law, Relators point out that "there are no cases that have applied the filed-rate doctrine to bar claims relating to Exchange plans under the ACA, even outside the context of the FCA." (Relators' Opp'n to Milliman 16 n.3

24

(collecting cases that have declined to apply the filed-rate doctrine to the ACA).)  But all four

cases Relators cite in that footnote are inapposite.  In three of them, the courts expressly noted

that the plaintiffs' claims were not challenging rates and would not result in a judicial

determination of the premiums' reasonableness; some also analyzed the question under a state

filed-rate doctrine, rather than the federal doctrine.  *Blue Cross Blue Shield Healthcare Plan of*

*Georgia, Inc. v. Kirby*, 869 S.E.2d 173, 176 (Ga. Ct. App. 2022); *Duff v. Centene Corp.*, 565 F.

Supp. 3d 1004, 1014 (S.D. Ohio 2021) (Ohio law); *Harvey v. Centene Mgmt. Co. LLC*, 357 F.

Supp. 3d 1073, 1083–84 (E.D. Wash. 2018) (Washington law).  In the fourth case, the court gave

a variety of reasons for not applying it, most of them procedural, and it denied the motion

"without prejudice to the defendant's ability to assert the doctrine as a defense and have the court

consider its applicability in a more appropriate procedural context."  *Brown v. Hartford*

*Healthcare Corp.*, No. X03-CV-22-6152239-S, 2023 WL 7150051, at *15 (Conn. Super. Ct.

Oct. 26, 2023).  These cases do not create—or support—a blanket rule that the filed-rate doctrine

does not apply to claims relating to Exchanges under the ACA.

Because the ACA itself does not expressly override the filed-rate doctrine, and because

Relators have not cited any cases prohibiting applying the filed-rate doctrine in the context of the

ACA, the court will not impose such a prohibition in this case.

> **4. The filed-rate doctrine precludes not just certain remedies, but any claim
> requiring a determination that a rate is unreasonable, and the nonjusticiability
> rationale supports the doctrine's application here.**

Relators next insist that the filed-rate doctrine only prevents certain claims for damages

and not entire claims.  Specifically, they posit that it only precludes a damages recovery (not

injunctive relief), and only where the damages calculation itself will necessarily require the court

to determine what a reasonable rate would have been.  (Relators Opp'n to Milliman 17.)  Under

25

this theory, the doctrine does not apply where a claim does not require the court to impose or set a different rate (or would not entitle a ratepayer to a different rate).  (Relators' Opp'n to Sentara 16.)

In conjunction with this argument, Relators submit that some of the damages available under the FCA, including treble damages and civil penalties (sought in each count, FAC ¶¶ 222, 228, 234), could be determined without the court ever determining what a reasonable rate would be.  (*Id.* at 16–17.)  They also point to law indicating there are multiple possible types of damages in an FCA case, including damages that could include "benefit of the bargain" or "disgorgement."  (*Id.*)  In their FAC, Relators first pled damages in the total amount that the United States paid, stating that the rate filing induced the government to allow Optima to participate in the Exchange and thus every payment for every claim should be treated as damages.  (FAC ¶¶ 204–05.)  Under this theory, it appears that the damages sought are a full refund to the United States.  And Relators argue that at least this first category of damages would not require the court to "precisely assess rates" to find in their favor.  (Relators' Opp'n to Sentara 10.)

The second measure of damages, which Relators pled in the alternative, is the difference between what the U.S. paid because of the false statements and what it would or should have paid absent the false statements.  (*Id.* ¶ 206.)

While Relators are correct that the first of these might not require a precise determination of the rate that would be reasonable, that fact alone does not save their claims.[10]  Either type of damages can only be awarded if the court first finds that the rates approved by BOI were unreasonable because of the false representations.  Thus, the court will have to second-guess BOI

---

[10]  The court need not reach the issue, but the second measure seems to be the more accurate measure of damages where the claim is that rates were inflated based on fraud.

and find that its approved rates were unreasonable for Relators to succeed.  Put differently, to even find a violation of the FCA, the court would have to conclude that the rates approved by BOI were improperly inflated based on defendants' misrepresentations.  That implicates the core of the nonjusticiability rationale.  And most case law holds that the filed-rate doctrine prohibits this.

Relators' general premise finds some support in *Advamtel, LLC v. AT & T Corp.*, 118 F. Supp. 2d 680, 684–86 (E.D. Va. 2000).  There, the court reasoned that the "filed-rate doctrine applies only where the policy of [price] nondiscrimination in rates is implicated.  In other words, deviations from the [approved rate] that do not result in rate discrimination are not barred by the filed-rate doctrine." *Id.* at 684–86 (citations omitted).

*Murray* also offers support, in that the court allowed the relators to pursue some damages, but not others, under the FCA.  *Murray* allowed certain damages claims "as long as [the penalty] is not based upon any consideration of the actual damages suffered by the Government."  No. 94-6059, at 6.  That portion of *Murray* supports Relators' position that the doctrine is a damages remedy and bars certain classes of damages, but not all of them.

But to the extent that either *Advamtel* or *Murray* would allow a claim that would require the court to determine that a specific rate was unreasonable, they are outliers.  Even if the damages sought would not discriminate between ratepayers or require the court to retroactively set a different rate, awarding damages would still violate the nonjusticiability principle, which is the other important principle underlying the doctrine.

The nonjusticiability rationale demands an "expansive reach" in applying the filed-rate doctrine. *George E. Warren LLC v. Colonial Pipeline*, 50 F.4th 391, 395 (3d Cir. 2022).  And it

"prevents more than judicial rate-setting; it precludes any judicial action which undermines agency rate-making authority." *Marcus v. AT&T Corp.*, 138 F.3d 46, 61 (2d Cir. 1988).

Indeed, a recent Fifth Circuit case expressly rejected the same argument Relators espouse here. *Shannon v. Allstate*, No. 24-50836, 2026 WL 675629 (5th Cir. 2026).[11] The court in *Shannon* concluded that the filed-rate doctrine barred plaintiffs' claims that an insurance company violated the Texas Insurance Code by charging longstanding customers higher premiums than new customers for the same coverage. Plaintiffs argued that they were not challenging the reasonableness of rates, but the "discriminatory retention model." *Id.* at *2. In rejecting that argument, the court concluded that the claims implicated the validity of the rates and that the doctrine precluded the courts from "second guessing the [state agency's] authority over insurance ratemaking." *Id.* at *3.

The *Shannon* court reasoned:

> [A] key principle underlying the [filed-rate] doctrine is nonjusticiability. *Marcus v. AT&T Corp.*, 138 F.3d 46, 61 (2d Cir. 1998) (nonjusticiability is implicated because "[t]he filed rate doctrine prevents more than judicial rate-setting; it precludes any judicial action which undermines agency rate-making authority"). Thus, even claims nominally focused on services or billing are barred if damages would require a court to evaluate the reasonableness of filed rates. *AT&T Co. v. Cent. Office Tel., Inc.*, 524 U.S. 214, 223 (1998).

2026 WL 675629, at *2. As the *Shannon* court summarized: "At bottom, the filed rate doctrine prohibits judicial rate making or second-guessing the regulator's authority over insurance ratemaking . . . ." *Id.* at *3.

---

[11] *Shannon* was determined at the summary-judgment stage, but its reasoning nonetheless supports dismissal here.

Similarly, the Third Circuit explained in *McCray v. Fidelity National Title Insurance Co.*,

682 F.3d 229 (3d Cir. 2012):

> The "nonjusticiability strand" [of the filed-rate doctrine] recognizes that "(1) legislatively appointed regulatory bodies have institutional competence to address rate-making issues; (2) courts lack the competence to set . . . rates; and (3) the interference of courts in the rate-making process would subvert the authority of rate-setting bodies and undermine the regulatory regime." *Sun City Taxpayers' Assoc. v. Citizens Utils. Co.*, 45 F.3d 58, 62 (2d Cir. 1995).

*Id.* at 242.  In concluding that the nonjusticiability strand supported applying the filed-rate

doctrine in that case, the court noted first that any calculation of damages would require the

district court to calculate the proper or legal rate.  *Id.*  But it added that the district court's

interference in the rate-making process would "subvert the authority" of the state agency by

second-guessing its rate determination, which also implicated the nonjusticiability strand.  *Id.*

The Second Circuit also rejected a similar argument in *Wegoland*.  There, as here, the

plaintiffs asserted fraud on the rate-setting agency itself, and they contended that courts would

not be required to determine a "reasonable" rate but would only have to decide "what damages

arose from the fraud."  27 F.3d at 21.  As that court reasoned, however, "the two are hopelessly

intertwined."  *Id.*  "The fact that the remedy sought can be characterized as damages for fraud

does not negate the fact that the court would be determining the reasonableness of rates[.]"  *Id.*

(citation omitted); *see also McCray*, 682 F.3d at 235 n.5 (explaining that the doctrine bars any

forms of relief that "seek[] to prevent the defendants from relying on the filed rate"); *accord*

*Shannon*, 2026 WL 675629, at *2 ("[E]ven claims nominally focused on services or billing are

barred if damages would require a court to evaluate the reasonableness of filed rates."); *Katz v.*

*Fid. Nat. Title Ins. Co.*, 685 F.3d 588, 599 n.6 (6th Cir. 2012) (explaining that injunctive relief is

barred if it is "no more than a request for a different rate-making decision"); *Wah Chang*, 507

29

F.3d at 1225–26 (stating the doctrine bars all types of remedies that "necessarily hinge on a claim that [an] approved rate was too high"); *Breiding v. Eversource Energy*, 344 F. Supp. 3d 433, 450 (D. Mass. 2018) (denying equitable relief because it required the court "to determine the reasonableness of" filed rates), *aff'd*, 939 F.3d 47 (1st Cir. 2019).

These principles from these courts of appeals cases compel a similar result as in *Shannon* and *Wegoland*. Based on the allegations in the FAC, the court cannot agree that there are claims or remedies that would not require the court to evaluate the reasonableness of the BOI-approved rates. To find that fraud was committed, the court must find that the premium rates approved by BOI and CMS were unreasonable. The filed-rate doctrine prohibits it from doing so. *See Shannon*, 2026 WL 675629, at *3; *Wegoland*, 27 F.3d at 21.

### 5. There is not a fraud exception to the filed-rate doctrine.

Relators' final attempt to avoid application of the filed-rate doctrine focuses on the fact that their claims involve misrepresentations directed toward the rate-setting entity, essentially suggesting that there is a type of "fraud exception" to the doctrine. This argument is unpersuasive.

First, and as a general matter, both the Supreme Court and the Fourth Circuit have held that misrepresentations or fraudulent conduct by a defendant can be barred by the filed-rate doctrine. *See Am. Tel. & Tel. Co.*, 524 U.S. 214, 222 (1998) (reasoning that the doctrine applies regardless of the carrier's motive and "even if a carrier intentionally misrepresents its rate and a customer relies on the misrepresentation"); *Marco Supply Co. v. AT & T Commc'ns, Inc.*, 875 F.2d 434, 436 (4th Cir. 1989) (holding the doctrine precluded relief against a carrier even if the carrier's "representation as to applicable rates is fraudulent").

Other circuits agree. *Leo v. Nationstar Mortg. LLC*, 964 F.3d 213, 216–17 (3d Cir. 2020) (reaffirming that there is no fraud exception to the filed-rate doctrine and collecting authority); *Coll v. First Am. Title Ins. Co.*, 642 F.3d 876, 888 n.10 (10th Cir. 2011) (collecting authority for the proposition that there is no fraud exception); *Wegoland*, 27 F.3d at 22 ("[A] fraud exception to the filed rate doctrine is both contrary to guiding Supreme Court precedent and important regulatory policies."); *see also id.* at 20 (emphasizing that apart from one ruling that was unanimously overturned en banc, "every court that has considered the plaintiffs' argument has rejected the notion that there is a fraud exception to the filed rate doctrine"); *cf. Carlin v. DairyAmerica, Inc.*, 705 F.3d 856, 869 (9th Cir. 2013) (recognizing that application of the doctrine is not determined by "the culpability of the defendant's conduct" or "the nature of the cause of action," but is to be applied strictly whenever the doctrine's underlying purposes are implicated (quoting *Ice Cream Liquidation, Inc. v. Land O'Lakes, Inc.*, 253 F. Supp. 2d 262, 275 (D. Conn. 2003))).

Further, the doctrine is not limited to cases involving misrepresentations about the actual rate to others, but it also applies in cases involving misrepresentations to the agency that was setting the rates. *See Leo*, 964 F.3d at 214 (noting that the doctrine has resulted in dismissals "even when [an] insurance company 'defraud[s] an administrative agency to obtain approval of a filed rate'" (quoting *Taffet v. S. Co.*, 967 F.2d 1483, 1494–95 (11th Cir. 1992) (en banc))); *Lifeschulz Fast Freight, Inc. v. Consol. Freightways Corp.*, 805 F. Supp. 1277, 1295 (D.S.C. 1992) (reasoning that "even when a rate is allegedly fraudulently obtained, the filed rate doctrine applies"), *aff'd*, 998 F.2d 1009 (4th Cir. 1993). And, in a case with factual allegations very similar to those here, *Flint v. MetLife Insurance Co.*, 460 F. App'x 483, 485–86 (6th Cir. 2011), the Sixth Circuit affirmed the dismissal of claims brought by an insured that MetLife and

31

Milliman provided inaccurate and misleading information to a state department of insurance during the rate-making process to secure an improper rate increase.

Based on this abundance of authority, the court cannot conclude that the filed-rate doctrine in inapplicable to Relators' claims—which are obvious challenges to an approved rate— merely because Relators have alleged fraudulent conduct or misrepresentations in the setting of the rate.

### III.  CONCLUSION

The court recognizes that the filed-rate doctrine works a harsh result in this case.  *Cf. Am. Tel. & Tel.*, 524 U.S. at 223 (acknowledging that the doctrine "may seem harsh in some circumstances").  But it is a result that the law compels, even if the law is not entirely settled as to every issue.  Because the filed-rate doctrine applies and bars Relators' claims as a matter of law, the court will grant both motions to dismiss with prejudice.  The court also will deny the motions to strike as moot.

An appropriate order will be entered.

Entered: July 31, 2026.

*/s/ Elizabeth K. Dillon*
Elizabeth K. Dillon
Chief United States District Judge